**CLAUDIA M. QUINTANA**
City Attorney, SBN 178613
**BY:  KATELYN M. KNIGHT**
Deputy City Attorney, SBN 264573
**TIMOTHY R. SMYTH**
Deputy City Attorney, SBN 258661
**CITY OF VALLEJO**, City Hall
555 Santa Clara Street, P.O. Box 3068
Vallejo, CA  94590
Tel:    (707) 648-4545
Fax:    (707) 648-4687
Email: katelyn.knight@cityofvallejo.net
Email: timothy.smyth@cityofvallejo.net

*Attorneys for Defendants CITY OF VALLEJO and ZACH JACOBSEN*

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| ANNICE EVANS, individually and as Successor in Interest to Decedent ANGEL RAMOS; DANTE RAMOS, in his individual capacity; PHILLIP WILSON-VAUGHN, in his individual capacity; LEANN SANCHEZ, in her individual capacity; DARCEL LEWIS, in his individual capacity; D.W., by and through his Guardian Ad Litem, CARITA WILSON; and ALICIA SADDLER, individually and as Guardian Ad Litem for minor G.W., | Case No: 2:17-cv-01619-TLN-AC |
| | **DECLARATION OF KATELYN M. KNIGHT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT** |
|          Plaintiffs,<br>     vs. | Date:    May 30, 2019<br>Time:    2:00 p.m.<br>Crtrm:  2 |
| CITY OF VALLEJO; a municipal corporation; ZACK JACOBSEN, Police Officer for the City of Vallejo; and DOES 1-50, individually and in their official capacities as Police Officers for the City of Vallejo, inclusive, | |
|          Defendants. | |

I, Katelyn M. Knight, declare as follows:

1.      I am an attorney-at-law licensed to practice in the State of California and I am a Deputy City Attorney in the Vallejo City Attorney's Office.  I am the attorney responsible for handling the defense of this matter on behalf of the City of Vallejo.  I have personal knowledge of the matters set forth in this Declaration, except where stated on information and belief, and could and would competently testify to them under oath if called as a witness.

1      2.      Attached hereto as Exhibit A is a true and correct copy of the First Amended

2  Complaint filed in this action.

3      3.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the

4  deposition of Officer Zach Jacobsen.  A true and correct copy of the complete transcript is

5  lodged with the Court.

6      4.       Attached hereto as Exhibit C is a true and correct copy of excerpts from the

7  deposition of Officer Matthew Samida.  A true and correct copy of the complete transcript is

8  lodged with the Court.

9      5.      Attached hereto as Exhibit D is a true and correct copy of the expert report of Dr.

10  Durand Begault disclosed in this action.  True and correct copies of the enhanced audio files

11  prepared by Dr. Begault of the radio traffic and a portion of Officer Murphy's body camera

12  footage are lodged with the Court.

13      6.      Crime Analyst and Vallejo Police Department custodian of records Andrew Bates

14  provided me with a true and correct copy the video interview of minor G.W. pertaining to the

15  incident.  Attached hereto as Exhibit E is a true and correct copy of a certified transcript of that

16  interview.

17      7.      Attached hereto as Exhibit F is a true and correct copy of excerpts from the

18  deposition of DeShon Wilson.  A true and correct copy of the complete transcript is lodged with

19  the Court.

20      8.      Attached hereto as Exhibit G is a true and correct copy of the original Complaint

21  filed in this action.

22      9.      Plaintiffs DeShon Wilson, Alicia Saddler, G.W., Dante Ramos, Darcel Lewis,

23  Leann Sanchez, and Phillip Wilson voluntarily dismissed their claims.

24      10.    Attached hereto as Exhibit H is a true and correct copy of Plaintiff Annice Evans'

25  responses to written interrogatories.

26      11.    I reviewed the docket related to this action and did not see an affidavit in

27  compliance with California Code of Civil Procedure § 377.32 filed with the Court.  I am not

28  aware of a compliant affidavit being filed by Plaintiff prior to commencement of this action.

1

Executed on this 2nd day of May, 2019, at Vallejo, California.

2

I declare under penalty of perjury under the laws of the State of California and the United

3

States that the foregoing is true and correct.

4

5

*/s/ Katelyn M. Knight*

6

_____

KATELYN M. KNIGHT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**JOHN L. BURRIS, Esq. SBN 69888**
**BEN NISENBAUM, Esq. SBN 222173**
**MELISSA C. NOLD, Esq. SBN 301378**
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone:  (510) 839-5200
Facsimile:  (510) 839-3882
john.burris@johnburrislaw.com
bnisenbaum@gmail.com
melissa.nold@johnburrislaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNICE EVANS, individually and as Successor in Interest to Decedent ANGEL RAMOS; and D.W., by and through his Guardian Ad Litem, CARITA WILSON<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF VALLEJO; a municipal corporation; ZACK JACOBSEN, Police Officer for the City of Vallejo; and DOES 1-50, individually and in their official capacities as Police Officers for the City of Vallejo, inclusive.<br><br>Defendants. | CASE NO.:  2:17-cv-01619-TLN-AC<br><br>FIRST AMENDED COMPLAINT |

## **INTRODUCTION**

1.  In the late-night hours of January 23, 2017, Alicia Saddler, Phillip Wilson-Vaughn, LeAnn Sanchez, Dante Ramos, Darcel Lewis, minors G.W., minor Plaintiff D.W., and Decedent Angel Ramos were at the home of Plaintiff Annice Evans, having a family

gathering. A dispute erupted amongst the family members, prompting someone to call Vallejo Police Department. When Defendant Zach Jacobsen and other Vallejo Police Officers arrived, the family members were still arguing, but no one was in want or need of police assistance. Multiple Vallejo Police Officers came through the backyard and up the stairs leading to the dimly lit second floor deck, where Alicia Saddler, Phillip Wilson-Vaughn, Decedent Angel Ramos and D.W. were located. Just inside the back door were LeAnn Sanchez, G.W., and Dante Ramos. Darcel Lewis was located on the ground floor.

2. Without cause or warning, yet-to-be-identified Vallejo Police Officers tased Saddler, Wilson-Vaughn and D.W., and opened fire on Angel Ramos. Decedent Angel Ramos, an unarmed man, was shot several times in the chest and torso and died on the scene. Decedent Angel Ramos' dying body fell on top of D.W. Then, to add insult to egregious injury, Alicia Saddler was arrested as her brother lay dying next to her. Tellingly Ms. Saddler was never charged with any crime. All of the family members were taken to the Vallejo Police Department and treated like criminals, until finally being released hours later.

3. In a press release, the Vallejo Police Department claimed that Decedent Angel Ramos was armed with a knife and actively trying to stab D.W., when Defendant Jacobsen opened fire. However, Plaintiff D.W., the purported victim, vehemently denies the City's outright lies.

4. According to Vallejo Police Department officials, Defendant Vallejo Police Officer Zach Jacobsen was standing on the ground level, and shot up at Decedent Angel Ramos, who was standing on the dimly lit second floor deck. Despite Defendant Jacobsen's poor vantage point behind a tree, limited view of the dimly lit second floor deck, and no deadly threat, he inexplicably opened fire, just feet away from small children and at least ten (10) people in harm's way.

5.   This action seeks to recover damages for the violation of Mr. Ramos' rights, the rights of his
mother, Ms. Annice Evans. Mr. Ramos never had any children and his father predeceased him
making Ms. Evans his only surviving parent and heir.

**JURISDICTION**

6.   This action arises under Title 42 of the United States Code, Section 1983.  Title 28 of the United
States Code, Sections 1331 and 1343 confers jurisdiction upon this Court.  The unlawful acts
and practices alleged herein occurred in Vallejo, California, which is within this judicial district.
Title 28 United States Code Section 1391(b) confers venue upon this Court.

**PARTIES**

7.   Plaintiff ANNICE EVANS (hereinafter referred to as "EVANS") is at all times mentioned
herein a natural person.  Plaintiff is acting in her individual capacity and as Successor-in-
interest and biological mother of Decedent, ANGEL RAMOS. Plaintiff EVANS is a person
with standing to bring the action pursuant to California Code of Civil Procedure 377.30 and
377.60 and California Probate Code 6402.  Decedent, ANGEL RAMOS, was not married at
the time of his death, did not have children and died without leaving a will. Decedent RAMOS'
biological father is deceased.

8.   Plaintiff D.W. (hereinafter referred to as "D.W.") is at all times mentioned herein a minor child.
D.W. sues in his individual capacity, by through his Guardian Ad Litem CARITA WILSON.

9.   Defendant CITY OF VALLEJO (hereinafter referred to as "CITY") is and at all times
mentioned herein a municipal corporation, duly authorized to operate under the laws of the
State of California.  Under its supervision, the CITY OF VALLEJO operates the Vallejo
Police Department ("VPD").

10. Defendant ZACH JACOBSEN, (hereinafter "JACOBSEN") is and at all times mentioned herein a natural person. He is being sued in his individual and official capacity as a police officer for the City of Vallejo.

11. Plaintiffs are ignorant of the true names and/or capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sue said defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs believe and allege that each of the DOE defendants is legally responsible and liable for the incident, injuries and damages hereinafter set forth. Each defendant proximately caused injuries and damages because of their negligence, breach of duty, negligent supervision, management or control, violation of public policy and/or use of excessive force. Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care or control or upon any other act or omission. Plaintiffs will ask leave to amend their complaint subject to further discovery.

12. In engaging in the conduct alleged herein, defendant police officers acted under the color of law and in the course and scope of their employment with VPD. In engaging in the conduct described herein, Defendant police officers exceeded the authority vested in them as police officers, under the United States and California Constitutions, and as employees of VPD.

13. For state law causes of action related to Federal claims, Plaintiffs are required to comply with Administrative claim filing requirements under California law. On April 25, 2017, Plaintiffs filed a Government Tort Claim with the VPD, notifying VPD of Plaintiff's claims for damages. Defendant did not accept nor reject Plaintiffs claims, however, the statutory waiting period expired on prior to the filing of the Complaint herein.

## STATEMENT OF FACTS

14. In the early morning hours of January 23th, 2017, Alicia Saddler, Dante Ramos, Leann Sanchez, Phillip Wilson-Vaughn, Darcel Lewis, Plaintiff D.W. and G.W., were having a family gathering, located at 1722 Sacramento Street, in Vallejo, California. The family was involved in family argument, prompting someone to call the police.

15. The Vallejo Police Department dispatched officers to the home. When Defendant Zach Jacobsen and other City of Vallejo Police Officers arrived, the family members were still arguing, but no one was in need or want of police assistance and all of the family members were unarmed.

16. Several officers came through the back yard and up the stairs leading to the second floor deck area where Alicia Saddler, Philip Wilson-Vaughn, D.W., and Decedent Angel Ramos were located. Dante Ramos, G.W., and LeAnn Sanchez were standing in the back doorway, directly behind Angel Ramos. Darcel Lewis was on the ground floor facing Defendant Jacobsen.

17. Without cause or warning, yet-to-be-identified Vallejo Police Officers tased Alicia Saddler, Philip Wilson-Vaughn and D.W. and commanded them to lay on the ground. Angel Ramos was standing on the deck, unarmed and directly next to D.W.

18. According to officials at the Vallejo Police Department, Defendant Jacobsen was standing on the ground level, while the incident was occuring above him on the second floor deck. Despite Officer Jacobsen's poor vantage point and dimly lit, limited view of the scene from behind a tree, he inexplicably and recklessly shot up into the deck, which was occupied by at least 10 (ten) people, including a small child.

19. Angel Ramos was shot in the chest multiple times, while unarmed. Angel Ramos' dying body fell onto D.W. Angel Ramos died from mulitple gunshot wounds, leaving behind a grieving mother and numerous traumatized siblings.

20. After the shooting, the Vallejo Police Department issued a press release claiming Angel Ramos was armed with a knife and in the process of trying to stab D.W., at the moment they shot him. However, the purported victim, D.W., steadfastly denies the offical version of the events and reports that Angel Ramos was clearly and obviously unarmed when Officer Jacobsen inexplicably opened fire. The CITY's official versions of the event are belied by the inciden scene, physical evidence, placement of Decedent's injury and physics.

21. While numerous Defendant Officers were wearing lapel cameras, inexplicably none of the lapel cameras captured the shooting. Officer Jacobsen's lapel camera was suspiciously not turned on during this incident.

22. In the months following the shooting, the family of Angel Ramos has been harassed by yet-to-be-identified members of the Vallejo Police Department, including officers stopping in front of the family home on multiple occasions shining their flood lights into the windows. During a May 2017 incident, a man who claimed to be a Vallejo Police Officer accosted Plaintiff Saddler at a nightclub in Suisun. The man warned Ms. Saddler that she and her family needed to quit pursuing legal actions related to the death of Angel Ramos

23. Plaintiffs are informed and believe and thereon allege that VPD and DOES 26-50, inclusive, breached their duty of care to the public in that they have failed to discipline Defendant Officers JACOBSEN, and DOES 1-25 inclusive, for their respective misconduct and involvement in the incident described herein. Their failure to discipline Defendant Officer JACOBSEN and DOES 1-25 inclusive, demonstrates the existence of an entrenched culture,

policy or practice of promoting, tolerating and/or ratifying with deliberate indifference, the use of excessive and/or deadly force and the fabrication of official reports to cover up defendant JACOBSEN, and DOES 1-25 inclusive, misconduct.

24. Plaintiffs are informed, believe and thereon allege that the CITY is on notice of Defendant JACOBSEN's history of excessive force, evidenced by his pending Federal litigation related to another excessive force incident, wherein a mentally ill person was abused and injured. (See Brooks v. City of Vallejo; 2:16-cv-0237).

25. Plaintiffs are informed, believes and thereon alleges that the VALLEJO Police Department has a long history of failing to discipline officers involved in misconduct; excessive force; and unwarranted shooting deaths, and not only fails to discipline said officers, but has actually promoted one of these said officers, despite being accused of multiple gross constitutional violations, including excessive force and multiple wrongful deaths.

26. Plaintiffs are informed, believes and thereon alleges that CITY and DOES 26-50 were aware of the constitutional defects in their training, discipline and response to citizen complaints.

27. Plaintiffs are informed, believes and thereon alleges that members of the Vallejo Department, including, but not limited to Defendant Officers JACOBSEN and DOES 1-25 inclusive and/or each of them, have individually and/or while acting in concert with one another used excessive, arbitrary and/or unreasonable force against Decedent and D.W.

28. Plaintiffs are further informed, believe and therein allege that as a matter of official policy – rooted in an entrenched posture of deliberate indifference to the constitutional rights of persons who live, work or visit the City of Vallejo, VPD has allowed persons to be abused by its Police Officers including Defendant Officers JACOBSEN and DOES 1-25 and/or each of them, individually and/or while acting in concert with one another.

29. Plaintiff are informed, believe and therein allege that VPD Police Officers exhibit a pattern and practice of using excessive and/or deadly force against citizens. In each and every one of the shooting cases wherein a person died as a result of the Officers' use of deadly force, VPD has found the Officer used deadly force within policy even under the most questionable of circumstances. VPD's failure to discipline or retrain any of the involved Officers is evidence of an official policy, entrenched culture and posture of deliberate indifference toward protecting citizen's rights and the resulting deaths and injuries is a proximate result of VPD's failure to properly supervise its Police Officers and ratify their unconstitutional conduct.

30. Plaintiffs are informed, believe and therein allege that CITY knew, had reason to know by way of actual or constructive notice of the aforementioned policy, culture, pattern and/or practice and the complained of conduct and resultant injuries/violations.

31. Plaintiffs are ignorant of the true names and capacities of Defendants DOES 1 through 50, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs are informed, believes, and thereon alleges that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein. Plaintiffs will amend their complaint to state the names and capacities of DOES 1-50, inclusive, when they have been ascertained.

## DAMAGES

32. Plaintiffs were mentally, and emotionally injured and damaged as a proximate result of decedent's wrongful death, including but not limited to: Plaintiffs' loss of familial relations, decedent's society, comfort, protection, companionship, love, affection, solace, and moral support as a consequence of Defendants' violation of Plaintiff's federal civil rights under 42 U.S.C. §1983 and the Fourteenth Amendment.

33. Plaintiff D.W. was physically and emotionally injured as a result of being tased without cause.

34. Plaintiff EVANS is entitled to recover wrongful death damages pursuant to C.C.P. Sections 377.60 and 377.61 and Probate Code Section 6402(b).

35. Plaintiff EVANS, as Successor in interest to Angel Ramos is entitled to recover damages pursuant to the decedent's right of survivorship for the pain and suffering he endured as a result of the violation of his civil rights.

36. Plaintiffs found it necessary to engage the services of private counsel to vindicate the rights of decedent and plaintiff under the law.  Plaintiff is therefore entitled to an award of attorneys' fees and/or costs pursuant to statute(s) in the event that she is the prevailing parties in this action under 42 U.S.C. §§§§ 1983 and 1988.


**FIRST CAUSE OF ACTION**

**Violation of Fourth Amendment of the United States Constitution**
**(42 U.S.C. §1983)**
(Plaintiffs EVANS, as Successor-in-Interest to Decedent Angel Ramos; and D.W. v. Defendants JACOBSEN and DOES 1-25 inclusive)

37. Plaintiffs re-allege and incorporates by reference paragraphs 1 through 36 of this complaint.

38. Defendants' above-described conduct violated Plaintiff D.W.'s constitutional rights to be free from excessive and/or arbitrary and/or unreasonable use of force when Defendants tased Plaintiff without cause or warning. Defendants' unconstitutional conduct caused Plaintiff unwarranted pain and suffering.

39. Defendants' above-described conduct violated Decedent's right, as provided for under the Fourth Amendment to the United States Constitution, to be free from excessive and/or arbitrary and/or unreasonable use of deadly force against him.

40. Angel Ramos was forced to endure great conscious pain and suffering because of the

Defendants' conduct before his death;

41. Angel Ramos did not file a legal action before his death;

42. Plaintiff EVANS, is the sole successor in interest of Angel Ramos claims damages for the conscious pain and suffering incurred by Angel Ramos, as provided for under 42 U.S.C. §1983.

43. Defendants acted under color of law by shooting and killing decedent without lawful justification and subjecting decedent to excessive force thereby depriving the decedent of certain constitutionally protected rights, including, but not limited to:

      a. The right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the United States Constitution;

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

**(Violations of Plaintiff's Civil Rights to Familial Relationship)**
**(42 U.S.C. § 1983)**
(Plaintiff EVANS v. Defendants JACOBSEN and DOES 1-25 inclusive)

44. Plaintiff hereby re-alleges and incorporates by reference herein paragraphs 1 through 43 of this Complaint as though fully set forth;

45. Defendants, acting under color of state law, and without due process of law, deprived Plaintiffs of their right to a familial relationship by seizing Decedent by use of unreasonable, unjustified and deadly force and violence, causing injuries which resulted in Decedent's death, all without provocation and did attempt to conceal their extraordinary use of force and hide the true cause of Decedent's demise to deprive Plaintiff of her right to seek redress in violation of their rights, privileges, and immunities secured by the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

### (Monell – 42 U.S.C. section 1983)
(Plaintiff ANNICE EVANS, as Successor-in-Interest to Decedent Angel Ramos v. CITY and DOES 26-50)

46. Plaintiff hereby re-alleges and incorporates by reference herein paragraphs 1 through 45 of this Complaint.

47. Plaintiff is informed and believes and thereon alleges that high-ranking VPD officials, including high-ranking police supervisors and DOES 26 through 50, and/or each of them, knew and/or reasonably should have known about the repeated acts unconstitutional use of deadly force by VPD Officers.

48. Despite having such notice, Plaintiff is informed and believes and thereon alleges that CITY & DOES 26-50, and/or each of them, approved, ratified, condoned, encouraged, sought to cover up, and/or tacitly authorized the continuing pattern and practice of misconduct and/or civil rights violations by VPD which brought about Officers JACOBSEN, and DOES 1-25 unlawfully shooting Angel Ramos to death.

49. Plaintiff is further informed and believes and thereon alleges that as a result of the deliberate indifference, reckless and/or conscious disregard of the misconduct by Defendant Officers JACOBSEN, and DOES 1-25 and/or each of them, ratified and encouraged these officers to continue their course of misconduct.

50. Plaintiff further alleges that Defendants CITY and DOES 26-50

and/or each of them, were on notice of the Constitutional defects in their training of VPD police officers, including, but not limited to unlawfully using deadly force to make detentions and/or arrests.

51. Plaintiff is further informed and believes and thereon alleges that CITY and DOES 26-50 knew or should have known of Defendant JACOBSEN's and DOES 1-25's history of abuse, but failed to discipline and/or terminate and/or refrain from hiring them.

52. The aforementioned acts and/or omissions and/or deliberate indifference by high ranking officials, including high ranking CITY supervisors and DOES 26-50, and each of them resulted in the deprivation of Plaintiff and Decedent's constitutional rights including, but not limited to the right to not be deprived of life, liberty or property without due process of the law, as guaranteed by the Fourteenth Amendment to the United States Constitution and the right to be free from excessive force by police officers, as guaranteed by the Fourth Amendment to the United States Constitution.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## **FOURTH CAUSE OF ACTION**

**(Wrongful Death - Negligence)**
**(C.C.P. §377.60 and 377.61)**
(Plaintiff ANNICE EVANS, as Successor in interest to Angel Ramos
v. Defendants JACOBSEN and DOES 1-25 inclusive)

53. Plaintiff re-alleges and incorporates by reference herein paragraphs 1 through 52 of this Complaint, except for any and all allegations of intentional, malicious, extreme, outrageous, wanton, and oppressive conduct by defendants, and any and all allegations requesting punitive damages.

54. Defendants JACOBSEN and DOES 1-25 inclusive, by and through their respective agents and

employees, proximately caused the death of Decedent Angel Ramos as a result of their

negligent conduct and/or negligent failure to act as set-forth herein.

55. As an actual and proximate result of said defendants' negligence, and the death of decedent,

Plaintiff has sustained pecuniary loss along with the loss of comfort, society, and services of

their son in an amount according to proof at trial.

56. As a further actual and proximate result of said defendants' negligence, Plaintiff incurred

funeral and burial expenses, in an amount according to proof at trial.

57. Pursuant to California C.C.P. Sections 377.60 and 377.61, Plaintiff has brought this action,

and claims damages against said defendants for the wrongful death of decedent, and the

resulting injuries.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION

**(Violation of Right To Enjoy Civil Rights)**
**(Violation of CALIFORNIA CIVIL CODE §52.1)**
(Plaintiff ANNICE EVANS, as Successor in interest to Angel Ramos Against Defendants
JACOBSEN and DOES 1-25)

58. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 57 of this Complaint.

59. Defendants JACOBSEN and DOES 1-25's above-described conduct constituted interference,

and attempted interference, by threats, intimidation and coercion, with the Decedent Angel

Ramos' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the

United States and the State of California, in violation of California Civil Code §52.1.

WHEREFORE, Plaintiff pray for relief as hereinafter set forth.


## JURY DEMAND

60. Plaintiffs hereby demands a jury trial.

**PRAYER**

WHEREFORE, Plaintiffs pray for relief, as follows:

1. For general damages in a sum to be determined at trial;

2. For special damages, including but not limited to, past, present and/or future wage loss, income and support, medical expenses and other special damages in a sum to be determined according to proof;

3. For funeral and burial expenses according to proof;

4. For punitive damages and exemplary damages in amounts to be determined according to proof as to defendants JACOBSEN and DOES 1 through 25 and/or each of them;

5. Any and all permissible statutory damages;

6. For reasonable attorney's fees pursuant to 42 U.S.C. §1988; and

7. For cost of suit herein incurred.


Dated: September 13, 2018          THE LAW OFFICES OF JOHN L. BURRIS


                                    /s/ John L. Burris
                                    JOHN L. BURRIS
                                    BEN NISENBAUM
                                    MELISSA C. NOLD
                                    Attorneys for Plaintiffs

**EXHIBIT B**

DEPOSITION OF OFFICER ZACK JACOBSEN

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

--oOo--

ANNICE EVANS, individually and        )
as Successor in Interest to           )
Decedent ANGEL RAMOS; DANTE           )
RAMOS, in his individual              )
capacity; PHILLIP WILSON-VAUGHN,      )
in his individual capacity;           )
LEANN SANCHEZ, in her individual      )
capacity; DARCEL LEWIS, in his        )
individual capacity; D.W., by         )
and through his Guardian Ad           )
Litem, CARITA WILSON; and ALICIA      )
SADDLER, individually and as          )
Guardian Ad Litem for minor           )
G.W.,                                 )    Case No.:
                    Plaintiffs,       )    2:17-cv-01619-TLN-AC
vs.                                   )
                                      )
CITY OF VALLEJO; a municipal          )
corporation; ZACK JACOBSEN,           )
Police Officer for the City of        )
Vallejo; and DOES 1-50,               )
individually and in their             )
official capacities as Police         )
Officers for the City of              )
Vallejo, inclusive,                   )
                    Defendants.       )
_____)

DEPOSITION OF OFFICER ZACK JACOBSEN

THURSDAY, OCTOBER 11, 2018

REPORTED BY:  HEATHER M. LOFHOLM, CSR #11570

1

1      Q.   Please.  As I understand it, you say that you saw

2   a knife in Mr. Ramos's hand, and that's why you shot him,

3   correct?

4      A.   Yes, sir.

5      Q.   Describe the knife for me.

6      A.   At which point?  I saw Mr. Ramos with a knife on

7   two separate occasions.

8      Q.   Were they different knives?

9      A.   I don't know if they were different knives.

10     Q.   Okay.  The first occasion that you saw him with a

11  knife, describe the knife.

12     A.   The knife appeared to be an eight- to ten-inch

13  kitchen knife.  As I described it in my initial interview,

14  if you bought a set of kitchen knives it would be the

15  largest knife in the set is how I remember it.

16     Q.   When you say "eight- to ten-inch kitchen knife"

17  do you mean that the blade is eight to ten inches?

18     A.   Yes.

19     Q.   Or the entire thing?

20     A.   Yes, sir.

21     Q.   So eight to ten inches plus the blade -- I'm

22  sorry, plus the handle?

23     A.   I believe the blade was approximately eight to

24  ten inches long.

25     Q.   Okay.  And what color was it?

                                                              21

1    A.    The blade was silver.

2    Q.    And when did you see him?  Where was he when you

3  saw him holding that knife?

4    A.    He was inside what I believed to be the kitchen.

5    Q.    And you saw him through an open door that led out

6  to the deck?

7    A.    Yes, sir.

8    Q.    And did you see what he did with that knife?

9    A.    He had it above his shoulder with the handle of

10  the knife in his hand and the blade of the knife extending

11  out away from his pinky (indicating).

12    Q.    Over what period of time did you see him holding

13  that knife at that time?

14    A.    Do you mean how long?

15    Q.    Correct.  How long did that observation last of

16  him holding the knife?

17    A.    I would estimate somewhere around five seconds.

18    Q.    And during that five seconds was he holding it in

19  the same position, or was he doing something with his arm?

20    A.    I recall him being held back by someone.  He

21  appeared to be trying to get at a person that I could not

22  see.  They were out of my view.  It would have been on the

23  north side of the kitchen, and he appeared to be extremely

24  angry, trying to get at someone (indicating).

25    Q.    Okay.  And my question, though, is what was he

                                                        22

1    doing with the arm that was holding the knife?  Was it in

2    the same position?  Was it in a stabbing motion?  What was

3    it doing (indicating)?

4        A.   As I recall, it was generally in the same

5    position.  I don't know that it was completely stable, but

6    generally in the same position as he was trying to move

7    forward (indicating).

8        Q.   And for the record, you've held your right arm --

9    that was in his right hand?

10       A.   Yes, sir.

11       Q.   And you held it with your -- and almost, I guess,

12   at a -- is that a 45-degree angle or 90-degree angle?

13   That's a right angle, so 90 degrees?

14            MS. KNIGHT:  Might be 85, I think.

15   BY MR. NISENBAUM:

16       Q.   So about an 85, 90-degree angle at the elbow,

17   correct?

18       A.   Yes, sir.

19       Q.   So that the fist is about almost ear height,

20   maybe a little bit above your ear, correct?

21       A.   Generally, yes, sir.

22       Q.   And with the -- where the blade would have been

23   facing towards the wrist, the bottom of the blade would be

24   lined up with the wrist basically, correct (indicating)?

25       A.   The blade just extended out and away from the

                                                              23

DEPOSITION OF OFFICER ZACK JACOBSEN

1    pinky (indicating).

2        Q.    Okay.

3        A.    So I don't know that it was parallel or ...

4        Q.    All right.  You said the blade was silver?

5        A.    Yes, sir.

6        Q.    And at that point in time did you hear Mr. Ramos

7    saying anything?

8        A.    No, not that I can recall.

9        Q.    Did you hear like the sounds of people saying

10   things?

11       A.    Yes.  At the time there was -- it sounded as

12   though everybody that I could see was screaming and

13   yelling, so there was a lot of screaming and yelling going

14   on.

15       Q.    Was it English, Spanish, combination?

16       A.    I believe it was all in English.  I don't recall

17   hearing any Spanish.

18       Q.    What did you hear being yelled?

19       A.    A lot of expletives, a lot of the word "fuck,"

20   but specifically there were too many voices yelling and

21   screaming to where I couldn't at this point distinctly

22   remember who was saying what.

23       Q.    Did Mr. Ramos appear to be injured at that time,

24   from what you could tell?

25       A.    Not that I could see.

                                                            24

1    Q.   Did you see anyone who appeared to be injured at
2  that time?
3    A.   Not that I could see.
4    Q.   Okay.  And then when you next saw Mr. Ramos --
5  well, strike that.
6         So you had an observation of about five seconds
7  of Mr. Ramos when he was inside the kitchen, correct?
8    A.   Roughly.
9    Q.   I understand.  I said "about."
10   A.   Yes, sir.
11   Q.   Okay.  And how did you stop observing him?  What
12 caused you to stop seeing him?
13   A.   The door shut to the deck.
14   Q.   When the door shut was the -- did he still have
15 that knife?
16   A.   I don't remember being able to see Mr. Ramos when
17 the door shut, and my attention was drawn at that point to
18 one of the subjects that was on the deck who was
19 subsequently tased.
20   Q.   Okay.  When you last recall seeing Mr. Ramos did
21 he still have the knife?
22   A.   Yes.
23   Q.   Was it still in roughly the same position?
24   A.   Yes.
25   Q.   Okay.  Now let's talk about the second time that

                                                            25

Barbara J.Butler & Associates - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA  95050 - (510) 83-BUTLER (2885) or (408) 248-BUTLER(2885)

DEPOSITION OF OFFICER ZACK JACOBSEN

```
 1    you saw the knife.  How much later was it after the door
 2    shut?
 3         A.   I believe it was about 12 seconds.
 4         Q.   Okay.
 5         A.   Because I have the timeline in my head of how the
 6    events transpired.  I'm just trying to figure out which
 7    point -- would it be better if I said the timeline that I
 8    have in my head?  I think that will assist.
 9         Q.   I think we'll get to that.  I'm just asking you
10    the time frame.  About how much later was it?  I know
11    things happened in between, of course.
12         A.   Right.
13         Q.   But, you know, your best estimate?
14         A.   I'm sorry.  Could you ask me the question again.
15         Q.   Sure.  From the point in time that the door shut
16    to when you next saw Mr. Ramos with the knife about how
17    much later was it?
18         A.   I'd say somewhere between 10 and 12 seconds.
19         Q.   Okay.  And how did you come to see him with a
20    knife again?
21         A.   The door to the kitchen opened, and Mr. Ramos
22    came out from the kitchen onto the deck.
23         Q.   And you were observing him from below the deck;
24    is that correct?
25         A.   Yes, sir.
```

26

```
 1      Q.   So the kitchen deck, is that on the second floor?

 2      A.   Yes, sir.

 3      Q.   So you were on the ground floor?

 4      A.   Yes, sir.

 5      Q.   All right.  So you were looking up?

 6      A.   Yes, sir.

 7      Q.   And can you describe the decking for me.

 8      A.   As I recall, it was a wood deck, possibly a wood

 9 deck painted white.  Appeared to be a wood deck.

10      Q.   And how big were the gaps between the planks of

11 wood that you were looking through?  Were you looking

12 through from underneath the deck or from the -- I don't

13 know, I guess the deck fencing?

14      A.   It would have been the railing and above the

15 railing.

16      Q.   Okay.  How tall -- strike that.

17           From the -- from your perspective on the ground,

18 let's say, from the top of your head where was the bottom

19 of the deck?  How far above it was you -- or how far above

20 you was it?

21      A.   How far above my head was the deck?

22      Q.   Bottom of the deck.

23      A.   Bottom of the deck?  Maybe four to six feet maybe

24 if the deck was -- I'm 5'5".  The deck was maybe somewhere

25 between 10 and 12 feet off the ground.
```

27

1      Q.   Okay.  Was the backyard on an incline or a

2   decline rather, or was it flat?

3      A.   I don't recall.

4      Q.   Okay.  You don't recall being on a significant

5   hillside?

6      A.   No, sir.

7      Q.   And you weren't under the deck?  You were a

8   distance from the deck, correct?

9      A.   Yes, sir.  There's a wooden fence that separates

10  the property line from the street and the sidewalk, and I

11  was on the outside of that fence.

12     Q.   Okay.  All right.  So how tall was that fence?

13     A.   Probably six feet, somewhere around there.

14     Q.   And what kind of fence is that?

15     A.   I believe it was just a wood fence.

16     Q.   And where were you?  Were you on a sidewalk?

17  Were you on the adjacent yard?

18     A.   There was a --

19          MS. KNIGHT:  I'm sorry.  Vague as to time.  Are

20  we still talking about the second --

21  BY MR. NISENBAUM:

22     Q.   When you saw him the second time.

23     A.   I believe it's gravel.  There's a gravel area on

24  the north side of the fence, and I was standing in that

25  gravel area.

28

DEPOSITION OF OFFICER ZACK JACOBSEN

1     A.   And not to that subject, so specifically the
2  events that led up to Officer Samida deploying his Taser I
3  don't know, but of those yelling and screaming out on the
4  deck it appeared as though that subject was being more
5  aggressive than everyone else.
6     Q.   More aggressive in what way?
7     A.   It appeared as though he wanted to get inside the
8  kitchen but was being held back by a heavy-set female.
9     Q.   Okay.  And how many other people were on the deck
10 apart from that subject prior to Mr. Ramos coming outside?
11    A.   I don't recall the exact number, but I think it
12 was somewhere around four, four or five people.
13    Q.   All right.  So did you have an understanding --
14 well, strike that.
15         Let me go back to your -- to the call.  How was
16 your attention directed to this incident?  Where were you?
17 A donut shop or something?
18    A.   A burger store.
19    Q.   Okay.  And was that on official duty or getting
20 something to eat?
21    A.   No, it was on a call for service.
22    Q.   I wasn't clear on that.  So what was that call?
23    A.   I don't remember.  I think it might have been a
24 suspicious person or some type of disturbance at Nation's.
25    Q.   Nation's.  That's it.  They sell pies there, too,

                                                          39

DEPOSITION OF OFFICER ZACK JACOBSEN

1    right?

2         A.    I hear they're pretty good.

3         Q.    There was one by my house when I was growing up.

4    It was in 1982.  Okay.  And what was the call that you

5    heard that pertained to this address?

6         A.    The call -- I'm going to say the call was toned

7    out, meaning that dispatch does an alert for priority one

8    calls, and so tone came out letting me know that a

9    priority one call was about to be dispatched, at which

10   point I heard dispatch say that a fight was taking place

11   at that address, where weapons were involved, possibly

12   sticks.

13        Q.    The weapons that were identified were identified

14   as possibly sticks?

15        A.    I believe that's what dispatch had said.

16        Q.    Okay.  And how far was the Nation's from the

17   address where the priority one call was about?

18        A.    I would say maybe somewhere between eight and

19   twelve blocks.

20        Q.    Is that half a mile, three quarters of a mile?

21        A.    I think half a mile might be safe to say, but

22   initially -- to clarify, initially the call came out at

23   Sacramento Street and Buckles Street, not at the residence

24   that Mr. Ramos was in.

25        Q.    Okay.  How far was that from the residence that

                                                              40

DEPOSITION OF OFFICER ZACK JACOBSEN

1      A.   Officer Samida.

2      Q.   How do you spell it?

3      A.   S-a-m-i-d-a.

4      Q.   And your understanding is that at least three

5   other officers were responding.  Did that include -- or

6   had indicated they would respond prior to you saying you

7   would respond?  Did that include Officer Samida?

8      A.   I'm sorry.  Could you say that question again.

9      Q.   I guess my question is when you heard that at

10  least three other officers were responding prior to you

11  saying you would respond, was that three other units or

12  three other officers?

13     A.   I don't know if they were two-man units or not.

14     Q.   Okay.

15     A.   I don't recall.

16     Q.   All right.  And then after you indicated you

17  would respond did you hear other officers saying they

18  would respond as well?

19     A.   I don't recall if I heard anybody after me.

20     Q.   Okay.  And how long did it take you to get to the

21  location?

22     A.   Which location?

23     Q.   I understand that it was dispatched at a

24  different location initially.

25     A.   Right.

46

DEPOSITION OF OFFICER ZACK JACOBSEN

1    Q.   But the location where the shooting happened.

2    A.   I believe from the time the call was dispatched

3  to the time I got to the house was somewhere around two

4  minutes, a little over two minutes.

5    Q.   Okay.  And you didn't go directly to this

6  location where the shooting happened, correct?

7    A.   Correct.

8    Q.   You went to the location initially where it was

9  dispatched?

10    A.   Yes, sir.

11    Q.   And did you stop there?

12    A.   I pulled onto Buckles Street, which is -- it's a

13  dead end court off of Sacramento, so traveling north on

14  Sacramento I made a left on Buckles, and I had seen two

15  people on the corner house, so it would have been the --

16  on the northwest corner of Buckles and Sacramento pointing

17  across the street back to the south, but we drove down

18  Buckles to ensure that there was nothing happening on that

19  street, contacted, I believe, a subject inside a car and

20  asked if he had seen a fight, and he said no, so we turned

21  around, drove back towards Sacramento Street and then

22  noticed the two people still up on their balcony pointing

23  to the southeast side.

24    Q.   And were your windows down as you drove?

25    A.   Yes.

47

DEPOSITION OF OFFICER ZACK JACOBSEN

1    Q.   Okay.  Did you hear a commotion?

2    A.   Not off Buckles Street I did not.

3    Q.   When did you first hear a commotion that you

4  thought was the sound of a fight?

5    A.   Just as we turned onto Nebraska.

6    Q.   And how far was that from the address of the

7  location where the shooting happened?

8    A.   I'm sorry?  Where?

9    Q.   Where the shooting happened.  How far was it

10  where you first heard the sound of a fight?

11    A.   When we got to the house, because it's on a

12  corner, so we went south on Sacramento and then we turned

13  eastbound onto Nebraska.  Just after we turned I could

14  hear what sounded like arguing, and as we pulled down the

15  street and got closer to where the deck would have been

16  that's where I knew we were in the right location.

17    Q.   And you knew because you could hear the sound of

18  fighting?

19    A.   Yes, screaming and yelling.

20    Q.   And you were able to tell what house it was

21  coming from?

22    A.   Yes, sir.

23    Q.   Okay.  And you got out of your car immediately, I

24  assume?

25    A.   Yes, sir.

48

DEPOSITION OF OFFICER ZACK JACOBSEN

1    Q.   Okay.  Probably not more than 20 feet?

2    A.   I wouldn't think so, but maybe.

3    Q.   Okay.  I understand.  It's a very rough

4  estimation?

5    A.   Yeah.

6    Q.   Now, once you -- were you able to see anything in

7  the house from your vehicle?

8    A.   No, sir.

9    Q.   Once you got out of your car could you see

10  anything in the house?

11    A.   Not until I walked up to the fence.

12    Q.   Okay.  And you walked up to the fence on Nebraska

13  Street, correct?

14    A.   Yes, sir.

15    Q.   Okay.  And from there were you able to see into

16  the house?

17    A.   Yes, but there were -- everybody who was up on

18  the deck yelling and screaming and fighting, it was from

19  the deck into the kitchen, which is why I'm having a

20  difficult time remembering exactly how many people were

21  out on the deck because it was -- it seemed like --

22    Q.   It moved?

23    A.   It moved, so yes, the door to the kitchen was

24  open, and I could see in there.

25    Q.   Okay.  And were there windows also or just the

51

DEPOSITION OF OFFICER ZACK JACOBSEN

1   door?  Was the door the only thing you could see into the

2   house?

3       A.   That's the only thing that I recall being able to

4   see.

5       Q.   Okay.  And the deck -- did the deck wrap around

6   to the side of the house?

7       A.   Not that I recall.  I believe there was a set of

8   stairs that went down along the east side of the house,

9   but the deck did not wrap around.

10      Q.   Okay.  So the deck was just on the back of the

11  house, correct?

12      A.   Correct.

13      Q.   Okay.  And what time of day was it?  This was

14  shortly after midnight?

15      A.   Yes.

16      Q.   Okay.  So obviously very dark outside?

17      A.   Yes, sir.

18      Q.   The only lighting -- I don't know if you know the

19  answer to this.  Do you recall whether it was a clear

20  day -- or clear night, cloudy night?

21      A.   I don't specifically remember.

22      Q.   Okay.  And you don't, of course, remember whether

23  it was a full moon or a new moon or somewhere in between,

24  correct?

25      A.   Correct.

52

DEPOSITION OF OFFICER ZACK JACOBSEN

1    Q.   Okay.  The lighting that you had came primarily

2    from the residence, correct?

3    A.   The kitchen and then the -- there was a light on

4    the outside of the house that illuminated the deck.

5    Q.   That was my next question.  Was there deck

6    lighting?

7    A.   Yes, sir.

8    Q.   There was, correct?

9    A.   Yes, sir.

10   Q.   Okay.  And then you also had a flashlight,

11   correct?

12   A.   Yes, sir.

13   Q.   And you did not feel the need to use a flashlight

14   to assist your vision?

15   A.   No, sir.

16   Q.   Correct?

17   A.   Correct.

18   Q.   So it's bright enough that you felt like you

19   could see what was happening, correct?

20   A.   Correct.

21   Q.   And did you have any discussion with the person

22   you were assigned to, Samida, about how you were going to

23   handle this call?

24   A.   No, it happened too quickly.

25   Q.   On the drive there did you have any discussion

Barbara J.Butler & Associates - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA  95050 - (510) 83-BUTLER (2885) or (408) 248-BUTLER(2885)

DEPOSITION OF OFFICER ZACK JACOBSEN

1    A.   Yes.

2    Q.   Okay.  All right.  And did you see that person

3  move Mr. Ramos at all?  In other words, did they move him

4  backwards?

5    A.   I don't recall him moving, just keeping him from

6  advancing.

7    Q.   Okay.

8    A.   And then the door shut.

9    Q.   And were you able to tell how the door shut, what

10  caused the door to shut?

11    A.   No.

12    Q.   Okay.  At some point -- when you arrived did

13  you -- were you using sirens?

14    A.   No, not -- no, I don't believe so.

15    Q.   Okay.  Were your overhead lights on?

16    A.   No.

17    Q.   Okay.  At some point you announced yourself?

18    A.   Yes.

19    Q.   When was that?

20    A.   When I first got up to the fence and started

21  seeing everybody screaming and yelling and started

22  yelling.

23    Q.   What did you do to announce yourself?

24    A.   I said, "Police" over and over and over.  "Stop

25  fighting.  Stop."  Specifically I don't know exactly the

Barbara J.Butler & Associates - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA  95050 - (510) 83-BUTLER (2885) or (408) 248-BUTLER(2885)

DEPOSITION OF OFFICER ZACK JACOBSEN

1    words that I used, just that I announced myself as a

2    police officer, repeatedly told them to stop and back

3    away.  I believe I said, "Back away."

4        Q.   Was there any amplification of your voice?

5        A.   No.

6        Q.   And it wasn't done over your loudspeaker?

7        A.   No, sir.

8        Q.   It was just you verbally using your voice saying

9    as loud as you could?

10       A.   Yes, sir.

11       Q.   Okay.  And what about your partner?  Was he also

12   saying the same thing?

13       A.   I believe so.  I heard other officers yelling.  I

14   assume it was Officer Samida.

15       Q.   Okay.  You heard at least one other officer

16   yelling, correct?

17       A.   Yes, correct.

18       Q.   Okay.  And then what's the next thing that

19   happened?  Well, strike that.

20            So you're at the fence, correct?

21       A.   Yes, sir.

22       Q.   You have an observation of Mr. Ramos, and you

23   told me the first time when you saw him inside the house

24   was about five seconds, correct?

25       A.   Yes, sir.

                                                          60

DEPOSITION OF OFFICER ZACK JACOBSEN

```
1        A.    Okay.

2        Q.    When did you change your position?

3        A.    So when Mr. Ramos came out of the kitchen and got

4   on top of the subject who had been tased and fell to the

5   ground, between that point and when I fired is when I

6   changed -- I pointed, but I pulled the trigger right after

7   I extended my arms upward and decided that I was going to

8   shoot Mr. Ramos (indicating).

9        Q.    And now you've indicated with both hands pointing

10  upward, correct?

11       A.    Yes, sir.

12       Q.    When you fired your gun were both hands holding

13  the gun?

14       A.    Yes, sir.

15       Q.    So both hands were at that 30- to 45-degree

16  angle?

17       A.    Yes, sir.

18       Q.    Both arms, I mean?

19       A.    Yes, sir (indicating).

20       Q.    And where was -- did you actually see Officer

21  Samida, where he was when you got to the fence?

22       A.    I don't remember specifically where he was.  I

23  know he was probably within five to ten feet of me.

24       Q.    Okay.  And on your left or your right?

25       A.    My right.
```

65

1   time period for me.

2        A.   So when we pulled up and I exited the car I could

3   hear the screaming and yelling.  As I got over to the

4   fence and I looked up and I saw somewhere between four and

5   five people up on the deck, the kitchen area, just a lot

6   of screaming and a lot of yelling.  Everybody was

7   screaming and yelling, a little chaotic up there.  I was

8   yelling, giving commands that I was the police, to stop,

9   to back away.  Nobody was listening.  Nobody appeared to

10  even recognize that we were there.

11        At some point the people on the deck either

12  backed away from the door -- but I was able to see into

13  the kitchen area, at which point I saw Mr. Ramos with the

14  knife inside the kitchen.

15       Q.   Okay.  And up until the point where the kitchen

16  door closed the first time?

17       A.   So when I saw Mr. Ramos with the knife it

18  appeared as though he was trying to move forward toward

19  somebody else in the kitchen that I couldn't see, and

20  another person was holding Mr. Ramos back or trying to

21  stop him, at which point I got on the radio and I advised

22  dispatch that there was a subject armed with a knife

23  inside the house.  I don't remember specifically what I

24  said on the radio, but I advised dispatch there was a

25  subject with a knife, and then seconds later the door

75

DEPOSITION OF OFFICER ZACK JACOBSEN

 1  shut.

 2      Q.   Okay.  How far was Mr. Ramos from the kitchen

 3  door -- from, we'll call it, the threshold of the kitchen

 4  door?

 5      A.   I believe a couple feet.

 6      Q.   And was he being moved backwards away from it?

 7      A.   I think he was just being stopped from advancing.

 8      Q.   That's what I thought.  When you say "pulling him

 9  back" that's what you mean?

10      A.   Did I say "pulled back"?

11      Q.   I thought I heard that.  Maybe I was wrong.  You

12  said it looked like he was advancing on someone in the

13  kitchen?

14      A.   Or trying to.

15      Q.   Where in the kitchen would he be advancing?  Away

16  from the door?

17      A.   North, north of the door.

18      Q.   North would be perpendicular to the doorway --

19  I'm sorry, I mean parallel to the doorway?

20      A.   So would it be better if I drew it?  I know she

21  can't --

22      Q.   Yeah, if you can.

23      A.   It would make it easier for me.

24      Q.   We'll make this Exhibit A.

25      A.   So if the doorway is here and the deck is here,

                                                              76

1    if this is the doorway, then Mr. Ramos is here.  He's

2    facing this way, and I can't see who's here because of the

3    house (indicating).

4        Q.   Can you show me where your position is on this

5    diagram.

6        A.   It would be somewhere here (indicating).

7        Q.   Okay.  And for the record, on Exhibit A you've

8    marked an X with a circle indicating Mr. Ramos, correct?

9        A.   That's correct.

10       Q.   And there's an arrow, and that arrow indicates

11   the direction he's facing?

12       A.   Yes, sir.

13       Q.   Okay.  And then next to Mr. Ramos you've made a

14   small rectangle, which is the doorway?

15       A.   Correct.

16       Q.   Okay.  And then you put a circle without anything

17   in it, indicating your position, correct?

18       A.   Correct.

19       Q.   And the lines on it that you've made are a rough

20   estimation of the deck; is that correct?

21       A.   Yes, out here (indicating).

22            MR. NISENBAUM:  Okay.  Let's make this Exhibit A,

23   please.

24                  (Plaintiffs' Exhibit A

25                   was marked for identification.)

                                                              77

DEPOSITION OF OFFICER ZACK JACOBSEN

1    BY MR. NISENBAUM:

2        Q.    So looking at Exhibit A, it looked like

3    Mr. Ramos, the direction that he was facing -- you've

4    drawn an arrow indicating the direction he was facing.  If

5    there were a person there that he was attempting to

6    attack, they would have been out of your view, correct?

7        A.    Correct.

8        Q.    And so you thought that he was being

9    essentially -- so there would have been a person -- the

10   person holding Mr. Ramos would have been in between

11   Mr. Ramos and the person you thought he might have been

12   trying to attack, correct?

13       A.    That's correct.

14       Q.    And it looked like Mr. Ramos was trying to go in

15   that direction that the arrow is?

16       A.    That's correct.

17       Q.    Okay.  It did not look like they were trying to

18   stop him from going out the door, correct?

19       A.    Correct.

20       Q.    Okay.  And then the kitchen door closed?

21       A.    Yes.

22       Q.    And I think you said 10 to 12 seconds passed,

23   something like that.

24       A.    Yes, sir.

25       Q.    And then -- so tell me what happens after the

                                                              78

DEPOSITION OF OFFICER ZACK JACOBSEN

1    kitchen door opens up through the time you shoot him.

2       A.   After the kitchen door opens Mr. Ramos comes out

3    of the kitchen onto the deck, gets on top of the subject

4    who had been tased.  He was laying down on the deck, at

5    which point I saw Mr. Ramos's hand come up over -- with

6    his right hand up and over in the same manner as which I

7    saw him before, meaning like a hammerfist (indicating)

8    position with his hand with the blade extending out from

9    his pinky.

10      Q.   Let me stop you there.  Could you see the full

11   blade to the tip or just part of it?

12      A.   I don't recall seeing the tip of the blade

13   specifically, because it was very fast.

14      Q.   Okay.  Go ahead.

15      A.   So I saw Mr. Ramos do a striking motion down

16   once, come back up, and I saw the knife come down a second

17   time, and on the second time that Mr. Ramos came down with

18   the knife it was at that point that I decided the only way

19   that I could stop him from attacking the person on the

20   deck with the knife was to shoot him, and I shot him.

21      Q.   Okay.  Now, how much of the blade did you see

22   inch-wise?

23      A.   I don't recall the length of the blade.  I saw

24   the whole blade, but to specifically say I was able to

25   definitively see the tip of it like I could in the

79

DEPOSITION OF OFFICER ZACK JACOBSEN

1    kitchen -- in the kitchen it was more stationary, so I had

2    a very good look at the knife while it was relatively

3    stationary (indicating).  When he was out on the deck and

4    he's coming down in two motions with it I can see the

5    blade of the knife, but I don't -- I couldn't tell how

6    long the knife blade was or any other specific description

7    of it other than it was a silver blade of a knife that

8    came down quick twice, and then I shot him.

9         Q.   Okay.  How thick was the blade of the knife,

10   meaning from the blade to the flat edge above it, could

11   you estimate how big that was?

12        A.   I don't specifically remember.

13        Q.   Would you say it was more than an inch, roughly

14   an inch or less than that?

15        A.   I don't know that I could see what size it was.

16   I just -- I saw the silver blade of the knife, but because

17   he came down in the striking motion twice I just -- to say

18   that it was an inch or an inch and a half, I feel like

19   those dimensions are too small to say specifically what it

20   was.

21        Q.   Okay.  Did it appear to be the same knife that

22   you had seen him with when you saw him in the kitchen

23   before the door closed?

24        A.   I couldn't tell.

25        Q.   Okay.  All right.  Did it appear to be as long as

80

1      A.   No.

2      Q.   Okay.  I thought you got up to the fence and the

3   kitchen door was open.

4      A.   It was.  I'm sorry.

5      Q.   You got up to the fence?

6      A.   Right.

7      Q.   You could see the kitchen door was open?

8      A.   Correct.

9      Q.   And you could see into the kitchen?

10     A.   After the subjects on the deck shifted, moved

11  away, and then I was able to see into the kitchen, but it

12  was not immediate.  I did not see Mr. Ramos with the knife

13  immediately when I got to the fence.

14     Q.   Okay.  How long after you got to the fence was it

15  when you saw Mr. Ramos with the knife?

16     A.   I believe it was about 10 to 13 seconds.

17     Q.   And during that 10 to 13 seconds you were yelling

18  "Police.  Stop fighting," words to that effect?

19     A.   Yes, sir.

20     Q.   And you saw Mr. Ramos with the knife, correct?

21     A.   Yes, sir.

22     Q.   And you then reported to dispatch immediately?

23     A.   Correct.  Once it registered -- that period of

24  time where we have to register what we see, when I

25  registered seeing Mr. Ramos with the knife in the kitchen,

85

1    that's when I got on the radio, advised dispatch that

2    there was a subject armed with a knife inside the house,

3    and then within a second or two the door shut.

4        Q.   Okay.  And I take it the broadcast to dispatch

5    took a second, a second or two, correct?

6        A.   Roughly.

7        Q.   And the kitchen door was closed for about 10 to

8    12 seconds, right?

9        A.   I believe so.

10       Q.   Okay.  So you had completed your call to

11   dispatch?  That had been completed probably ten seconds --

12   at least ten seconds past between the time you completed

13   the call to dispatch and when the kitchen door reopened,

14   correct?

15       A.   I'm sorry?  Could you say that again.

16       Q.   At least ten seconds passed from the time you

17   completed your call to dispatch about there being a knife

18   to when the door reopened, correct?

19       A.   I believe it was -- I believe it was about ten

20   seconds.

21       Q.   Okay.  And during that time the commands that you

22   were giving were what?  Were they the same?

23       A.   Yes, as far as I recall.  I don't specifically

24   remember at that point.

25       Q.   "Police.  Stop fighting"?

                                                              86

DEPOSITION OF OFFICER ZACK JACOBSEN

1              MS. KNIGHT:  Quick objection to "violation."

2      That doesn't seem like the right word to me.  Contrary to

3      training?

4              MR. NISENBAUM:  Sure.

5      Q.   It would be contrary to your training to use

6      lethal force against a person who was not armed with a

7      weapon but was just punching the person below him in the

8      same situation, correct?

9      A.   I'm going to say typically, yes.

10     Q.   What would be --

11     A.    In the event that -- a hypothetical, if the

12     person on the ground was unconscious and the person above

13     him -- there was no way for an officer who was viewing

14     this to -- there was no way for an officer to make contact

15     with the subject who was hitting and it was to the point

16     where it looked like either traumatic brain injury or some

17     type of traumatic condition was going to occur as a result

18     of repeated blows to the head, and that could end up

19     resulting in great bodily injury or death, but --

20     Q.   If he was bashing his brains that would be

21     different?

22     A.   Correct.

23     Q.   Was your view of Mr. Ramos unobstructed when you

24     shot him?

25     A.   Yes.

89

DEPOSITION OF OFFICER ZACK JACOBSEN

1      Q.   Okay.  And you're talking about Mr. Ramos's upper

2   body?

3      A.   Yes.

4      Q.   Because his lower body was obstructed?

5      A.   Correct.

6      Q.   Okay.  And what part of Mr. Ramos did you target?

7      A.   Center mass.

8      Q.   What angle of Mr. Ramos did you have?

9      A.   I had a view of his upper torso, head, arm, so

10   my -- where I was aiming to shoot was the center of his

11   torso.

12      Q.   His chest?

13      A.   Yes.

14      Q.   Okay.  I think you indicated in your testimony

15   that the knife would go out of your view on each of the

16   times -- on each of the two occasions when Mr. Ramos

17   appeared to be punching down with his fist that you say

18   was holding the knife, correct?

19      A.   That is correct.

20      Q.   And could you tell where on the subject he was

21   hitting?

22      A.   I could not specifically, no.

23      Q.   Could you tell if it was closer to the head as

24   opposed to the feet?

25      A.   To me it appeared as though it would have been

90

DEPOSITION OF OFFICER ZACK JACOBSEN

1    upper torso area.

2         Q.   And did you actually see whether there was

3    contact between Mr. Ramos's fist or object in his hand and

4    that individual?

5         A.   No.

6         Q.   Okay.  And is that because your view of that was

7    blocked?

8         A.   Yes.

9         Q.   And it was blocked by the wooden beam --

10        A.   Correct.

11        Q.   -- of the deck?

12        A.   Yes, sir.

13        Q.   And was that the lower -- the flat part of the

14   deck or the siding?

15        A.   The lower part, flat part.

16        Q.   All right.  What I'd like you to do on Exhibit A

17   is I've marked the location on the deck where the

18   individual was that Mr. Ramos got on top of.  It might be

19   difficult.  If you could put a circle indicating where

20   that individual was located when he was on the ground

21   after being tased.

22        A.   Maybe there (indicating).

23        Q.   And it appeared Mr. Ramos was on top of him?

24        A.   Yes.

25        Q.   And what you've done is drawn an arrow from X

91

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

--oOo--

ANNICE EVANS, individually and   )
as Successor in Interest to      )
Decedent ANGEL RAMOS; DANTE      )
RAMOS, in his individual         )
capacity; PHILLIP WILSON-VAUGHN,)
in his individual capacity;      )
LEANN SANCHEZ, in her individual)
capacity; DARCEL LEWIS, in his   )
individual capacity; D.W., by    )
and through his Guardian Ad      )
Litem, CARITA WILSON; and ALICIA)
SADDLER, individually and as     )
Guardian Ad Litem for minor      )
G.W.,                            ) CASE NO:
                Plaintiffs,      ) 2:17-cv-01619-TLN-AC
        vs.                      )
                                 )
CITY OF VALLEJO; a municipal     )
corporation; ZACK JACOBSEN,      )
Police Officer for the City of   )
Vallejo; and DOES 1-50,          )
individually and in their        )
official capacities as Police    )
Officers for the City of         )
Vallejo, inclusive,              )
                Defendants.      )
_____) CERTIFIED COPY

DEPOSITION OF OFFICER MATTHEW SAMIDA

MONDAY, SEPTEMBER 24, 2018

REPORTED BY: ANGELICA R. GUTIERREZ, CSR NO. 13292

1

1    A.    Yes.

2    Q.    Okay.  When you first arrived, do you recall

3  knocking on the front door of the house, or what do you

4  recall first happening?

5    A.    As we were driving down the roadway, which was

6  Nebraska Street, we heard a loud commotion coming from

7  the residence.  We stopped the car, parked, and got out

8  and we approached from Nebraska Street, which is the

9  north side of the house, and the subjects that we were

10  attempting to contact were on the backyard patio.

11    Q.    Okay.  When you responded to the house, had

12  you ever been there before that you were aware of?

13    A.    I don't think I had.

14    Q.    So when you went to make contact with the

15  residents or people at the house, you didn't have any

16  recollection of any specific incidents at that house

17  prior to that, correct?

18    A.    Correct.

19    Q.    When you first contacted the residents, were

20  you aware of the identity of any of the persons that

21  were on the property?

22    A.    No.

23    Q.    Okay.  So, prior to contacting the residents,

24  you had no knowledge of who they were or any incident

25  at the house, correct?

18

DEPOSITION OF MATTHEW SAMILA

1      A.    Correct.

2      Q.    Okay.  Do you remember what the weather was

3   like that evening?

4      A.    It had been raining off and on.  Fairly cold.

5      Q.    Okay.  Do you recall approximately what time

6   you arrived at the call for service?

7      A.    I do not.  I believe it was about five minutes

8   after the call came in.

9      Q.    Okay.  Was this in the evening time?

10     A.    I think it was evening, early morning,

11  something like that.

12     Q.    Okay.  Would it be fair to say it was

13  nighttime?

14     A.    Yes.

15     Q.    And it was dark outside?

16     A.    Yes, it was.

17     Q.    At some point, you came aware of people being

18  out on the back porch of the property at 1722

19  Sacramento, correct?

20     A.    Yes.

21     Q.    Do you recall how many people you saw on the

22  porch when you first got there?

23     A.    About four.

24     Q.    Okay.  Did those people seem to be the source

25  of what you referred to as commotion earlier?

                                                    19

DEPOSITION OF MATTHEW SAMIDA

1     A.   Yes.

2     Q.   Okay.  When you say "commotion," do you mean

3   like loud music, loud voices, screaming, what

4   specifically was the commotion, if you can recall?

5     A.   Loud yelling and screaming.  It sounded like

6   people pushing each other, maybe stomping of the feet

7   because of the physical pushing sort of thing.

8     Q.   Okay.  You referred to the area as a back

9   porch.

10          Was that porch area raised off the ground?

11    A.   Yes, it was.

12    Q.   Okay.  Was it fair to say that it was

13  essentially the second floor?

14    A.   Yes.

15    Q.   To the best of your ability to estimate, how

16  far off the ground was the raised porch area?

17    A.   About 7, 8 feet.

18    Q.   Okay.  And this was a wooden raised structure

19  that was extending from the second floor of the home;

20  is that correct?

21    A.   Correct.

22    Q.   Okay.  When you got there, the porch was above

23  you, correct?

24    A.   Correct.

25    Q.   Okay.  Do you recall if the porch had any sort

20

DEPOSITION OF MATTHEW SAMIDA

1    of railing around it like to prevent people from

2    walking off the edge and falling on the ground?

3         A.   It did.  The railing was on the side of the

4    house and the west end, south side of the porch.

5         Q.   Okay.  Can you describe what the railing was

6    made of?

7         A.   It was wooden, and it had wooden slats,

8    vertical wooden slats, along with a horizonal top rail.

9         Q.   Okay.  And the wooden slats, approximately how

10   far apart were they?

11        A.   Four or 5 inches maybe.

12        Q.   Would it be accurate to describe the wooden

13   slats as being 4 to 5 inches away from one another, or

14   4 to 5-inches wide themselves?

15        A.   A 4 to 5-inch gap between each slat.  I don't

16   recall exactly how thick the pieces of wood were.

17        Q.   Okay.  Would it be fair to say from your

18   vantage point that you could partially see through the

19   wooden railing at the places where the slats were not

20   located?

21        A.   Yes.

22        Q.   It's pretty hard to describe those kind of

23   things for the record, but that's helpful.

24        A.   It really is.

25        Q.   Okay.  Approximately, how high up did the

21

1   railing go, like the people that were there, could you

2   see them from the waist down, chest down, to the best

3   of your recollection?

4       A.   I'm sorry.  Do you mean the railing, or the

5   bottom of the patio?

6       Q.   Meaning like the railing.  If a person was

7   standing on the porch, how much could you see

8   completely unobstructed?

9       A.   That's kind of a hard question to answer

10   because obviously it changes with the angle of how

11   close to the railing and how close to the house they

12   were standing.

13          But if they were standing right next to the

14   railing, you could probably see maybe about waist up,

15   your belly button up.  Depending on how tall they are,

16   I would say the railing was probably about 3 feet tall.

17      Q.   Okay.  What were the lighting conditions on

18   the porch?

19      A.   There was a light on, on the porch.

20      Q.   To your recollection, was this like a normal

21   bulb, was it like a flood light?  Do you know what type

22   of light it was?

23      A.   It was a normal lightbulb.

24      Q.   Would it be fair to say that the porch was

25   dimly lit?

22

DEPOSITION OF MATTHEW SAMIDA

1      A.   It definitely wasn't lit like this room.  It
2    was still --
3      Q.   Okay.  From your own perspective, based on the
4    lighting, were you able to see the people on the porch
5    long enough to describe them, for example, like their
6    race, age, gender?
7      A.   Not with just the light on the porch.
8    However, almost immediately after arriving on scene we
9    used our flashlights to illuminate the porch, which
10   allowed us to get a better view of everybody.
11     Q.   Okay.  So in addition to the porch light,
12   everyone also had flashlights, or some officers had
13   flashlights available to help illuminate the scene?
14     A.   Correct.
15     Q.   From where you were located, I mean to
16   indicate prior to the tasing, do you recall there being
17   a tree obstructing your view to some degree?
18     A.   I do.
19     Q.   Okay.  At some point, did you enter the yard
20   at 1722 Sacramento Street?
21     A.   Yes.
22     Q.   Okay.  Was that before or after you had
23   deployed your taser?
24     A.   Are you referring to the front side yard?
25     Q.   Yes.

                                                        23

DEPOSITION OF MATTHEW SAMILA

1    A.    I'm going to say it was almost simultaneous.

2    It might have been either right before or right after,

3    maybe a second or two.

4    Q.    Okay.  So within a second or two of entering

5    into the yard, is that when the taser was deployed?

6    A.    Yes.

7    Q.    Okay.  When you first arrived, prior to

8    deploying your taser, do you recall observing what

9    Officer Jacobson was doing?

10    A.    No.  I know he was in close proximity.  My

11    attention was on the patio with the subjects having

12    some sort of altercation.

13    Q.    Okay.  When you say "close proximity," do you

14    mean close proximity to you or to the individuals?

15    A.    To me.

16    Q.    When you say "close proximity," do you mean

17    within 5 feet, 10 feet, 1 foot?

18    A.    Within 5, 10 feet, maybe.

19    Q.    Okay.  Can you please describe to me what you

20    observed that led you to tasing the young man on the

21    porch?

22    A.    Sure.  So like I stated earlier, I saw four

23    people on the porch.  I saw a young male.  I believe at

24    the time he was probably about 18 years old.  He was a

25    thin build, but you could tell he had like an athletic

24

DEPOSITION OF MATTHEW SAMPA

1    build as well.  I don't remember if he had a shirt on

2    or off.  It was either like an undershirt/tank top or

3    no shirt at all, because I remember seeing his build.

4             But he seemed extremely upset.  He was yelling

5    at somebody.  It appeared he was yelling at somebody

6    inside the house.  He just seemed extremely agitated,

7    kind of moving all around.

8             There was another male on the deck.  I think

9    he was a little bit more of a heavy-set male.  He

10   appeared older.  I couldn't really tell what he was

11   doing.  He seemed much more calm than the other younger

12   male.

13            Then there was also a female who was a

14   heavier-set female, and she also appeared a little bit

15   older, maybe late 20s, early 30s.  She appeared to be

16   trying to calm the younger male down, and keep him away

17   from the house.

18            I remember at one point, the young male tried

19   walking towards the door to the house and the female

20   wrapped her arms around him and tried pulling him back

21   more towards the stairs away from the house.

22            At that point, the male was able to break free

23   and walk up to the doorway of the house.  He was

24   yelling at whoever was inside the house.  I could see

25   somebody standing there inside the doorway, and it

                                                        25

1    appeared he was trying to get that person to come out

2    and fight him, the young male.

3         The young male took a @blade stance, kind of a

4    generic fighting stance, and he had his hands balled in

5    fists and raised them up to his chest area.  It looked

6    like he was trying to convince whoever was inside the

7    house to come out of the house and fight.

8    Q.   Okay.  At that point, you had opted to deploy

9    the taser; is that correct?

10   A.   Well, before that we were attempting to get

11   their attention.  These are flashlights that not only

12   illuminate it, but also kind of do like a sweeping

13   motion with our lights to try and get their attention.

14        There was some sort of light on the background

15   of the house.  I also used my flashlight in a strobe

16   mode, which makes it flash really fast to try and get

17   their attention, as well as yelling at them, announcing

18   ourselves as police officers, and telling them to stop

19   fighting and to break it up.

20        Then it was at that point that I realized that

21   nobody on that deck showed any interest in following

22   our commands to stop fighting, and it appeared to me

23   that the young male was going to start a violent

24   physical altercation with somebody in the house.

25   Q.   Okay.  It's fair to say that you deployed your

26

1    taser to try to stop the physical altercation you

2    suspected was about to happen?

3        A.   Yes.

4        Q.   Okay.  The younger male, do you recall what

5    race he was?

6        A.   He appeared to be African-American.

7        Q.   Okay.  What about the heavier-set man on the

8    porch, do you recall his race?

9        A.   I think so.  He was African-American or

10   Hispanic, one of the two, darker complexion.

11       Q.   Okay.  What about the heavier-set female who

12   was out on the porch, do you recall what race she was?

13       A.   The same, either a Hispanic female or an

14   African-American, darker complexion.

15       Q.   Okay.  When you first saw the young man that

16   you ended up tasing, you said he appeared to be trying

17   to provoke a fight with somebody who was located inside

18   the house, correct?

19       A.   Correct.

20       Q.   Okay.  Were you able to see who the person was

21   inside the house to any degree?

22       A.   Yes, but I don't recall what they looked like.

23   I just remember seeing like a figure.  I don't recall

24   like in detail specifically, no.

25       Q.   Okay.  Is it fair to say that you didn't have

                                                              27

1    a clear view of the person, but it was clear to you

2    that there was a person standing there?

3        A.   Yes.

4        Q.   Do you know whether that person appeared to be

5    male or female or could you tell?

6        A.   I couldn't tell.

7        Q.   Okay.  Prior to the young man trying to

8    provoke the person inside the house, did you observe

9    anyone else come outside of the house prior to you

10   tasing the young man?

11       A.   It was hard to tell.  I don't recall.

12       Q.   Do you not remember, or you do not recall

13   seeing anybody?

14       A.   I don't remember.

15       Q.   Okay.  Approximately, how long had you

16   observed the behavior of the young man prior to the

17   tasing, if you recall?

18       A.   Somewhere between 30 seconds and 60 seconds.

19       Q.   Okay.  When you tased the young man, where

20   were you standing in proximity to the man who was

21   tased?

22       A.   I was standing obviously ground level, so he

23   was above me on the porch, and I was standing just, I'd

24   say, north of him and a little bit to his back right

25   side.

                                                          28

1    Q.   Do you know approximately how many feet away

2    from him you were at the time that you tased him?

3    A.   15, 20 feet, maybe.

4    Q.   Okay.  When you tased him, do you know were

5    the taser prong struck him?  Did you see that?

6    A.   I believe one struck him, and the other got

7    caught up on the wooden slats of the side railing.

8    Q.   Okay.  When you deployed your taser, did you

9    aim to deploy between the slats or above where the

10   railing was?

11   A.   The only way I was able to deploy it was

12   between the slats.

13   Q.   Okay.  Why was that the only way?

14   A.   Because if I deployed above the railing based

15   off of where he was standing at the time, it either

16   would have gone over his head or hit him in the head,

17   which is obviously not good, so the only other option

18   was between the slats.

19   Q.   So it's fair to say that you deployed the

20   taser through the railing because trying to aim it over

21   would have potentially caused him harm?

22   A.   Correct.

23   Q.   Okay.  Do you recall where the taser prongs

24   struck him?

25   A.   I think it was his right leg, his upper right

29

1    leg, somewhere around there.

2        Q.   Okay.  After you had deployed the taser, did

3    the young man fall on the ground?

4        A.   He did.

5        Q.   Approximately, how long after you tased him

6    did fall on the ground?

7        A.   I'd say within three seconds.

8        Q.   Okay.  Once he had fallen to the ground, what

9    was your view of him from where you were standing?

10       A.   When he fell on the ground, it looked like he

11   was in a seated position, kind of leaned up against the

12   wall.  So what I could see was probably like maybe his

13   chest or mid-torso level up.

14       Q.   Okay.  So when you saw him fall to the ground,

15   he fell into a seating position?

16       A.   It seemed like it was kind of a leaned-back

17   seating position.

18       Q.   The time when you tased the young man, do you

19   recall where Officer Jacobson was at that time?

20       A.   He was to my left, maybe about 10 feet away.

21       Q.   Okay.  Once the young man fell on the ground

22   did you see another man or other men come outside from

23   the house?

24       A.   Yes.

25       Q.   How many people did you see outside the house

                                                            30

DEPOSITION OF MATTHEW SAMILA

1    after he was on the ground?

2         A.   At least one.

3         Q.   Okay.  When that one man that you recall

4    seeing came out of the house, can you describe what

5    that man looked like?

6         A.   He appeared to be a Hispanic male.

7         Q.   Okay.  Did he appear to be an adult?

8         A.   Yes.

9         Q.   When you saw him exit the house, do you recall

10   what he was wearing?

11        A.   I think he had a shirt one.  Either he didn't

12   have a shirt on, or it was the same kind of attire as

13   an under/tank top shirts.

14        Q.   Okay.  Do you recall if he was wearing pants?

15        A.   He was wearing shorts.

16        Q.   Do you know if the shorts were boxer shorts,

17   or shorts you'd wear out of the house?

18        A.   I'd say they were boxers.

19        Q.   Do you recall approximately how old this man

20   looked?

21        A.   20 or 25, somewhere around there.

22        Q.   Was there anything else that you recall

23   observing about him that stuck out in your mind?

24        A.   No.

25        Q.   I'll represent the man that came out of the

                                                              31

1    house was Angel Ramos.

2         Once Angel Ramos came out of the house, do you

3    recall seeing him go to the man that you had tased and

4    punched him in the face?

5    A.    I saw him come out of the house quickly, and

6    he didn't dive on him, but he got over him.  It looked

7    like he was either kneeling over him or using his left

8    hand to prop himself up over the young man.  It looked

9    like he was using his left hand to strike the young man

10   who I had tased --

11   Q.    Okay.

12   A.    -- with his right hand.

13   Q.    It's fair to say that you saw the man come out

14   of the house and what appeared to be strike other man

15   with his right hand in the face?

16   A.    Yes.

17   Q.    When you saw the young man appear to be struck

18   in the face, did you have your taser at that point, or

19   did you have your firearm out?

20   A.    I had my taser out, and I was trying to switch

21   cartridges.  I was trying to reload a new cartridge

22   into that taser while all this was occurring.

23   Q.    Okay.  At that point, do you recall if you

24   anticipated potentially pulling your taser again?

25   A.    Yes.

                                                          32

DEPOSITION OF MATTHEW SAMIDA

1           But you have since come to the understanding

2    that Angel Ramos was unarmed, correct?

3        A.   I'm sorry?

4        Q.   You have since come to the understanding that

5    Angel Ramos was unarmed when he was killed, correct?

6        A.   I don't have any knowledge of that.

7        Q.   Okay.  When you observed Angel Ramos, did you

8    see a knife in his hand?

9        A.   No.  I could not really see his right hand.

10       Q.   Are you aware that there was no knife taken

11   from the vicinity where Angel Ramos was located?

12       A.   You mean, on the deck?

13       Q.   Yes.

14       A.   No.

15       Q.   Okay.  So it's still your understanding that

16   Officer Jacobson is maintaining that Angel Ramos had a

17   knife; is that correct?

18       A.   Yes.

19       Q.   Okay.  Was it your understanding that other

20   officers had their guns out on the night that Officer

21   Jacobson shot Angel Ramos?

22       A.   Yes.

23       Q.   Do you know approximately how many of the

24   officers were present at the time?

25       A.   I don't.  Like I said earlier, my focus was

                                                         36

1    far as when they would like to see the camera

2    activated?

3        A.   Yes.

4        Q.   Would this incident be one of the types of

5    things that would spark you to turn on your body-worn

6    camera?

7        A.   Yes.

8        Q.   Just a second.

9             At the time when the firearm was discharged,

10   do you know where Officer Jacobson was standing

11   generally?

12       A.   To my left.

13       Q.   Okay.  For example, if you are facing the

14   porch, were you to the left or right of the tree?

15       A.   I was to the right.

16       Q.   Okay.  So Officer Jacobson was to the left of

17   the tree?

18       A.   Yes.  We were separated by -- I think there

19   was a line of bushes maybe about 2 or 3 feet tall, and

20   I think it was a metal chain-link gate that was also

21   about 2 or 3 feet tall that was between us.

22       Q.   Okay.  So you were on the right side of the

23   shrub in the little gate and Officer Jacobson was on

24   the left side of that?

25       A.   Yes.

                                                              45

DEPOSITION OF MATTHEW SAMIDA

1        Q.   Do you know how far he was from the short like

2    3-foot metal fence?

3        A.   I would assume about 5 feet, maybe.

4             MS. KNIGHT:  No, don't assume.

5             MS. NOLD:  Q.  You can make an estimate, but

6    not an --

7        A.   I believe that he was about 10 feet away from

8    me, so just doing the math I was a couple feet away

9    from the fence.

10       Q.   There were a set of shrubs, and then he would

11   have been approximately --

12       A.   Yes.

13            MS. NOLD:  I have no more questions.

14            MS. KNIGHT:  No follow-up for me.

15            COURT REPORTER:  Do you want a transcript?

16            MS. KNIGHT:  Yes.

17            (Deposition concluded at 11:13 a.m.)

18

19

20                        --o0o--

21

22

23

24

25

                                                          46

**EXHIBIT D**

January 3, 2019



Katelyn M. Knight, Esq.
**City of Vallejo City Attorney's Office**
555 Santa Clara Street
Vallejo, CA 94590
Tel. 707 648 4388

RE:    **Rule 26 Expert Report**
       Evans v. City of Vallejo

**AFC 18-9038**

**Materials reviewed:**

    **Q1:**    Audio-video recording, "VTS_01_1 (Deshon Wilson).VOB"
          MD5 hash 909c34b13b89192b5167d54d84e8af41

    **Q2:**    Audio-video recording, "VTS_01_2 (Deshon Wilson).VOB"
          MD5 hash b474d7514d96f8c2850a593daed9aab9

    **Q3:**    Audio-video recording, "VTS_01_3 (Deshon Wilson).VOB"
          MD5 hash 7f916690687cbf5a9edd1d30a856e84a

    **Q4:**    Audio-video recording, "AXON_Body_Video_2017-01-23_0043-file 3
       (Ofc. Murphy) .mp4" MD5 hash c023569ba71e10d73543381056efdc66

    **Q5:**    Audio recording, "1700970-RADIO (Dispatch).mp3"
          MD5 hash d240ef5fb2addefa6088eefab237c3ff

    **Q6:**    Transcript, "D.WILSON Transcription.docx"

    **Q7:**    Transcript, "Dispatch Transcription.pdf"

                *            *            *

Katelyn M. Knight, Esq.                    January 3, 2019                    2

Dear Ms. Knight:

Your office engaged me to evaluate audio-video evidence and to review depositions and transcripts indicated in the above-referenced materials. Specifically, I was asked to:

1) Provide enhanced versions of the audio from interview recordings **Q1-Q3**, bodycam video **Q4** and dispatch recording **Q5**;

2) Provide corrected versions of transcripts **Q6** and **Q7** based on the audio enhancements;

3) Evaluate the timing of taser and gunfire from body-worn camera recording **Q4,** and transcribe discernable speech in the events leading up to the gunshots.

**Audio enhancements and corrected transcripts**

I have attached a compact disc containing the enhanced audio version of the interview recordings of Deshon Wilson from **Q1-Q3.** These three source files were converted to .wav format and combined into a single file. The final ~15 minutes of **Q3** occurs after the interview was finished, and so was not included. The audio enhancement involved application of signal processing to increase the intelligibility of the spoken dialogue, primarily through increasing the level of Mr. Wilson's voice.

The enhancement process did not alter the meaning or interpretation of the words spoken. Some speech remains unintelligible, primarily due to speech articulation, and therefore is not recoverable by signal processing. A corrected transcript of **Q6** is attached to this document.

The attachment also contains a file with an enhanced audio version of the dispatch recording **Q5.** The audio enhancement involved application of signal processing to increase the intelligibility of the spoken dialogue, and to reduce distortion. A corrected transcript of **Q7** is attached to this document.

The attachment also contains a file with an enhanced audio version of an excerpt of the bodycam video **Q4**, from the start of audio up to the recorded gunfire (30-50 seconds). The audio enhancement involved application of signal processing to increase the intelligibility of the spoken dialogue, and to reduce distortion and rustling sounds from walking and running. A transcript is attached to this document. Intelligibility was significantly affected due to the substantial amount of background noise, the distance of the mic from different talkers, and non-verbal speech sounds, including shouting.

In all instances, the enhancement process did not alter the meaning or interpretation of the transcribed words spoken.

Katelyn M. Knight, Esq.                    January 3, 2019                                3

**Audio timing of taser shot and gunfire**

The timing of shots was determined via analysis of the audio portion of bodycam video **Q4.** The onset is determined via visual inspection of the recorded waveform, spectrographic analysis, and critical listening.

An impulsive event occurs consistent with the firing of a taser at ~34 seconds in **Q4.** The subsequent characteristic electrical pulse sound of the taser cannot be discerned. The taser acoustic waveform contains significant high frequency energy during its firing, but inherently has a lower amplitude and consequently is less distinct than gunfire due to background noise and movement of the officer wearing the camera. The video shows an image of an officer below the balcony of the incident location beginning at ~40 seconds (Figure 1 shows a clearer image from ~42 seconds). This is consistent with reports that a taser was fired at Mr. Wilson prior to the gunfire.

Table I shows the calculated timing of identified less-lethal shots and gunshots within the barrage, and the time interval between successive events. The taser shot occurs approximately 14.5 seconds prior to the at 33.928 barrage concludes ~3.2 seconds after its first instance.

TABLE I.

| EVENT | TIMING (s) re **Q4** | TIME  INTERVAL (s) |
|---|---|---|
| 1. Taser | 33.941 | - |
| 2. Gunshot 1 | 48.433 | 14.492 |
| 3. Gunshot 2 | 48.964 | 0.531 |
| 4. Gunshot 3 | 49.304 | 0.34 |
| 5. Gunshot 4 | 49.964 | 0.66 |



FIGURE 1. Image of officer below balcony (~42 s, **Q5**).

Katelyn M. Knight, Esq.                     January 3, 2019                                    4

My conclusions are made to a reasonable degree of scientific certainty, based on evidence
available to me at the date of this report. I reserve the right to amend or modify the conclusions
presented as additional information becomes known to me.

                           *                      *                      *

Sincerely,

**AUDIO FORENSIC CENTER**

Durand R. Begault Ph.D.
Director

Attachments:
        -DVD disc with audio excerpts
        -transcripts

**EXHIBIT E**

1                  UNITED STATES DISTRICT COURT

2          IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

3                            -o0o-

4

5

6

7

8    ANNICE EVANS, et al.,              )
                                        )
9            Plaintiffs,                )      CASE NUMBER
                                        )2:17-cv-01619-TLN-AC
10   versus                             )
                                        )
11   CITY OF VALLEJO, et al.,           )
                                        )
12           Defendants.                )
     _____)

13

14

15

16

17                            -o0o-

18              INTERVIEW OF G███████  W██████

19              MONDAY, JANUARY 23, 2017

20                FAIRFIELD, CALIFORNIA

21                            -o0o-

22

23

24

25

1               **I N D E X**

2                  -o0o-

3   Examination by Ms. Armstrong. . . . . . . . . . . . 3

4   Certificate of Certified Shorthand Reporter . . . . .66

5                  -o0o-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **MONDAY, JANUARY 23, 2017**

2             -o0o-

3       BE IT REMEMBERED that on Monday, January 23,

4 2017, commencing at an unknown time, at the Solano

5 Family Justice Center, 604 Empire Street, Fairfield,

6 California,

7              G██████ W██████,

8 a minor, was interviewed by HALEY ARMSTRONG as

9 hereinafter set forth, preserved via a digital audio and

10 video recording.

11             -o0o-

12        (At the commencement of the digital

13          recording a male minor is seated in a

14          room.  A female adult enters the

15          room.)

16       **EXAMINATION BY MS. ARMSTRONG**

17 BY HALEY ARMSTRONG:

18 Q.     Okay.  Okay.  Here you go.  Is that one all

19 right?

20       So like I said, my name is Haley.  Okay?  And

21 what I do is talk to kids.  That's my job.  Okay?

22 A.     (Nods head.)

23 Q.     And so this room is a bit of a special room,

24 and I'll talk to you a little bit today about it, about

25 how it works in here.  Okay?

1           Are you comfortable over there?

2    A.         (Nods head.)

3    Q.         Do you like the smaller chair?  That's about

4    your size.  Okay.  Cool.  Did you look up in the corner

5    and just see the camera?

6    A.         (Nods head.)

7    Q.         Okay.  So the camera is connected to that room

8    that the guys are in so they can watch us and listen to

9    us.  So I'm going to be asking you questions, and if I

10   forget to ask you something, they can just tell me right

11   in my ear with this walkie-talkie.  Okay?

12   A.         (Nods head.)

13   Q.         All right.  So tell me your whole name.

14   A.         G█████████████████ W█████, Junior.  Not

15   Junior.

16   Q.         Not Junior?

17   A.         G█████████████████ W█████.

18   Q.         Okay.  And how old are you, G████████?

19   A.         Nine.

20   Q.         Nine?  Okay.  What do you like to be called?

21   A.         (Inaudible.)

22   Q.         G███████?  Okay.  You can just call me Haley.

23   Okay?  Or "Hey, You," or whatever works for you.  All

24   right?  Okay.

25           So in this room we have some rules that are

1    pretty easy.  Okay.  I'm gonna tell you about them.  So

2    the first thing is if I ask you a question and you don't

3    know the answer, just say, "Haley, I don't know."  Okay?

4    A.        (Nods head.)

5    Q.        So if I said, "█████████, what's my dog's

6    name," what would you say?

7    A.        I don't know.

8    Q.        Right.  Do you know if I have a dog?

9    A.        (Shakes head.)

10   Q.        No.  Right?  Okay.  So that's perfect.  Just

11   say, "I don't know."  All right?

12             And the second thing is if I ask you a

13   question and you don't know what I mean or what I'm

14   saying, then just say, "Haley, I don't know what you

15   mean."  Okay?  So if I said, "█████████, what's your

16   occular pigmentation," what would you say?

17   A.        I don't know what you mean.

18   Q.        Exactly.  Okay.  Then I'll ask it a different

19   way.  So I'll say, "What's your eye color?"

20   A.        Brown.

21   Q.        Brown.  Okay.  Just a different way of saying

22   it.  All right?

23             And sometimes I'm wrong and make a mistake or

24   I say the wrong thing.  And when I'm wrong, I want you

25   to tell me that I'm wrong.  Okay?  So if I say,

1   "G████████, how old did you just say you were?

2   Ninety-nine?  Was that it?"

3   A.        (Shakes head.)

4   Q.        No?  What was it, again?

5   A.        Nine.

6   Q.        Nine.  That's right.  Okay.  So just tell me

7   that I got something wrong.  I want to make sure that I

8   hear what you're saying.  Okay?  All right.

9           And so I don't know what's happened to you,

10  and I won't be able to tell you the answers to my

11  questions, so because of that, it's really important

12  that you tell me the truth.  Do you promise to tell me

13  the truth?

14  A.        (Shakes head.)

15  Q.        Okay.  And it's helpful if you say "yes" or

16  "no" out loud.

17  A.        Yes.

18  Q.        Okay.  Okay.  Great.

19          Okay.  So tell me about some things that you

20  like to do.

21  A.        I like to go and run track on the field.

22  Q.        Um-hmm.

23  A.        I like to play with my baby brother and

24  sister.  And I like to play with my friends.  And I like

25  to watch TV.

1   Q.       Oh.  Okay.  Tell me about the last time that

2   you ran track.

3   A.       Like last week.

4   Q.       Uh-huh.

5   A.       And then -- and then I went with my mom, and

6   she got to sit down, and --

7   Q.       She got to sit down?  Is that what you said?

8   A.       Yeah.  She was watching me and my friends ran

9   track.

10  Q.       Okay.  And where were you when you ran track

11  that time?

12  A.       It was at the -- like at a high school field,

13  near Vallejo High School.

14  Q.       Okay.  So what was the first thing you did?

15  A.       I stretched before started to run.

16  Q.       Uh-huh.

17  A.       And then I got into my position.  It helps me

18  get better to run.  And then I started to run.

19  Q.       Okay.  And what made you start running?

20  A.       Because I always like to run fast.  So I was

21  trying -- I wanted to get faster, so I started to run

22  track.

23  Q.       Okay.  Awesome.  And then you said you ran

24  with your friends the last time that you were running on

25  the track?

1   A.        (Nods head.)

2   Q.        Okay.  Who was there?

3   A.        Me, my friend C███████, and A█████.

4   Q.        C███████ and A█████.  Okay.  And how old is

5   C███████?

6   A.        C███████ is eight.

7   Q.        And how about A█████?

8   A.        Nine.

9   Q.        He's nine?  Okay.  Oh.  And then did you all

10  run together, or you ran and they ran, or something

11  else?

12  A.        It was a race.

13  Q.        Oh; it was a race.  Oh.  So who won the race?

14  A.        A█████.

15  Q.        A█████?  Oh.  Okay.  Where were you in the

16  race?

17  A.        Second.

18  Q.        Second place.  Were you really close to A█████?

19  A.        (Nods head.)

20  Q.        Yeah?  I bet you were.  All right.  Cool.

21  Thank you for telling me about that.

22            So this room is the kind of place where you

23  can talk about all kinds of things.  We try to make sure

24  it's a very safe space.  So kids talk about, you know,

25  all things that they like to do or are happy about, and

```
 1    then sometimes things that are sad or hard to talk
 2    about.
 3              So what are some things you don't like to do?
 4    A.        Homework.
 5    Q.        Homework.  Right?  Tell me more about
 6    homework.
 7    A.        I don't like math.
 8    Q.        You don't like math?  Okay.  What is it that
 9    you don't like about math?
10    A.        Division.
11    Q.        Division?  Why is that?
12    A.        Because it's super hard.
13    Q.        Super hard.  Okay.  Do you do your homework?
14    A.        (Nods head.)
15    Q.        Yeah?  All right.  That's good.  Yeah,
16    division can be hard.  I remember I had to do division
17    when I was about your age, I think, is when I started
18    learning.  It wasn't my favorite thing, either.
19              Okay.  So (inaudible), and thank you for
20    telling me about those things.
21              So tell me why you came in to talk today, or
22    this morning, I guess.
23    A.        I don't know.
24    Q.        You don't know?  Okay.  I heard something --
25    something happened last night.
```

```
 1    A.         Um-hmm.

 2    Q.         Tell me about that.

 3    A.         There was a fight.

 4    Q.         There was a fight?  What happened?

 5    A.         I don't know.

 6    Q.         You don't know?

 7    A.         I was in my room, and then --

 8    Q.         You were in --

 9    A.         I was in my room.

10    Q.         Oh.

11    A.         Then I came out, and everybody was fighting.

12    Q.         Okay.  And what made you come out of your

13    room?

14    A.         Because I heard somebody scream --

15    Q.         Um-hmm.

16    A.         -- and so I ran out, and then I seen them

17    fighting.

18    Q.         Okay.  And what did you see when you ran out?

19    A.          I seen them trying to get past the door,

20    because my dad and my brother -- my dad and my big

21    brother -- they were outside the door, and my two uncles

22    were on the inside of the door, and then my two uncles

23    kept on trying to get in the outside to fight them.

24    Q.         To fight who?

25    A.         My dad and my brother.
```

```
1    Q.        Oh.  Okay.  And then what happened?

2    A.        And then my dad -- he busted the window.

3    Q.        Um-hmm.

4    A.        And then -- I don't know what happened after

5    that.

6    Q.        Okay.  Okay.  So where were you when this

7    happened?

8    A.        At -- they were fighting in the kitchen, and

9    so I went to the kitchen, and that's where I seen it.

10   Q.        Whose house is it?

11   A.        My granny's.

12   Q.        Your granny's house?  What's your granny's

13   name?

14   A.        Annice.

15   Q.        What is it?

16   A.        Annice.

17   Q.        Annice.  Okay.  And who lives there?

18   A.        My -- my mom, my dad, the twins, me, and my

19   two uncles, his girlfriend, and their baby.

20   Q.        Everybody lives there?

21   A.        Um-hmm, except for my big brother; he doesn't

22   live there.

23   Q.        Okay.  What's your big brother's name?

24   A.        Dooka.

25   Q.        Dooka?
```

```
 1    A.        He's 16.

 2    Q.        He's 16.  And was he there when this happened?

 3    A.        Um-hmm.

 4    Q.        Okay.  Is he the one that was on the patio

 5    with your dad?

 6    A.        Yeah.

 7    Q.        Or -- is that what you said?  You said they

 8    were outside?

 9    A.        Um-hmm.

10    Q.        Okay.  Okay.  Now, you said your two uncles

11    were in the kitchen, and then --

12    A.        (Nods head.)

13    Q.        -- there was a door, and your dad and your

14    brother were on the other side?

15    A.        Um-hmm.

16    Q.        So what -- what happened when they were like

17    that?

18    A.        My two uncles (inaudible) and got my cousin

19    DJ, because he kept blocking them from getting out there

20    so they wouldn't hurt each other.

21    Q.        Um-hmm.

22    A.        And then that's when my dad -- he busted the

23    door, and that's all I seen.

24    Q.        Okay.  So what did your dad -- when you say he

25    busted the door, what do you mean?
```

```
 1   A.        Like he shattered the glass with his fist.

 2   Q.        Oh.  Okay.  What's your dad's name?

 3   A.        Phillip.

 4   Q.        Phillip?  Okay.  So who was there when this

 5   happened?

 6   A.        Everybody.

 7   Q.        Everybody?

 8   A.        Except for my granny.  She was at work.  She's

 9   gonna be here tomorrow.

10   Q.        Okay.  So your granny was at work.  Okay.  Was

11   there anyone who was not in your family that was there?

12   A.        No.

13   Q.        Okay.

14   A.        Oh, yeah.  My -- my uncle's girlfriend's

15   friend.

16   Q.        Your uncle's girlfriend's friend.  Okay.  Do

17   you know who that is?

18   A.        Jenny.

19   Q.        Jenny.  Your uncle's girlfriend's friend is

20   Jenny?

21   A.        Um-hmm.

22   Q.        Okay.  All right.  Okay.  So you said what

23   made you come out of the room is you heard someone

24   screaming.  Okay.  How about when you went to bed?

25   A.        I was like -- I was sitting there watching a
```

1  movie --

2  Q.        Um-hmm.

3  A.        -- so then I laid down because I got tired,

4  and then like right when I was about to lay down I heard

5  somebody scream.

6  Q.        Okay.  And what was happening when you were

7  watching the movie?  What else was happening?

8  A.        I was just watching -- I forget what I was

9  watching.

10  Q.        Okay.

11  A.        I was laying there, me, my baby brother and

12  baby sister.  We were sitting in there watching it.

13  Q.        Um-hmm.  Okay.  And did you hear anything

14  besides the movie while you were watching the movie?

15  A.        (Shakes head.)

16  Q.        Okay.  And how old are you baby brother and

17  sister?

18  A.        They're both one.

19  Q.        They're both one?  Okay.  So are they the

20  twins you were talking about?

21  A.        (Nods head.)

22  Q.        Okay.  Okay.  And you said your mom lives in

23  the house, too?

24  A.        Um-hmm.

25  Q.        Where was your mom when this happened?

1   A.          She was trying to break up the fight.

2   Q.          Okay.  And here's a tissue.  You can use that

3   if you need to cough or sneeze or something like that.

4               Okay.  So your mom was trying to break up the

5   fight.  Do you know what -- what time it was when that

6   was happening, what time you were trying to fall asleep?

7   A.          Like around -- I can't remember.

8   Q.          Okay.  That's all right.  Okay.  So you came

9   out because you heard someone scream.  So where is your

10  room?

11  A.          It's like -- it's like right by the kitchen.

12  Q.          It's right by the kitchen?

13  A.          It was like where they were fighting, and then

14  I heard my uncle's girlfriend scream, and she just kept

15  calling for someone.  I don't know who she was calling

16  for.

17  Q.          Okay.  And then what else did you hear?

18  A.          I heard my mom trying to get him -- get my --

19  my dad away from the door --

20  Q.          Um-hmm.

21  A.          -- so they wouldn't do anything to get inside.

22  Q.          Okay.  And what do you think was happening?

23  A.          I don't know.

24  Q.          Okay.  You said it was -- so your dad and your

25  brother were on one side of the door, and your uncles

1   were on the other side of the door.  Have you ever seen

2   anything like that before?

3   A.        Huh-uh.

4   Q.        Have you ever heard them fight before?

5   A.        Huh-uh.

6   Q.        Okay.  And you said you heard screaming.

7   Were -- were people talking or yelling or making noise

8   at all?

9   A.        They were just -- like she was screaming.

10  Q.        Um-hmm.

11  A.        She was calling Angel, because it was just one

12  of my uncles, Dante, and he was -- he was the first one

13  to start fighting, and then she was yelling for Angel,

14  and then he came in there, and then they -- he kept on

15  trying to see what was wrong, but then my big brother

16  kept trying to -- trying to beat both of them up.

17  Q.        Okay.  And who was Angel, again?

18  A.        He's -- he's the one with short hair, and

19  Dante is the one that has long hair.

20  Q.        Okay.  And they are your uncles?

21  A.        Um-hmm.

22  Q.        Are they related to you?  Are they more

23  like (inaudible)?

24  A.        (Inaudible.)

25  Q.        Okay.  So your mom --

1    A.        Those are her brother.

2    Q.        Okay.  All right.  So her brothers were there.

3    Okay.  And then -- so tell me what happened when you --

4    between when you came out of the room and when you saw

5    your dad bust the door.

6    A.        I jumped back because I didn't want nothing

7    to -- nothing to start bleeding on me.  And then Leann's

8    friend and Leann -- they kept on telling me to unlock my

9    dad's phone to call 911, because their phone was dead.

10   So -- and then DJ came in the room, and --

11   Q.        Who's DJ?

12   A.        He's my -- my dad's cousin.  And then he came

13   in the room --

14   Q.        Um-hmm.

15   A.        -- and I was standing to give them the

16   phone --

17   Q.        Um-hmm.

18   A.        -- and he kept on like passing them and

19   pushing me back, because -- I don't know what he was

20   trying to do.  And then -- and then I -- and then when I

21   went out there, they were gone.  Leann and Dante and her

22   friend were gone, and I didn't know where they went.

23   Q.        Okay.  And then what happened?

24   A.        And then that's when I walked out on the

25   porch, and then I -- I didn't know what to do, and then

1   I cut my foot because there was a piece of glass.

2   Q.        Um-hmm.

3   A.        And -- and then I had to get the twins,

4   because they got -- I didn't want them to cut their

5   feet, so I bring them into the living room.

6   Q.        Um-hmm.

7   A.        And then I started to look for Dante, Leann,

8   and Jenny, and I checked their room, and there was like

9   blood all on the -- it was on the wall and on their

10  door.  And then they weren't in there, and I don't know

11  where they went.

12  Q.        Okay.  And when you saw the blood on the

13  door -- and in their room, you said?

14  A.        It was like on their door and like the wall

15  where all of the baby's toys are at.

16  Q.        Okay.  And what did it look like?

17  A.        It was like -- it looked like handprints and

18  then a smear on it.

19  Q.        Okay.  And then after you saw that what

20  happened?

21  A.        I went back, and then I was -- so I went to go

22  look back there to see if they were on the porch, and

23  they weren't on the porch, so --

24  Q.        Um-hmm.

25  A.        And then I just made the twins stay in the

1    living room, and then that's when the police told us to

2    go outside, and then that's when we all got into the

3    police cars.

4    Q.        Okay.  Okay.  When you went to go look at the

5    back porch, you said there was no one there.

6    A.        No.  It was my mom, my big brother, and my dad

7    on the ground.  They were like laying on the ground.

8    Q.        Oh.  So you didn't -- you didn't see Leann and

9    Dante?  Okay.  So that's who you were looking for, and

10   you didn't see them.  Okay.  So tell me what you saw on

11   the back porch when you went out.

12   A.        I saw my mom and my dad and my brother on the

13   ground.

14   Q.        Um-hmm.

15   A.        And I seen my uncle.  He was laying on the

16   ground, and he was like bloody.  I don't know if he was

17   okay.  They wouldn't tell me if he was okay.  They just

18   told us to go downstairs, and they put us in the police

19   cars.

20   Q.        Okay.  And what -- when you went out to look,

21   did you do anything?

22   A.        I was just on the -- I wasn't even on the

23   porch.  I was still inside the house.

24   Q.        Okay.

25   A.        And I was looking from the -- from the door

1   because it was open.

2   Q.        Um-hmm.

3   A.        And that's how I saw.

4   Q.        Okay.  And so you said you saw your mom on the

5   ground and your brother and your uncle, and who else?

6   A.        And my dad.

7   Q.        And your dad.  Okay.  And what else did you

8   see?

9   A.        And I seen my uncle and I seen blood on the

10  floor.

11  Q.        Okay.  Was there someone else around?

12  A.        And then the police officers were like on the

13  steps, and so they -- we went down the steps, and

14  they -- and then my granny called to see what was wrong,

15  and then I told her what happened, but then they took my

16  phone away --

17  Q.        Um-hmm.

18  A.        -- so we went to the police car, and then she

19  called me back and I said, "I (inaudible) talk to you

20  later," and then she -- she said she'll call me back a

21  little bit later.

22  Q.        Okay.

23  A.        And then the baby started to cry, so I

24  (inaudible) for them because they like to watch that

25  show, just to calm them down, and then my granny -- she

1  called, and she said my Uncle Del was coming, and then

2  they picked up the babies, and then -- and then -- then

3  we -- I was in the police car, and then we -- we went to

4  the police station --

5  Q.      Um-hmm.

6  A.          -- and then we started to watch TV for a

7  little bit, and then we came here.

8  Q.      Okay.  And who were you with in the police

9  car?

10  A.      One of the cops.

11  Q.      Okay.  Is that your phone?

12  A.      Um-hmm.

13  Q.      Oh.  Okay.  And that's the one that you talked

14  to your grandma on?

15  A.      Um-hmm.

16  Q.      Okay.  All right.  It sounds like a lot

17  happened.

18          So when all this was happening, what kinds of

19  things did you hear?

20  A.      I just heard like a lot of screaming.

21  Q.      Um-hmm.

22  A.      And then my big brother -- he's on the ground,

23  saying he was a minor; he was only 16.  And like there

24  was blood all in his mouth.  And then they had him on

25  his knees.  They carried my dad with him and my big

1    brother onto the brick part of the --

2    Q.         Um-hmm.

3    A.         -- in the backyard, and then they had them on

4    their knees, and then they had handcuffs behind their

5    back, and then they carried them through the grass into

6    the police cars, and I didn't see which one they were

7    in.  I couldn't -- and I seen the car DJ was in.  He was

8    in the one right in front of us.

9    Q.         Okay.  All right.  And then -- and then what

10   happened?

11   A.         And then I kept asking the police officers if

12   they seen Leann and Dante's baby, because I didn't know

13   if he was okay.  And then -- and then when I asked him,

14   he said he was with Leann.  (Inaudible.)

15   Q.         Okay.  So before you were watching the movie,

16   what was happening at your house?

17   A.         We were all eating dinner.

18   Q.         Okay.  And what was that like?

19   A.         I -- I was in my room, and then I had just

20   started the movie, and then they were all eating at the

21   table.

22   Q.         Okay.  And when you say "they were all," who

23   was eating at the table?

24   A.         Like most of the people that was fighting.

25   Q.         Okay.  Okay.  So do you know what the fight

1    was about?

2    A.        (Shakes head.)

3    Q.        No?  And you said you haven't seen them do

4    that before.

5    A.        Huh-uh.

6    Q.        Okay.

7    A.        Usually my big brother isn't around, because

8    he lives in Union City.

9    Q.        Oh.  Okay.  And your big brother is 16.

10   That's --

11   A.        (Nods head.)

12   Q.        Is he your oldest brother?

13   A.        Um-hmm.

14   Q.        Okay.  So tell me if I'm right.  So your older

15   brother -- what was his name, again?

16   A.        Dooka.

17   Q.        Dooka.  Okay.  Dooka.  And then are you the

18   next one?

19   A.        Um-hmm.

20   Q.        Okay.  So G██████.

21   A.        And then Q████ and then Baby P██████.

22   Q.        Q████?

23   A.        And Baby P██████.  Well, Baby P██████, because

24   he was born first, and then there was Q████.

25   Q.        Oh.  So they're the twins.

```
1    A.          Um-hmm.

2    Q.          Okay.  Do you have any other brothers or

3    sisters?

4    A.          Oh, yeah.  My -- my dad's daughter, J███████

5    She -- she's like right after me.  And then next comes

6    the twins.

7    Q.          Where was she?

8    A.          She doesn't live with us.  She lives in

9    Washington.  She's supposed to be coming over for

10   December break.

11   Q.          Oh.  Okay.  Okay.  So she lives pretty far

12   away.  Okay.  All right.

13               Let me see if they have any other questions

14   that they want me to ask you.  Okay?  And if anything

15   else comes up that you haven't told me, feel free.

16   Okay?  Is there anything else you think I should know?

17   A.          I can't think of anything.

18   Q.          You can't think of anything?  Okay.  All

19   right.  So how -- how are you feeling right now?

20   A.          Okay.

21   Q.          Okay?  All right.  How does it feel to talk to

22   me about this stuff?

23   A.          Scary.

24   Q.          Huh?

25   A.          Scary.
```

```
1    Q.        Scary?  Okay.

2              So I have a picture of somebody here, and tell

3    me if you know who it is.  Okay?

4    A.        Um-hmm.

5    Q.        All right.

6    A.        Angel.

7    Q.        Angel?  Okay.  And then this is -- he's your

8    uncle?

9    A.        One of my uncles.

10   Q.        Okay.  He's one of your uncles.  Okay.

11   Thanks.

12             Okay.  All right.  I think that's kind of

13   everything for now.  Let me think.

14             Okay.  So let's take a little break.  All

15   right?  And if you want, you can come down the hall, or

16   you can hang out in here.  Feel free if you want to

17   color or something.  Do you like to color?

18   A.        A little bit.

19   Q.        A little bit?  Well, you're welcome to do that

20   if you want.  You can use that thing.  So the crayons

21   are here, or if you want to come, you're welcome to hang

22   out in our other room, too.  It's a little bigger.  What

23   do you think?

24   A.        I think I'll just sit here.

25   Q.        Hang out here?
```

```
 1   A.        (Nods head.)

 2   Q.        All right.  No worries.  I'll be back in a

 3   little while.  Okay?  If you need anything, I'm just

 4   down the hall.

 5             (Ms. Armstrong exits the interview

 6             room and returns approximately ten

 7             minutes later.)

 8                        -o0o-

 9             MS. ARMSTRONG:  Q  Hello.  Thank you for

10   waiting.

11   A.        Um-hmm.

12   Q.        Okay.  So I do have some more questions for

13   you, but I think mostly I kind of just want to know

14   where everybody was and what was happening.  So let's go

15   back to when you first heard someone scream and then you

16   came out of your room, and tell me everything that you

17   saw.

18   A.        I saw -- there's this thing called an island

19   where we put all our stuff in.

20   Q.        An island?

21   A.        Yeah.

22   Q.        Okay.

23   A.        And it was like down, over, like it was all

24   tipped over.

25   Q.        Okay.
```

1   A.        And then our ironing board is broken, because

2   like you could take -- you can just -- it was like a

3   cabinet, and it will come out.  It will -- the ironing

4   board will come out.  It was like Angel punched it a lot

5   of times, and then it broke.

6   Q.        Did you see Angel punch it?

7   A.        Uh-huh.

8   Q.        Okay.

9   A.        Because he kept getting mad and he kept

10  punching it.  And then I seen -- I seen -- I think I

11  seen Angel have a knife in his hand, and he was like

12  pointing at the door.  I don't know if he was trying to

13  go through there.

14  Q.        Um-hmm.

15  A.        And then I seen -- I -- I seen like a -- like

16  grease, like slippery stuff on the floor, and there was

17  glass on the floor from the shattered window.

18  Q.        Um-hmm.

19  A.        And all of the -- like we had papers right

20  there, and then they were all tipped over, and they're

21  all on the ground.  And I seen blood on the ground.  And

22  then there was like -- there was like a lot of like

23  forks and spoons, because they -- like they knocked over

24  the thing that holds all the dishes --

25  Q.        Um-hmm.

1    A.        -- and they were all over the floor.

2    Q.        Okay.  And then what happened?

3    A.        And then -- and then they all got -- Angel and

4    them finally got to the outside, and they all started

5    fighting, and that's when the police came, and I heard

6    three gunshots, and then I seen Dante and Leann get on

7    the ground, and then they -- they -- they ran out of the

8    kitchen.  I -- I thought they went to their room, but

9    they weren't in their room.  I think they went through

10   the front door.

11   Q.        Okay.

12   A.        And then I don't know where Jenny went.  I

13   think she left or something.  And then I seen -- I seen

14   my dad and -- my dad, my mom, and my uncle on the

15   ground.

16   Q.        Um-hmm.

17   A.        And then -- and then that's when one of the

18   police officers told me and my brother and sister --

19   they told us to go out there.

20   Q.        Um-hmm.

21   A.        And so -- and then they -- that's when they

22   took the babies to the police car, and then they were

23   going to get me next, and then -- and then we went to

24   the police car, and my granny called, and she -- she

25   asked what happened, and then I told her all the stuff

1    that I knew.  And then she kept calling, and she was

2    crying because she didn't know if Angel was all right.

3    And then I tried to call her again, but she wouldn't

4    answer.  And then -- so that's when -- that's when my

5    Uncle Del came to pick up the babies, and then I went in

6    the car, and then that's when we went to the police

7    station.

8    Q.       Okay.  Okay.  So you said when you came out of

9    the room what you saw was the island was tipped over?

10   A.       Um-hmm.

11   Q.       And there was stuff everywhere.  Was that

12   okay?  So what were you watching?  What was happening

13   when you -- when you came out?

14   A.       I just saw Dante and Angel trying to get to

15   the door, to the back door.

16   Q.       Okay.

17   A.       They were trying to get outside.  Angel kept

18   telling my dad to come in there so that he can fight

19   them.  But DJ kept saying, "No.  Just -- just get away

20   from the door."  And then he -- he -- he kept like

21   blocking them, and then like they kept on trying to like

22   get to the door, like trying their hardest to push DJ

23   away from the door so they could get to the door.

24   Q.       Um-hmm.

25   A.       And then like one of them said that they got

1    stabbed, and then that's when I heard the three

2    gunshots, and I seen like them dripping with blood.  I

3    seen a slice mark.  I think it was Dante or either

4    Angel.

5    Q.       Dante or Angel that what?

6    A.       They had a slice mark on them from the knife.

7    Q.       Okay.  You're not sure who it was?  Okay.

8    Were the lights on or off?

9    A.       They were on.

10   Q.       They were on?  Okay.  All right.  So tell

11   me -- let me just listen here.

12            Okay.  So you said that DJ is your cousin?

13   A.       Um-hmm.

14   Q.       Okay.  And he was trying to stop Angel --

15   A.       (Nods head.)

16   Q.       -- and --

17   A.       Dante.

18   Q.       -- Dante from going outside?

19   A.       Um-hmm.

20   Q.       Okay.  Tell me what the door looks like

21   between the kitchen and -- the door to the kitchen and

22   the outside.

23   A.       Yeah.  It's like the kitchen is right inside,

24   and then right out -- like once you go out that door,

25   it's the backyard.

1   Q.          Okay.

2   A.          It's like a wooden door.  And then they all --

3   it's like -- it's like my mom went to get Angel because

4   my mom and Angel got into a fight, and Angel broke the

5   glass and it all shattered all over, and he broke the

6   frame.  But I don't think it will be hard, because they

7   just need to get new glass and what happened to the

8   frame.  There was just glass everywhere.

9   Q.          So there was a different time that Angel and

10  your mom got in a fight, and you said Angel broke the

11  glass that time?

12  A.          Um-hmm.

13  Q.          Okay.  And how did he break the glass?

14  A.          He -- because he just came at my mom with a

15  mop because they were fighting.  And then like he was

16  outside, and he tried to get in, because my mom locked

17  him out from getting to her.

18  Q.          Um-hmm.

19  A.          And then he broke the glass of the window

20  trying to get to the lock, to reach the lock to open it.

21  Q.          Okay.

22  A.          And then that's when my mom called the police.

23  Q.          Okay.  So you said there was kind of a window

24  and door.  So you said the door was wood?

25  A.          Yeah.

```
1    Q.        What -- tell me how the door looks and what --
2    where the glass is that got broken.
3    A.        The glass is like -- it was like right in the
4    middle, like right at the top of the door.  And then
5    like the door is like right next to the cabinets.  And
6    then -- so I -- and then like when I seen my dad's fist,
7    I didn't get to see his fist after when he punched the
8    glass, and I don't know if he was bleeding or not.  It
9    like -- I don't know if the hand went through.  It's
10   just like the whole thing fell and shattered.
11   Q.        Okay.  Okay.  So you said you saw -- let's
12   back up a little bit.  So you said you -- when you came
13   out of your room, the thing that made you come out is
14   you heard someone scream.  Did you hear something
15   else --
16   A.        (Shakes head.)
17   Q.        -- before you came out of the room?  Okay.  So
18   you heard someone scream.  And did they scream a word,
19   or was it just a noise?
20   A.        They were screaming for Angel.  Leann was
21   screaming for Angel to break up the fight between Dante
22   and Dooka.
23   Q.        Okay.  So Dante and Dooka were fighting?
24   A.        Yeah.  And then my dad -- because Angel came
25   out there, and then Dooka got up in Angel's face, and
```

1   then Angel started talking.  That's when my dad started

2   to talk mess to Angel.

3   Q.        Okay.  When you say "talk mess" --

4   A.        Like they kept on like calling them like mean

5   words and stuff.

6   Q.        Okay.  What kind of words?

7   A.        Like bad words.  Dad called -- and they kept

8   on like -- they kept on pushing each other to tell them

9   to get out of their face.  And then -- and -- and then

10  that's when they like -- when they really started to

11  push, that's when the fight started.

12  Q.        Okay.

13  A.        And then I think I heard Leann say that my dad

14  accidentally punched my mom in the face by accident.

15  Q.        Um-hmm.

16  A.        And then when I went out there, I seen one of

17  the police had -- I don't know who it was.  My mom was

18  trying to get up because she was laying on glass, and

19  then I seen one of them -- I seen them Tase her, I think

20  either like right here or either one of her shoulders.

21  Q.        And you said she was trying to get up because

22  she was on glass?

23  A.        Yeah.

24  Q.        And then you say you saw someone Tase her.

25  A.        Um-hmm.

1    Q.        What happened when you saw that?

2    A.        They -- I saw the officer do that, and they

3    didn't respond to me, and they told us to go outside,

4    and then that's when they started to put us in the

5    police car.

6    Q.        Okay.  Okay.  So then you saw a lot of things

7    happen.

8              Okay.  So you said you saw Angel punching the

9    ironing board in the cabinet --

10   A.        Yeah.

11   Q.        -- kind of thing?

12   A.        Yeah.  It was like the -- like there's one

13   where you can put the iron in there, and then the iron

14   board is at the bottom.  He's -- he was punching where

15   the iron goes, and then like it started to break because

16   the wood started to crack, and then I saw him break it,

17   and he like kept on punching it.

18   Q.        Okay.  And then who was there that saw Angel

19   punching it?

20   A.        It was Leann.  And Dante was in there, and

21   Jenny was in there --

22   Q.        Um-hmm.

23   A.        -- and I was in there.  And then he like kept

24   punching it.  And DJ was in there, because he was on the

25   other side of the door trying to get them to not go

```
1   outside.
2   Q.        Okay.  So who was outside when Angel was
3   punching the ironing board?
4   A.        My mom and my dad, Dooka, and I don't know --
5   there's someone else.  I don't remember who.
6   Q.        Okay.  And so Angel punched the iron thing and
7   broke it, and what did he do after that?
8   A.        He -- like he kept trying to push DJ out of
9   the way --
10  Q.        Um-hmm.
11  A.        -- and DJ wouldn't move.  And then that's why
12  he kept like pushing DJ and telling him to move out of
13  his way.
14  Q.        Um-hmm.
15  A.        And then that's when my dad -- because he's
16  hearing them, because it's not that hard to hear.  He
17  kept hearing them calling him and stuff, and he broke
18  the glass, and he said -- he -- I forgot what he said,
19  but he punched the glass and he said something.
20  Q.        Okay.  What kind of thing did he say?
21  A.        Like -- I don't know.  Like he said something
22  like -- he said, "Stop calling me --" I don't know what
23  they called him.  And I couldn't hear, because like
24  Leann was like still screaming, and I could barely hear
25  what they were saying.
```

```
1   Q.        Okay.  And was the door open or shut or

2   something in between?

3   A.        It was -- it was closed.  And then --

4   because they heard each other, because when my dad broke

5   the glass they could still hear each other.

6   Q.        Okay.  And then was -- do you know if the door

7   was -- was it locked or unlocked?

8   A.        I think it was unlocked.

9   Q.        You think it was unlocked?

10  A.        Because I think Angel unlocked it, because I

11  think it was already locked.  I think DJ locked it so

12  they wouldn't -- so they wouldn't get out there.  And

13  then he unlocked it and he was trying to get past.  And

14  then that's -- when they finally made it out there, they

15  all started fighting, and that's when the police

16  arrived.

17  Q.        Okay.  So when your dad punched the glass was

18  the door locked or unlocked?

19  A.        Unlocked.

20  Q.        Unlocked?  Okay.  So -- so after Angel broke

21  the ironing board thing, you said he went over to DJ and

22  they were -- he was -- DJ was trying to stop Angel from

23  going outside?

24  A.        Um-hmm.

25  Q.        Okay.  And what do you -- what -- did Angel
```

1    have anything in his hands at that time?

2    A.          No.  Like right before -- like -- like a few

3    minutes like after -- like a few seconds after, he

4    was -- no.  Right before that, he kept like getting mad,

5    and then like he -- he went into the drawers, and he had

6    a knife in his hand, and DJ was trying to be super

7    careful --

8    Q.          Um-hmm.

9    A.          -- and he was like pushing him against like

10   where the knives were so he wouldn't get to nobody with

11   it.

12   Q.          Okay.

13   A.          And then it dropped, and I don't know how it

14   cut Dante.  I don't know.  I don't even know how it cut

15   Angel, either, either Angel or Dante.

16   Q.          Okay.  Okay.  And that's (inaudible).  Okay.

17   Okay.  Let's take a break from that for a second.

18               When you guys were having dinner, you said you

19   were eating in your room --

20   A.          Um-hmm.

21   Q.          -- and everybody else was at the -- like at

22   the table?

23   A.          Um-hmm.

24   Q.          What were they having for dinner?

25   A.          I don't know.  I had some chicken, and they

1    had some other stuff.  I don't know what they had.

2    Q.        Okay.  And what were they drinking?

3    A.        They -- they were drinking alcohol, and

4    they -- they were drinking beers.

5    Q.        Okay.  And what were you drinking?

6    A.        I was drinking -- my dad just made some

7    Kool-Aid, and he said I could have some after dinner, so

8    I drank some of that.

9    Q.        Okay.  Okay.  And so they were drinking.  Did

10   you see anything else like that?

11   A.        I seen like -- it was like something brown.

12   Q.        Uh-huh.

13   A.        And it was on the table.  And that's all I

14   seen.  Like it was like little cuts of something.

15   Q.        Little cuts of something?

16   A.        Uh-huh.

17   Q.        What did it look like?

18   A.        It was like -- it just looked like brown, and

19   it was like cut up, like little pieces of it was cut up.

20   Q.        Okay.  If you had to guess, what do you think

21   it was?

22   A.        I don't know.

23   Q.        Okay.  And what table was that?

24   A.        It was at the dining table.

25   Q.        The dining table.  And where is the dining

1  table?

2  A.      It's in our dining room.  It's like -- right

3  when you walk right out of the kitchen, it's right

4  there.

5  Q.      Okay.  Okay.  Did you see anything else?

6  A.      Huh-uh.

7  Q.      Okay.  All right.  So let's go back to the

8  spot we were.

9          So you said Angel went in the drawers and he

10 got a knife.  What did the knife look like?

11 A.      It was like -- it was -- the handle was red.

12 And it was like -- it wasn't a sharp one, like it was a

13 big, flat one, and then like a little bit sharp at the

14 top, and then like he was holding it like this, and he

15 was looking out the window, and then I don't know who --

16 and that's when DJ started to push him back against the

17 door -- I mean against like where the drawers are, like

18 so he couldn't get away.

19 Q.      Okay.  And then what happened?

20 A.      And then he took the knife from Angel, and

21 then I don't know where that knife went.  I don't know

22 if it's still in the house or anything.  And then -- and

23 then that's when Dante -- that's when Dante was able to

24 get out, and that's when he got to them, and that's when

25 Angel pushed away from DJ and they all started fighting

1  again.

2  Q.        Okay.  So you -- when you say Dante got out,

3  what do you mean?

4  A.        Like he opened the door and he got out and he

5  started to like -- started to go to my dad, and they all

6  started to fight.

7  Q.        And what were they doing when they were

8  fighting?

9  A.        Like they kept punching each other and

10 pushing, and then I think you go -- because it's like

11 stairs to go down.

12 Q.        Okay.

13 A.        And then I think he -- he said he's

14 (inaudible) to fall down the steps.

15 Q.        Okay.  And what else did you hear when this

16 was happening?

17 A.        I heard -- I heard -- because we have a dog.

18 I heard her barking.  She was in the house, and I heard

19 her barking.

20 Q.        Okay.  And then when -- let's see.  So Dante

21 went outside, and then Angel got past DJ.  Did you see

22 where the knife was when Angel was --

23 A.        Huh-uh.

24 Q.        -- running out?

25 A.        I didn't see where they put it, but I think DJ

1  had it, and I don't know where he put it.

2  Q.        Okay.  All right.  And then so what did Angel

3  do when he got past DJ?

4  A.        He -- he went out the door and he started to

5  fight them, because they kept on beating up Dante, so he

6  started to beat up them.

7  Q.        Okay.  And so your dad already -- the glass

8  was broken --

9  A.        Um-hmm.

10  Q.        -- by that time; right?  Okay.  So did your

11  dad break the glass before Dante -- or before Angel got

12  the knife, or after Angel got the knife?

13  A.        After Angel got the knife.

14  Q.        Okay.  Okay.  And then so DJ was trying to

15  keep Angel --

16  A.        Away from getting to them.

17  Q.        Okay.  And then -- and -- but then -- so your

18  dad could hear what they were saying?

19  A.        Um-hmm.

20  Q.        Is that right?  Okay.  And then --

21  A.        Because it was like halfway open.  He could

22  hear through the crack, and then that's when he busted

23  the window.

24  Q.        Okay.  And is the window a part of the door,

25  or is it on the -- next to the door?

1   A.        It's on the door.  It's like at the very top

2   of the door.

3   Q.        Okay.  The very top of the door.  And you said

4   the door is wood?

5   A.        Um-hmm.

6   Q.        Okay.  Okay.  So your dad was outside when he

7   punched the glass; right?

8   A.        (Nods head.)

9   Q.        Okay.  And so after Angel and -- and Dante

10  went outside and they were fighting again, what did you

11  do?

12  A.        I -- that's when Leann and Jenny told me to

13  unlock my dad's phone, because he had a pass code on

14  there, and their phones were dead, and to call the

15  police.  And then like when I was done typing in the

16  pass code, that's when they left, and I didn't see where

17  they went.

18  Q.        So Leann left, and who else?

19  A.        And Dante and Jenny.

20  Q.        And Dante and Jenny.  Okay.  And you said

21  something about a baby.

22  A.        Yeah, their -- their baby.  I don't know where

23  he was.  I asked the police officers, and they said

24  he -- that he was in the car with them, I think.

25  Q.        Okay.

1    A.        And then because they kept saying that the

2    baby was crying, but Dante wouldn't go check on him.  He

3    still was trying to get to Dooka and my dad.

4    Q.        Dante was still trying to get to Dooka and

5    your dad?  How do you know he was still trying to do

6    that?

7    A.        Because like he -- like when they kept on

8    telling him, he kept on like pushing away and trying to

9    get to him.

10   Q.        Okay.  Who was he pushing away from?

11   A.        It was Leann, because she was the one that

12   told him that the baby was crying, and then like the

13   police were just pulling up, and then -- and then that's

14   when the -- they shut their (inaudible), and she said,

15   "We need to go check on the baby," so that's when they

16   went to their room, and that's -- and they went

17   somewhere, and I don't know where.

18   Q.        Okay.  So where were you when that was

19   happening?

20   A.        I was in the room trying to -- because -- I

21   was in the living room trying to keep them back from all

22   the glass and --

23   Q.        You mean the twins?

24   A.        Yeah.

25   Q.        That's what -- okay.  That's what you were

1   saying earlier.

2          So when -- what was the last thing you saw

3   outside before you went to go to check on the twins or

4   keep them away from the glass?

5   A.        I seen Angel laying on the floor.

6   Q.        Okay.  And -- and that's when you saw -- okay.

7   So you saw Angel laying on the floor, and then you went

8   to go check on --

9   A.        The twins, to see if they were okay.

10  Q.        Okay.  So you said you heard three -- three

11  shots?

12  A.        (Nods head.)

13  Q.        Okay.  And where were you when you heard that?

14  A.        I was down in the house.  And I didn't know

15  what to do, so I called my granny when we went

16  downstairs, and then they told me just to get off the

17  phone real quick, so I got off the phone, and then when

18  we went to the car I -- I called her and I told her what

19  happened.  And then she kept crying because of Angel.

20  She said she hopes he was okay.  And -- and then that's

21  when she called my Uncle Del, and she called me back and

22  she said he was coming.

23  Q.        Okay.  So how is your Uncle Del related?

24  A.        It's my granny's -- that's my granny's

25  brother.

1    Q.        Oh.   Okay.   Your granny's brother.   And --

2    A.        And that's my mom and her brothers' uncle.

3    Q.        Okay.   So let me think here.

4              So you were in what room when you heard the

5    gunshots?

6    A.        I was in the kitchen.

7    Q.        You were in the kitchen.   Okay.   Who else was

8    in the kitchen?

9    A.        Just my dog, because she kept -- that's when

10   she was barking.

11   Q.        Okay.   And you told me earlier that you

12   stepped on glass?

13   A.        Um-hmm.

14   Q.        When did you step on the glass?

15   A.        Like when we were -- when we were leaving.

16   And because I was like standing -- I was like standing

17   right there, and he said, "Just stay right there."   And

18   they kept telling Dooka to be quiet.   I said, "Dooka, be

19   quiet so they can get it over with."   And then he

20   like -- he kept screaming that he was a minor and he was

21   only 16.   And -- and then that's when they took them all

22   downstairs, and that's -- that's when they carried them

23   through the grass.   I don't know where they put my mom

24   after when they Tased her.

25   Q.        Okay.   So -- okay.   Yeah, so you watched that

1   happen; right?  You saw that happen.  Okay.

2          So I'm trying to -- I'm trying to figure out

3   so where -- where you were when all this happened and

4   what you saw, and then when you went to go check on the

5   twins and then when you came back what you saw.  Does

6   that make sense?  I'm trying to understand everything

7   and the -- the time, you know.  You saw your mom get

8   Tased, and you said you saw her get hit, (inaudible),

9   but then you didn't -- you only heard the gunshots.  So

10  what happened -- I guess what happened first?

11  A.        I heard the gunshots.

12  Q.        Did your mom get Tased before the gunshots?

13  A.        Yeah, she got Tased -- no.  The -- the -- she

14  got Tased after.

15  Q.        Um-hmm.

16  A.        And then -- because they fired three times.

17  And then when I went out, I didn't know if they were

18  real guns or fake, and then I seen smoke in the air.

19  Q.        Okay.  And where did you see the smoke?

20  A.        On the porch, on the backyard porch.

21  Q.        On the backyard porch?

22  A.        Um-hmm.

23  Q.        Okay.  You said there were stairs?

24  A.        Yeah, stairs that go gown to the -- go back to

25  like the grass and the dirt parts.

```
 1   Q.        Okay.  So the smoke -- so there's like an

 2   upstairs outside area.  Okay.  So there was the glass

 3   door, and then you go onto a porch, and the stairs come

 4   off the porch; is that right?

 5   A.        Yeah.  Like the wooden door, and then there's

 6   the balcony --

 7   Q.        Um-hmm.

 8   A.        -- and then there -- you -- there's a set of

 9   steps like right when you go back, and then you go down

10   the steps, and then there's a brick part, and then the

11   rest is all grass.

12   Q.        Okay.  And so what do you think the smoke was

13   from?

14   A.        (Inaudible.)

15   Q.        Okay.  Let me see if they have any other

16   questions for you.  Let me check.

17             Okay.  So I just want to go back over

18   everybody that was there and how everybody knows each

19   other.  So why don't we start from when -- I guess

20   around dinnertime.  Most everyone lives at that house

21   that you talked about, right, except for one person?

22   A.        Dooka.

23   Q.        Oh.  Dooka.  Does he -- he doesn't live in the

24   house?

25   A.        (Shakes head.)
```

```
1    Q.      Oh.  What about your uncle's girlfriend's
2    friend?  Does she live in the house, too?
3    A.      Huh-uh.
4    Q.      Okay.  Does anyone else who was there live
5    somewhere else?
6    A.      No.
7    Q.      Okay.  So Dooka doesn't live there.  So when
8    did Dooka get there?
9    A.      Like a few days before.  And I think because
10   there's -- because I think today was my dad's birthday,
11   and then they all started to party.
12   Q.      Okay.
13   A.      And then -- and then Leann's friend -- she
14   doesn't live there.  She lives in a trailer with her mom
15   and her dad.
16   Q.      Okay.
17   A.      And then the rest of us -- we all live in that
18   house.
19   Q.      Okay.  So I want to try to make sure I get
20   everybody straight.  Okay.  So there's the twins, Baby
21   Phil and Chloe?
22   A.      Uh-huh.
23   Q.      Okay.  And then you, and then your older
24   brother Dooka, and your dad.  What's your dad's name,
25   again?
```

```
1    A.        Phillip.

2    Q.        Oh; he's Phillip, too.  Okay.  And your mom?

3    A.        Alicia.

4    Q.        Alicia.  Your mom lives there.

5    A.        (Nods head.)

6    Q.        Okay.  And then your grandma was at work;

7    right?

8    A.        Um-hmm.

9    Q.        So your grandma wasn't there.

10   A.        (Nods head.)

11   Q.        And then you have two uncles that were there?

12   A.        Um-hmm.

13   Q.        Angel and Dante.  And then DJ.

14   A.        And Leann.

15   Q.        And Leann.  So DJ is your cousin.

16   A.        Um-hmm.

17   Q.        Right?  How old is DJ?

18   A.        I don't know, but he -- I think he's in high

19   school.

20   Q.        Okay.  Okay.  And then Leann -- is Leann

21   Angel's girlfriend, or Dante's girlfriend?

22   A.        Dante's girlfriend.

23   Q.        Dante's girlfriend.  Okay.  And who else was

24   there when this was happening?

25   A.        It was just the people I named, and that's it.
```

1    Q.        Okay.  Okay.  They're asking me a question.

2              So when you said that there was one time where

3    Angel broke the glass on the door when he was fighting

4    with your mom, did you see Angel do anything like that

5    before?

6    A.        Huh-uh.  Like he was -- like he used to go --

7    like he used to -- (inaudible) says he used to be on

8    drugs.

9    Q.        Um-hmm.

10   A.        And like he used to see things that he said --

11   he would see things, like say that they were going to

12   shoot up the house and stuff.  And then like my mom was

13   talking to her friend, and then she said Angel is

14   being -- like one time, and then he said, "Why -- why

15   were you -- why were you talking about my business?"

16   Q.        Um-hmm.

17   A.        And then she said, "I wasn't even saying

18   nothing."  And then that's when my mom -- that's when

19   they started to argue.  And then that's when my mom

20   locked him out the door, because he was right at the

21   door --

22   Q.        Um-hmm.

23   A.        -- and then like she walked forward, and then

24   he like walked back because -- so she wouldn't do

25   nothing, and that's when she locked the door, and

1    that's -- because there was a mop out there, and then

2    he -- he used the back part and then he broke the glass

3    with it.

4    Q.        Okay.  Was there a different time that you saw

5    Angel do something like that?

6    A.        Huh-uh.

7    Q.        How about just getting in fights in general?

8    A.        He gets in fights with his friends.

9    Q.        He what?

10   A.        He gets in fights with his friends.

11   Q.        Oh.  Okay.  What kind of fights?

12   A.        Like all his -- like they used to -- like they

13   do -- what is it called?  Graffiti and stuff, and they

14   ride skateboards around, and he'll get in fights with

15   them because they kept talking about him, so that's why

16   he would get mad at them.

17   Q.        And what did he do when he got mad?

18   A.        Like he kept arguing with them.

19   Q.        Um-hmm.

20   A.        And then he would like -- he would

21   sometimes -- like he would walk -- he would go -- he

22   would follow them to see what they were doing, and

23   then -- and then like when they seen him, then he'll

24   like -- he'll be acting like he was going back home,

25   like he was just riding past, going back home.

```
1    Q.       How do you know that he did that?

2    A.       Because he kept -- he came home telling my

3    granny about what happened.

4    Q.       Oh.  Okay.  Okay.  So you heard him telling

5    your granny?

6    A.       Um-hmm.

7    Q.       Okay.  So tell me more about Angel.

8    A.       He -- like what?

9    Q.       Just more of the things he liked.

10   A.       Like he -- he used to -- like he used to --

11   when we lived in Oakland, he used to hang out with

12   people --

13   Q.       Um-hmm.

14   A.       -- that he wasn't supposed to.  And he said

15   one time he did something he wasn't supposed to, and

16   they said they would kill him, but -- but it was just a

17   pass.  So then he -- that's when he started hanging out

18   with other people.

19   Q.       Um-hmm.

20   A.       And then he -- because that people -- Dante

21   and Angel were in different groups, and that's when

22   Angel went to Dante's group, so they didn't have to mess

23   with the other group.

24   Q.       Okay.

25   A.       And then that's when they rode past and
```

1    they -- and then they let -- and they just kept looking

2    at Angel, and he looked nervous, so they asked Dante if

3    they could go home, and Dante said yeah, and then they

4    ran home as fast as they can, and then that's when

5    they -- they hurry up and lock the door, and then they

6    went to go tell my granny.

7    Q.        Okay.  And you heard -- is that how you know

8    that that happened, is they told your granny?

9    A.        (Nods head.)

10   Q.        Okay.  And when you say one group or different

11   group, what do you mean?

12   A.        Like it was -- like they were like the

13   graffiti people --

14   Q.        Um-hmm.

15   A.        -- and Dante's group was like -- they didn't

16   get into as much trouble as the graffiti.

17   Q.        Oh.  Okay.  Okay.  So let's go back a little

18   bit.  Excuse me.  I want to know more about -- you said

19   you saw blood on the -- in Dante's room?  Is that

20   where --

21   A.        On Dante's door.

22   Q.        And you said there was a handprint.

23   A.        Yeah.

24   Q.        Okay.  Where else did you see blood?

25   A.        Like I seen it on the floor.  It looked like

1    handprints, too, because he started to crawl for a

2    minute, because when they shot, and that's when he ran

3    to the room to go get the baby, and then he pushed open

4    the door, and that's when he grabbed the baby, and then

5    that's when they left.

6    Q.        Okay.  Okay.  And tell me again.  Where were

7    you when you heard the gunshots?

8    A.        I was in the kitchen.

9    Q.        You were in the kitchen.  And what were you

10   looking at when you heard the gunshots?

11   A.        I was looking at my mom and dad and Dooka down

12   on the ground.

13   Q.        Okay.  So your mom and dad and Dooka were on

14   the ground?

15   A.        (Nods head.)

16   Q.        Okay.  And then you heard the gunshots.  And

17   what did you see?

18   A.        I seen one of the officers pointing it in the

19   air, and they did that to make them stay on the ground,

20   because they kept on trying to get up.  That's why they

21   Tased my mom, because she kept on trying to get up

22   because she was laying on glass, and she was trying to

23   dust it away, and they didn't know why, so that's why

24   they got her.

25   Q.        Okay.  And that was about when you stepped

1   on -- on the glass; right?

2   A.        (Nods head.)

3   Q.        Did you have shoes on when you stepped on it?

4   A.        Because I was in the room, and then I looked

5   out the -- I looked at the room --

6   Q.        Um-hmm.

7   A.        -- because we were in the room still watching

8   the movie, and then I looked out the door, and then

9   that's when I seen them fighting.

10  Q.        Okay.  And so what happened to your foot when

11  you stepped on the glass?

12  A.        It just like started to bleed a little bit,

13  and then I said it was fine, so then that's when I put

14  my shoes on, and so then I didn't have to step on more

15  glass.

16  Q.        Okay.  How does your foot feel now?

17  A.        It's fine.  I can still walk.

18  Q.        Does it hurt?

19  A.        No.

20  Q.        No?  Okay.  Did anybody look at your foot?

21  A.        Huh-uh.  Oh, yeah.  They looked at it to see

22  if something was wrong with it.  I said, "No, nothing is

23  wrong with it," just (inaudible).

24  Q.        Okay.  Who looked at it?

25  A.        One of the officers.

```
1   Q.        One of the officers.  Now, how come the
2   officer looked at your foot?
3   A.        Because he was asking for our name, and then
4   he was asking if any of us got hurt, and I said, "Yeah.
5   I just cut my foot."
6   Q.        Okay.  Okay.  And did the officer take your
7   shoe off and look at?
8   A.        No.  He bringed me my shoes because they were
9   still in the room.
10  Q.        Oh.
11  A.        Because they -- they wanted us to get out of
12  the house and get into the police cars, and then he went
13  to go get me and the twins' shoes.
14  Q.        Okay.  Okay.  So did you try to keep the twins
15  away from the glass before the officers got there, or
16  after?
17  A.        Yeah, because it was all over the floor.
18  Q.        Okay.
19  A.        So I kept them in the living room because it
20  was all in the kitchen, and it was kind of going into
21  the dining room --
22  Q.        Um-hmm.
23  A.        -- because Dante still had it on his shoes and
24  on his pants and stuff, and he was -- it would shake
25  off, and it was spread in the dining room.
```

1    Q.       Okay.  So there was glass on him, and you said

2    he crawled through the kitchen?

3    A.       Yeah.  He -- because that's when the shots

4    were fired and they crawled through the kitchen.

5    Q.       Okay.  And did you see -- so you said what

6    Dante was doing.  What was Angel doing when the shots

7    were fired?

8    A.       He was already out there, because he was the

9    first one to get out there, and he was laying on the

10   ground.

11   Q.       Okay.

12   A.       Like he was on his belly and he was laying on

13   the ground, and so I thought I don't know if he was all

14   right, because my mom and my dad and Dooka -- they were

15   all on their -- they were all laying on their backs,

16   like they were on their backs, and then they sat there

17   on their butt, and then that's what they -- they bring

18   them downstairs and they put them on their knees, and

19   that's when they put handcuffs on them.

20   Q.       Okay.  Okay.  So you were -- does Dooka go by

21   another name?

22   A.       No.  He likes to be called Deck, because he

23   was -- because he just got -- he was in football --

24   Q.       Um-hmm.

25   A.       -- in high school, and he calls people to him

1   to see him play, and then they liked how he was

2   playing --

3   Q.        Um-hmm.

4   A.        -- and so they said that they gave him a

5   scholarship and they're gonna pay for the whole thing.

6   Q.        Wow.  That's great.  Okay.  So does -- how do

7   you spell your brother's name?

8   A.        D-o-o-k-a.  Yeah, k-a.

9   Q.        D-o-o-k-a.  Okay.  So just Dooka.  Okay.  And

10  does anyone call him anything else?

11  A.        Huh-uh.

12  Q.        Okay.  Just making sure I get everybody's name

13  right.

14            Let's see.  We talked about the door.  So you

15  told me about Angel, and you said that Angel and Dante

16  are in the same group?

17  A.        Um-hmm.

18  Q.        Okay.  What's Dante like?

19  A.        He's like -- he's younger than Angel.

20  Q.        Um-hmm.

21  A.        So that's why he -- that's why he wasn't like

22  with Angel and that, because they're in different

23  grades, but they still saw each other at recess, so

24  that's why he -- Angel would hang out with him.  And

25  then Dante -- he was like -- he was like -- he always

1  liked to like wonder about stuff, like he was curious

2  about stuff.

3  Q.        Uh-huh.

4  A.        And then that's why -- when Angel got into the

5  problem with his other friends, that's why he joined

6  Dante's group.

7  Q.        Okay.  And what kinds of things did Dante's

8  group do?

9  A.        They weren't like graffiti people.  They rode

10  skateboards and stuff, but they didn't do no graffiti.

11  Q.        Okay.

12  A.        And like they would like ride the skateboards

13  all day in the park and stuff.

14  Q.        And other than like last night with him and

15  Angel, did you ever see Dante do anything like what you

16  saw?

17  A.        Huh-uh.

18  Q.        Did you ever hear about him getting in fights

19  or anything like that?

20  A.        Yeah.  One time Angel and Dante fight.  We

21  were living out here.  It wasn't at the same house.

22  Q.        Okay.

23  A.        We were living on a different street.  And we

24  were living in a different house, and then I don't know

25  what the fight was about, but they -- they started to

1    fight, and then like they were fighting in the hallway

2    right by their rooms, and my granny had to break it up,

3    because my (inaudible) -- she's in college and she had

4    to get up to go -- to -- she had to get up early, and

5    she didn't want them to wake her up --

6    Q.       Okay.

7    A.       -- so that's why she told them to leave.  And

8    so Angel slept in -- because they have bunk beds, Angel

9    slept in, I think, his room on the floor and Dante slept

10   at the bottom of the bed.

11   Q.       Okay.  So were they -- they were loud.  Why

12   were they loud?

13   A.       Because they kept shouting at each other.

14   Q.       Okay.  So they got in a fight with each other?

15   A.       Um-hmm.

16   Q.       Okay.  Have you heard of Dante getting in a

17   fight or something like that with anybody else?

18   A.       Huh-uh.

19   Q.       Okay.  And on your -- on your shirt up here

20   you have some white stripes.  What -- on the other side

21   it looks like you have something that's on the white.

22   Has that been there for a long time, or is that --

23   A.       Huh-uh.

24   Q.       -- something else?  What is that?

25   A.       I don't know.

1    Q.        Okay.  So while all this stuff was happening

2    and you saw everybody fighting, how did you feel?

3    A.        I felt scared because I did not want nobody to

4    get hurt too real bad --

5    Q.        Yeah.

6    A.        -- so that's why -- and that's why Jenny and

7    Leann kept telling me to call the police --

8    Q.        Um-hmm.

9    A.        -- but every time I did that, I kept yelling

10   their names and they -- they wouldn't come, so -- and I

11   don't know why, so I didn't call the police.  I don't

12   know who called the police.  Because I still had dialed,

13   but I didn't press "Call."

14   Q.        Okay.

15   A.        And then I think one of the neighbors did,

16   because like the one -- there was one like right next

17   door, and he has to get up for work early --

18   Q.        Um-hmm.

19   A.        -- so that's probably why he called.

20   Q.        Oh.  Okay.  Okay.  All right.  How else did

21   you feel?

22   A.        Huh?

23   Q.        How else did you feel when it was happening?

24   A.        Mostly scared.

25   Q.        What were you thinking?

1    A.        I was thinking, "I hope that nobody gets hurt

2    too bad."

3    Q.        Okay.  Okay.  While we were talking did

4    something else come to your mind that you think would be

5    good to share with me?

6    A.        (Shakes head.)

7    Q.        Okay.  Why don't I see if there's anything

8    else that they want me to ask you about.  How are you

9    doing right now?

10   A.        Good.

11   Q.        Okay.  It seems like you're getting a little

12   tired.

13   A.        I am.

14   Q.        Yeah.  Probably now that the sun came out.

15   Yeah.  You've been up all night long.

16             All right.  Let me -- they're just chatting

17   and thinking of things that they might want to know.

18             Thank you so much for sharing all of that.  I

19   really appreciate it.

20             And -- so they're asking me about somebody.

21   Is there somebody named Deshon?

22   A.        That's my dad.  It's (inaudible) Deshon.

23   (Inaudible) is Deshon and my dad's Deshon.

24   Q.        Okay.  So it's a different part of your name?

25   A.        That's our ██████ name.

```
1    Q.          D█████ is your ███████ name?

2    A.          It's G██████████████████ W██████.

3    Q.          Okay.  And then your dad is Phil?

4    A.          Phillip Deshon Vaughn Wilson.

5    Q.          Phillip Deshon Vaughn Wilson.  He's Junior?

6    A.          Yeah.

7    Q.          Okay.

8    A.          Because his dad was Junior, and then he named

9    my baby brother after him.

10   Q.          Okay.  So that's why he's Baby P████?

11   A.          Um-hmm.

12   Q.          Okay.  Okay.  Okay.  We're trying to make sure

13   that we didn't miss anybody, so we were just -- okay.

14   So you're all named D█████.  Got it.

15   A.          Except for C████.  She's C████████████████

16   W██████.

17   Q.          M███████?  Is that your grandma's name?

18   A.          It's -- it's my -- because they didn't know

19   who to name --

20   Q.          Okay.

21   A.          Annice and Monique together, because that --

22   Monique is my dad's mom --

23   Q.          Oh.

24   A.          -- and then Annice is my mom's mom.

25   Q.          Oh.  Yeah.  That's pretty.  I like that.
```

1  A.        It's my Auntie Donnie's real name, because she

2  died and my mom named it after her.

3  Q.        Oh.  Okay.  Is ██████ your mom's only daughter?

4  A.        Um-hmm.

5  Q.        Okay.  All right.  And Dooka.  Who -- so

6  Dooka's your older brother.  Is Dooka your mom and your

7  dad's --

8  A.        No; it's my dad's son.

9  Q.        Oh.  Your dad's son.  Okay.  So is your sister

10 in Washington -- is she related to Dooka?

11 A.        I don't know.  My dad never told me.  But

12 that's my -- my dad's daughter.

13 Q.        Okay.  So Dooka and then your dad's

14 daughter -- they don't live with you guys.

15 A.        Huh-uh.

16 Q.        But -- but Dooka is visiting?

17 A.        Um-hmm.

18 Q.        Okay.  Where's he visiting from?

19 A.        Union City.

20 Q.        Union City.  So he's not that far away.  Okay.

21           All right.  Is there anything else that you

22 think we should know?

23 A.        No.

24 Q.        Okay.  What do you think you're gonna end up

25 doing today?

```
1    A.        I don't know.

2    Q.        Yeah.  I don't (inaudible), either.

3    A.        Probably sleep.  That's what I --

4    Q.        Probably sleep, huh.  Yeah.  Do you have

5    another -- someone else's house that you can go to to go

6    to sleep?

7    A.        I do have my -- my -- my friend's mom's house.

8    Q.        Your friend's mom's house?  Okay.  All right.

9    Well, I don't have any more questions for you.  Do you

10   have any questions for me?

11   A.        (Shakes head.)

12   Q.        Okay.  Let's go ahead out to my office and

13   relax.  All right?  If you want, you can bring that

14   blanket.  That's okay.

15             (End of digital recording.)

16                           -o0o-

17

18

19

20

21

22

23

24

25
```

```
1   STATE OF CALIFORNIA      )
                             ) ss:
2   COUNTY OF SOLANO         )

3            I, DENISE L. DOUCETTE, CSR 5963, RDR, CMR,

4   FAPR, do hereby certify that the foregoing Pages 1

5   through 65, inclusive, represent a full, true, and

6   correct transcription of a digital recording represented

7   to me to be an interview of G███████ W██████ conducted by

8   HALEY ARMSTRONG at the Solano Family Justice Center, 604

9   Empire Street, Fairfield, California, on Monday, January

10  23, 2017, transcribed to the best of my ability to hear

11  and comprehend said digital recording.

12           I further certify that I am not related to any

13  party or counsel or attorney for any of the parties in

14  this case or in any way interested in the outcome of the

15  action herein.  I have hereunto set my hand this 1st day

16  of May, 2019, at Vallejo, California.

17

18           _____

19                   DENISE L. DOUCETTE, CSR 5963

20

21

22

23

24

25
```

**EXHIBIT F**

1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4                        --oOo--

5   ANNICE EVANS, individually and   )
    as Successor in Interest to       )
6   Decedent ANGEL RAMOS, et al.,     )
                                      )
7          Plaintiffs,                )
                                      )
8          VS.                        ) No. 2:17-CV-01619-
                                      )       TLN-AC
9   CITY OF VALLEJO; a municipal      )
    corporation; ZACK JACOBSEN,       )
10  et al.,                           )
                                      )
11         Defendants.                )
                                      )
12  _____  )

13

14                        --oOo--

15        VIDEOTAPED DEPOSITION OF DESHON WILSON

16                        --oOo--

17

18                  Vallejo, California
                 Monday, September 17, 2018
19                     1:06 p.m.

20                        --oOo--

21

22               DOUCETTE & ASSOCIATES
                   1219 Marin Street
23            Vallejo, California 94590
                   (707) 554-9970
24

25  REPORTED BY: REBECCA K. DOWELL, CSR, RPR
             CSR License Number 8043

                                                              1

```
 1   A.      At the time I fell it was kinda -- I believe

 2   Angel and Dante kinda rushed out and --

 3   Q.      Who was in front?

 4   A.      I'm not sure.

 5   Q.      And what did Angel do next?                        02:02:35

 6   A.      He got on top of me and started basically

 7   punching me.  It was kind of a fight between me and

 8   him.

 9   Q.      Do you remember whether he was punching you

10   with his right fist or left fist?                          02:03:03

11   A.      It was both.

12   Q.      Both?

13           And were you hitting back?

14   A.      Yes.

15   Q.      Okay.  Were you able to connect?                   02:03:12

16   A.      No.

17   Q.      Where were you trying to hit him?

18   A.      I'm not sure.  I believe it was his face.

19   Q.      Okay.  And where was Dante at that time, if

20   you know?                                                  02:03:31

21   A.      I'm not sure.

22   Q.      Did you see anyone else up on the balcony or

23   in the kitchen at that time?

24   A.      No, ma'am.  I was on the ground, so wasn't

25   able to see anybody but --                                 02:03:43
```

47

1    Q.      Was Angel saying anything to you as you were

2    fighting?

3    A.      No.

4    Q.      Were you saying anything to him?

5    A.      No, ma'am.                                                    02:03:53

6    Q.      And what happened next?

7    A.      I kinda heard the shot, but I didn't at the

8    same time; it was kind of a muffled.

9            And Angel just kinda fell on top of me, and

10   then I didn't -- at the time I didn't know what was       02:04:13

11   going on.  I pushed him because I didn't know what

12   was going on.

13           Next thing you know, I see flashlights and

14   police kind of rushed up there.

15   Q.      At the time that Angel was on top of you did       02:04:32

16   he have a knife in his hand?

17   A.      No, ma'am.

18   Q.      Did you see him with a knife in his hands at

19   any point that night?

20   A.      No, ma'am.                                         02:04:46

21   Q.      Do you remember giving a statement to police

22   after you were taken down to the station?

23   A.      Yes, ma'am.

24   Q.      Do you remember saying that you were worried

25   Angel was going to cut you?                                02:04:55

48

**EXHIBIT G**

1  JOHN L. BURRIS, Esq. SBN 69888
   BEN NISENBAUM, Esq. SBN 222173
2  MELISSA C. NOLD, Esq. SBN 301378
   LAW OFFICES OF JOHN L. BURRIS
3  Airport Corporate Centre
   7677 Oakport Street, Suite 1120
4  Oakland, California 94621
   Telephone: (510) 839-5200
5  Facsimile:  (510) 839-3882
   john.burris@johnburrislaw.com
6  bnisenbaum@gmail.com
   melissa.nold@johnburrislaw.com
7
   Attorneys for Plaintiffs
8

9

10

11

12

13  ANNICE EVANS, individually and as Successor

14  in Interest to Decedent ANGEL RAMOS;
    DANTE RAMOS, in his individual capacity;
15  PHILLIP WILSON-VAUGHN, in his individual
    capacity; LEANN SANCHEZ, in her individual
16  capacity; DARCEL LEWIS, in his individual
    capacity; D.W., by and through his Guardian Ad
17  Litem, CARITA WILSON; and ALICIA
    SADDLER, individually and as Guardian Ad
18  Litem for minor G.W.,

19

20

21                   Plaintiffs,

22          vs.

23  CITY OF VALLEJO; a municipal corporation;
    ZACK JACOBSEN, Police Officer for the City
24  of Vallejo; and DOES 1-50, individually and in
    their official capacities as Police Officers for the
25  City of Vallejo, inclusive.

26
                     Defendants.
27

28

RECEIVED

AUG 2 3 2017

CITY ATTORNEY'S OFFICE
CITY OF VALLEJO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CASE NO.:

COMPLAINT FOR WRONGFUL DEATH
AND VIOLATION OF CIVIL RIGHTS AND
DAMAGES

**JURY TRIAL DEMANDED**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, WRONGFUL DEATH & DAMAGES - 1

**INTRODUCTION**

1. In the early morning hours of January 23, 2017, Plaintiffs Alicia Saddler, Phillip Wilson-Vaughn, LeAnn Sanchez, Dante Ramos, Darcel Lewis, minors G.W., minor D.W., and Decedent Angel Ramos were at the home of Plaintiff Annice Evans, having a family gathering. A dispute erupted amongst the family members, prompting someone to call Vallejo Police Department. When Defendant Zach Jacobsen and yet-to-be-identified Vallejo Police Officers arrived, the family members were still arguing, but no one was in want or need of police assistance. Multiple Vallejo Police Officers came through the backyard and up the stairs leading to the dimly lit second floor deck, where Alicia Saddler, Phillip Wilson-Vaughn, Decedent Angel Ramos and D.W. were located. Just inside the back door were Plaintiffs LeAnn Sanchez, G.W., and Dante Ramos. Darcel Lewis was located on the ground floor.

2. Without cause or warning, yet-to-be-identified Vallejo Police Officers tased Plaintiffs Saddler, Wilson-Vaughn and D.W., and opened fire on Angel Ramos. Decedent Angel Ramos, an unarmed man, was shot several times in the chest and torso and died on the scene. Decedent Angel Ramos' dying body fell on top of D.W., and Angel's shooting and death were witnessed and perceived by multiple traumatized Plaintiff family members, including Alicia Saddler, Dante Ramos, Phillip Wilson-Vaughn, Darcel Lewis, LeAnn Sachez, G.W., and D.W. Then, to add insult to egregious injury, Plaintiff Alicia Saddler was arrested as her brother lay dying next to her. Tellingly Ms. Saddler was never charged with any crime. All of the family members were taken to the Vallejo Police Department and treated like criminals, until finally being released hours later.

3. In a press release, the Vallejo Police Department claimed that Decedent Angel Ramos was armed with a knife and actively trying to stab D.W., when Defendant Jacobsen opened fire. However, Plaintiff D.W., the purported victim, vehemently denies the City's outright lies.

4. According to Vallejo Police Department officials, Defendant Vallejo Police Officer Zach Jacobsen was standing on the ground level, and shot up at Decedent Angel Ramos, who was standing on the dimly lit second floor deck. Despite Defendant Jacobsen's poor vantage point behind a tree, limited view of the dimly lit second floor deck, and no deadly threat, he

inexplicably opened fire, just feet away from small children and at least ten (10) people in harms way.

5. This action seeks to recover damages for the violation of Mr. Ramos' rights, the rights of his mother, Ms. Annice Evans and his siblings and family members who watched this unwarranted shooting. Mr. Ramos never had any children and his father predeceased him making Ms. Evans his only surviving parent and heir.

## JURISDICTION

6. This action arises under Title 42 of the United States Code, Section 1983. Title 28 of the United States Code, Sections 1331 and 1343 confers jurisdiction upon this Court. The unlawful acts and practices alleged herein occurred in Vallejo, California, which is within this judicial district. Title 28 United States Code Section 1391(b) confers venue upon this Court.

## PARTIES

7. Plaintiff ANNICE EVANS (hereinafter referred to as "EVANS") is at all times mentioned herein a natural person. Plaintiff is acting in her individual capacity and as Successor-in-interest and biological mother of Decedent, ANGEL RAMOS. Plaintiff EVANS is a person with standing to bring the action pursuant to California Code of Civil Procedure 377.30 and 377.60 and California Probate Code 6402. Decedent, ANGEL RAMOS, was not married at the time of his death, did not have children and died without leaving a will. Decedent RAMOS' biological father is deceased.

8. Plaintiff ALICIA SADDLER (hereinafter referred to as "SADDLER") is at all times mentioned herein a natural person. Ms. Saddler is acting in her individual capacity and as Guardian Ad Litem for minor G.W. Plaintiff SADDLER is the biological sister of Decedent Angel Ramos, and lived in the same home with Decedent at the time of the incident.

9. Plaintiff G.W. (hereinafter referred to as "G.W.") is at all times mentioned herein a natural person and minor child. Plaintiff G.W. sues in his individual capacity, by and through his Guardian Ad

Litem, ALICIA SADDLER. Plaintiff G.W. is the biological nephew of Decedent Angel Ramos, and lived in the same home as Decedent at the time of the incident.

10. Plaintiff PHILLIP WILSON-VAUGHN (hereinafter referred to as "WILSON-VAUGHN") is at all times mentioned herein a natural person acting in his individual capacity. Plaintiff WILSON-VAUGHN is the brother-in-law to Decedent ANGEL RAMOS and lived in the same home with Decedent at the time of the incident.

11. Plaintiff LEANN SANCHEZ (hereinafter referred to as "SANCHEZ") is at all times mentioned herein a natural person and acting in her individual capacity. Plaintiff SANCHEZ is the biological sister of Decedent Angel Ramos.

12. Plaintiff DANTE RAMOS (hereinafter referred to as "DANTE RAMOS") is at all times mentioned herein a natural person and acting in his individual capacity. Plaintiff DANTE RAMOS is the biological brother of Decedent Angel Ramos and lived in the same home with Decedent at the time of this incident.

13. Plaintiff DARCEL LEWIS (hereinafter referred to as "LEWIS") is at all times mentioned herein a natural person and acting in his individual capacity.

14. Plaintiff D.W. (hereinafter referred to as "D.W.") is at all times mentioned herein a minor child. D.W. sues in his individual capacity, by through his Guardian Ad Litem CARITA WILSON. (hereinafter referred to as "WILSON-VAUGHN")

15. Defendant CITY OF VALLEJO (hereinafter referred to as "CITY") is and at all times mentioned herein a municipal corporation, duly authorized to operate under the laws of the State of California. Under its supervision, the CITY OF VALLEJO operates the Vallejo Police Department ("VPD").

16. Defendant ZACH JACOBSEN, (hereinafter "JACOBSEN") is and at all times mentioned herein a natural person. He is being sued in his individual and official capacity as a police officer for the City of Vallejo.

17. Plaintiffs are ignorant of the true names and/or capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sue said defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs

believe and allege that each of the DOE defendants is legally responsible and liable for the incident, injuries and damages hereinafter set forth. Each defendant proximately caused injuries and damages because of their negligence, breach of duty, negligent supervision, management or control, violation of public policy and/or use of excessive force. Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care or control or upon any other act or omission. Plaintiffs will ask leave to amend her complaint subject to further discovery.

18. In engaging in the conduct alleged herein, defendant police officers acted under the color of law and in the course and scope of their employment with VPD. In engaging in the conduct described herein, Defendant police officers exceeded the authority vested in them as police officers, under the United States and California Constitutions, and as employees of VPD.

19. For state law causes of action related to Federal claims, Plaintiffs are required to comply with Administrative claim filing requirements under California law. On April 25, 2017, Plaintiffs filed a Government Tort Claim with the VPD, notifying VPD of Plaintiff's claims for damages. Defendant did not accept nor reject Plaintiffs claims, however, the statutory waiting period expired on prior to the filing of the Complaint herein.

## STATEMENT OF FACTS

20. On January 23[th], 2017, at approximately 1:00 a.m., Plaintiffs Alicia Saddler, Dante Ramos, Leann Sanchez, Phillip Wilson-Vaughn, Darcel Lewis, D.W. and G.W., were having a family gathering, located at 1722 Sacramento Street, in Vallejo, California. Plaintiffs are all related by blood or marriage. The family was involved in family argument, prompting someone to call the police.

21. The Vallejo Police Department dispatched officers to the home. When Defendant Zach Jacobsen and other yet-to-be-identified City of Vallejo Police Officers arrived, the family members were still arguing, but no one was in need or want of police assistance and all of the family members were unarmed.

22. Several officers came through the back yard and up the stairs leading to the second floor deck area where Plaintiffs Alicia Saddler, Philip Wilson-Vaughn, D.W., and Decedent Angel Ramos were located. Plaintiffs Dante Ramos, G.W., and LeAnn Sanchez were standing in the back doorway, directly behind Angel Ramos. Plaintiff Darcel Lewis was on the ground floor facing Defendant Jacobsen.

23. Without cause or warning, yet-to-be-identified Vallejo Police Officers tased Plaintiffs Alicia Saddler, Philip Wilson-Vaughn and D.W. and commanded them to lay on the ground. Angel Ramos was standing on the deck, unarmed and directly next to D.W.

24. According to officials at the Vallejo Police Department, Defendant Jacobsen was standing on the ground level, while the incident was occuring above him on the second floor deck. Despite Officer Jacobsen's poor vantage point and dimly lit, limited view of the scene from behind a tree, he inexplicably and recklessly shot up into the deck, which was occupied by at least 10 (ten) people, including a small child.

25. Angel Ramos was shot in the chest multiple times, while unarmed. Angel Ramos' dying body fell onto D.W. Angel Ramos died from mulitple gunshot wounds, leaving behind a grieving mother and numerous traumatized siblings, who witnessed their brother shot down in front of their eyes.

26. After the shooting, the Vallejo Police Department issued a press release claiming Angel Ramos was armed with a knife and in the process of trying to stab D.W., at the moment they shot him. However, the purported victim, D.W., steadfastly denies the offical version of the events and reports that Angel Ramos was clearly and obviously unarmed when Officer Jacobsen inexplicably opened fire.  The CITY's official versions of the event are belied by the inciden scene, physical evidence, placement of Decedent's injury and physics.

27. While numerous Defendant Officers were wearing lapel cameras, inexplicably none of the lapel cameras captured the shooting.

28. To date, the Solano County Coroner's Office refuses to release the Coroner's Report related to Angel Ramos' death, citing an unknown pending investigation. The Coroner's Report is expected to contain further evidence demonstrating the physical impossiblity of the CITY's official version of the events.

29. In the months following the shooting, the family of Angel Ramos has been harassed by yet-to-be-identified members of the Vallejo Police Department, including officers stopping in front

of the family home on multiple occasions shining their flood lights into the windows. During a May 2017 incident, a man who claimed to be a Vallejo Police Officer accosted Plaintiff Saddler at a nightclub in Suisun. The man warned Ms. Saddler that she and her family needed to quit pursuing legal actions related to the death of Angel Ramos. Ms. Saddler filed a claim related to that incident, in hopes of identifying the man responsible. To date, the CITY has not responded to the incident.

30. Plaintiff is informed and believe and thereon allege that VPD and DOES 26-50, inclusive, breached their duty of care to the public in that they have failed to discipline Defendant Officers JACOBSEN, and DOES 1-25 inclusive, for their respective misconduct and involvement in the incident described herein. Their failure to discipline Defendant Officer JACOBSEN and DOES 1-25 inclusive, demonstrates the existence of an entrenched culture, policy or practice of promoting, tolerating and/or ratifying with deliberate indifference, the use of excessive and/or deadly force and the fabrication of official reports to cover up defendant JACOBSEN, and DOES 1-25 inclusive, misconduct.

31. Plaintiffs are informed, believe and thereon allege that the CITY is on notice of Defendant JACOBSEN's history of excessive force, evidenced by his pending Federal litigation related to another excessive force incident, wherein a mentally ill person was abused and injured. (See Brooks v. City of Vallejo; 2:16-cv-0237).

32. Plaintiffs are informed, believes and thereon alleges that the CITY OF VALLEJO Police Department has a long history of failing to discipline officers involved in misconduct; excessive force; and unwarranted shooting deaths, and not only fails to discipline said officers, but has actually promoted one of these said officers, despite being accused of multiple gross constitutional violations, including excessive force and multiple wrongful deaths.

33. Plaintiffs are informed, believes and thereon alleges that CITY and DOES 26-50 were aware of the constitutional defects in their training, discipline and response to citizen complaints.

34. Plaintiffs are informed, believes and thereon alleges that members of the Vallejo Department, including, but not limited to Defendant Officers JACOBSEN and DOES 1-25 inclusive and/or each of them, have individually and/or while acting in concert with one another used excessive, arbitrary and/or unreasonable force against Decedent, Angel Ramos and Plaintiffs SADDLER, WILSON-VAUGHN, and D.W.

35. Plaintiffs are further informed, believe and therein allege that as a matter of official policy – rooted in an entrenched posture of deliberate indifference to the constitutional rights of persons who live, work or visit the City of Vallejo, VPD has allowed persons to be abused by its Police Officers including Defendant Officers JACOBSEN and DOES 1-25 and/or each of them, individually and/or while acting in concert with one another.

36. Plaintiff is informed, believes and therein alleges that VPD Police Officers exhibit a pattern and practice of using excessive and/or deadly force against citizens. In each and every one of the shooting cases wherein a person died as a result of the Officers' use of deadly force, VPD has found the Officer used deadly force within policy even under the most questionable of circumstances.  VPD's failure to discipline or retrain any of the involved Officers is evidence of an official policy, entrenched culture and posture of deliberate indifference toward protecting citizen's rights and the resulting deaths and injuries is a proximate result of VPD's failure to properly supervise its Police Officers and ratify their unconstitutional conduct.

37. Plaintiff is informed, believes and therein alleges that CITY knew, had reason to know by way of actual or constructive notice of the aforementioned policy, culture, pattern and/or practice and the complained of conduct and resultant injuries/violations.

38. Plaintiffs are ignorant of the true names and capacities of Defendants DOES 1 through 50, inclusive, and therefore sue these Defendants by such fictitious names.  Plaintiffs are informed, believes, and thereon alleges that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein.  Plaintiffs will amend their complaint to state the names and capacities of DOES 1-50, inclusive, when they have been ascertained.

## DAMAGES

39. Plaintiffs were mentally, and emotionally injured and damaged as a proximate result of decedent's wrongful death, including but not limited to: Plaintiffs' loss of familial relations, decedent's society, comfort, protection, companionship, love, affection, solace, and moral support as a consequence of Defendants' violation of Plaintiff's federal civil rights under 42 U.S.C. §1983 and the Fourteenth Amendment, in addition to the trauma of witnessing and perceiving a family member being gunned down as well as the other uses of force against family members as described herein.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, WRONGFUL DEATH & DAMAGES - 8

40. Plaintiffs D.W., Alicia Saddler, and Phillip Wilson-Vaughn were physically and emotionally injured as a result of being tased without cause.

41. Plaintiffs D.W., Alicia Saddler, Phillip Wilson-Vaughn, Darcel Lewis, G.W., Dante Ramos and LeAnn Sanchez were emotionally injured as a result of being forcefully detained and taken into custody, having commit no crime whatsoever and having just witnessed their family member's shooting death.

42. Plaintiff is entitled to recover wrongful death damages pursuant to C.C.P. Sections 377.60 and 377.61 and Probate Code Section 6402(b).

43. Plaintiff EVANS, as Successor in interest to Angel Ramos is entitled to recover damages pursuant to the decedent's right of survivorship for the pain and suffering he endured as a result of the violation of his civil rights.

44. Plaintiff found it necessary to engage the services of private counsel to vindicate the rights of decedent and plaintiff under the law.  Plaintiff is therefore entitled to an award of attorneys' fees and/or costs pursuant to statute(s) in the event that she is the prevailing parties in this action under 42 U.S.C. §§§§ 1983 and 1988.

## FIRST CAUSE OF ACTION

### Violation of Fourth Amendment of the United States Constitution

### (42 U.S.C. §1983)

(Plaintiffs EVANS, as Successor-in-Interest to Decedent Angel Ramos; D.W., WILSON-VAUGHN, SADDLER v. Defendants JACOBSEN and DOES 1-25 inclusive)

45. Plaintiffs re-allege and incorporates by reference paragraphs 1 through 42 of this complaint.

46. Defendants' above-described conduct violated Plaintiff D.W., SADDLER and WILSON-VAUGHN's constitutional rights to be free from excessive and/or arbitrary and/or unreasonable use of force when Defendants tased Plaintiffs without cause or warning. Defendants' unconstitutional conduct caused Plaintiffs unwarranted pain and suffering.

47. Defendants' above-described conduct violated Decedent's right, as provided for under the

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, WRONGFUL DEATH & DAMAGES - 9

Fourth Amendment to the United States Constitution, to be free from excessive and/or

arbitrary and/or unreasonable use of deadly force against him.

48. Angel Ramos was forced to endure great conscious pain and suffering because of the

Defendants' conduct before his death;

49. Angel Ramos did not file a legal action before his death;

50. Plaintiff EVANS, is the sole successor in interest of Angel Ramos claims damages for the

conscious pain and suffering incurred by Angel Ramos, as provided for under 42 U.S.C.

§1983.

51. Defendants acted under color of law by shooting and killing decedent without lawful

justification and subjecting decedent to excessive force thereby depriving the decedent of

certain constitutionally protected rights, including, but not limited to:

     a. The right to be free from unreasonable searches and seizures, as guaranteed by the

     Fourth Amendment to the United States Constitution;

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Violations of Plaintiff's Civil Rights to Familial Relationship)

### (42 U.S.C. § 1983)

(Plaintiff EVANS v. Defendants JACOBSEN and DOES 1-25 inclusive)

52. Plaintiff hereby re-alleges and incorporates by reference herein paragraphs 1 through 49 of

this Complaint as though fully set forth;

53. Defendants, acting under color of state law, and without due process of law, deprived

Plaintiffs of their right to a familial relationship by seizing Decedent by use of unreasonable,

unjustified and deadly force and violence, causing injuries which resulted in Decedent's

death, all without provocation and did attempt to conceal their extraordinary use of force and

hide the true cause of Decedent's demise to deprive Plaintiff of her right to seek redress in

violation of their rights, privileges, and immunities secured by the Fourteenth Amendment to

the United States Constitution.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, WRONGFUL DEATH & DAMAGES - 10

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION

**(Monell – 42 U.S.C. section 1983)**

(Plaintiffs ANNICE EVANS, as Successor-in-Interest to Decedent Angel Ramos; SADDLER; D.W.; and WILSON-VAUGHN v. CITY and DOES 26-50)

54. Plaintiffs hereby re-allege and incorporate by reference herein paragraphs 1 through 51 of this Complaint.

55. Plaintiffs are informed and believe and thereon allege that high-ranking VPD officials, including high-ranking police supervisors and DOES 26 through 50, and/or each of them, knew and/or reasonably should have known about the repeated acts unconstitutional use of deadly force by VPD Officers.

56. Despite having such notice, Plaintiff is informed and believes and thereon alleges that CITY & DOES 26-50, and/or each of them, approved, ratified, condoned, encouraged, sought to cover up, and/or tacitly authorized the continuing pattern and practice of misconduct and/or civil rights violations by VPD which brought about Officers JACOBSEN, and DOES 1-25 unlawfully shooting Angel Ramos to death.

57. Plaintiffs are further informed and believe and thereon allege that as a result of the deliberate indifference, reckless and/or conscious disregard of the misconduct by Defendant Officers JACOBSEN, and DOES 1-25 and/or each of them, ratified and encouraged these officers to continue their course of misconduct.

58. Plaintiff further alleges that Defendants CITY and DOES 26-50 and/or each of them, were on notice of the Constitutional defects in their training of VPD police officers, including, but not limited to unlawfully using deadly force to make detentions and/or arrests.

59. Plaintiff is further informed and believes and thereon alleges that CITY and

DOES 26-50 knew or should have known of Defendant JACOBSEN's and DOES 1-25's history of abuse, but failed to discipline and/or terminate and/or refrain from hiring them.

60. The aforementioned acts and/or omissions and/or deliberate indifference by high ranking officials, including high ranking CITY supervisors and DOES 26-50, and each of them resulted in the deprivation of Plaintiff and Decedent's constitutional rights including, but not limited to the right to not be deprived of life, liberty or property without due process of the law, as guaranteed by the Fourteenth Amendment to the United States Constitution and the right to be free from excessive force by police officers, as guaranteed by the Fourth Amendment to the United States Constitution.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### (Wrongful Death - Negligence)

### (C.C.P. §377.60 and 377.61)

(Plaintiff ANNICE EVANS, as Successor in interest to Angel Ramos
v. Defendants JACOBSEN and DOES 1-25 inclusive)

61. Plaintiff re-alleges and incorporates by reference herein paragraphs 1 through 58 of this Complaint, except for any and all allegations of intentional, malicious, extreme, outrageous, wanton, and oppressive conduct by defendants, and any and all allegations requesting punitive damages.

62. Defendants JACOBSEN and DOES 1-25 inclusive, by and through their respective agents and employees, proximately caused the death of Decedent Angel Ramos as a result of their negligent conduct and/or negligent failure to act as set-forth herein.

63. As an actual and proximate result of said defendants' negligence, and the death of decedent, Plaintiff has sustained pecuniary loss along with the loss of comfort, society, and services of their son in an amount according to proof at trial.

64. As a further actual and proximate result of said defendants' negligence, Plaintiff incurred

funeral and burial expenses, in an amount according to proof at trial.

65. Pursuant to California C.C.P. Sections 377.60 and 377.61, Plaintiff has brought this action, and claims damages against said defendants for the wrongful death of decedent, and the resulting injuries.

   WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION
### (Violation of Right To Enjoy Civil Rights)
### (Violation of CALIFORNIA CIVIL CODE §52.1)
### (ALL PLAINTIFFS Against Defendants JACOBSEN and DOES 1-25)

66. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 64 of this Complaint.

67. Defendants JACOBSEN and DOES 1-25's above-described conduct constituted interference, and attempted interference, by threats, intimidation and coercion, with the Decedent Angel Ramos and Plaintiffs SADDLER; WILSON-VAUGHN; G.W.; D.W.; SANCHEZ; DANTE RAMOS; DARCEL LEWIS' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code §52.1.

   WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION
### (Battery)
(Plaintiff ANNICE EVANS, as Successor-in-Interest to Decedent Angel Ramos; SADDLER; D.W.; WILSON-VAUGHN; G.W. DANTE RAMOS; DARCEL LEWIS; and SANCHEZ
v. Defendants JACOBSEN and DOES 1-25 inclusive)

68. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 66 of this complaint.

69. Defendants' above-described conduct constituted a battery.

   WHEREFORE, Plaintiffs prays for relief as hereinafter set forth.

### SEVENTH CAUSE OF ACTION

#### (Negligent Infliction of Emotional Distress)

(Plaintiffs SADDLER; WILSON-VAUGHN; SANCHEZ; DANTE RAMOS; and G.W. Against Defendant JACOBSEN and DOES 1-25, inclusive)

70. Plaintiffs re-allege and incorporate by reference herein paragraphs 1 through 68 of this Complaint.

71. Defendant JACOBSEN and DOES 1-25 engaged in actions that were negligent and/or intentionally tortious.

72. Defendants' actions caused Decedent Angel Ramos' death.

73. Plaintiffs each have a legally cognizable relationship with Decedent Angel Ramos.

74. All Plaintiffs named in this Cause of Action lived with Decedent Angel Ramos and/or were related by blood or marriage to Decedent and to each other. The wrongful conduct of Defendants and DOES 1-25 inclusive, as set forth herein, constitute negligent conduct done with conscious disregard for the rights of Plaintiffs.

75. As a proximate result of Defendant JACOBSEN and DOES 1-25 inclusive, conduct, Plaintiffs have suffered severe emotional and mental distress from being present and seeing/hearing their beloved family member being gunned down in their own home by Defendant JACOBSEN and DOES 1-25, prior to seeing his lifeless body lying on their deck.

76. Plaintiffs were further damaged by witnessing the unreasonable uses of force and unreasonable seizures of Plaintiffs SADDLER, WILSON-VAUGHN, and D.W.

77. Plaintiffs contend that the City of Vallejo is liable for all state law causes of actions, under the theory of Respondeat Superior, wherein damages occurred while City of Vallejo employees were engaged in the performance of their job duties.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## EIGHTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

(Plaintiffs SADDLER; WILSON-VAUGHN; G.W.; D.W.; DANTE RAMOS; DARCEL

LEWIS and SANCHEZ Against Defendants JACOBSEN and DOES 1-25)

78. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint.

79. Defendants' above-described conduct was extreme, unreasonable and outrageous.

80. In engaging in the above-described conduct, Defendants intentionally ignored or recklessly disregarded the foreseeable risk that Plaintiffs would suffer extreme emotional distress as a result of being terrorized, assaulted and threatened.

WHEREFORE, Plaintiffs pray for relief, as hereinafter set forth

## JURY DEMAND

81. Plaintiffs hereby demands a jury trial.

## PRAYER

WHEREFORE, Plaintiffs pray for relief, as follows:

1. For general damages in a sum to be determined at trial;

2. For special damages, including but not limited to, past, present and/or future wage loss, income and support, medical expenses and other special damages in a sum to be determined according to proof;

3. For funeral and burial expenses according to proof;

4. For punitive damages and exemplary damages in amounts to be determined according to proof as to defendants JACOBSEN and DOES 1 through 25 and/or each of them;

5. Any and all permissible statutory damages;

6. For reasonable attorney's fees pursuant to 42 U.S.C. §1988; and

7. For cost of suit herein incurred.

Dated:  August 3, 2017                    THE LAW OFFICES OF JOHN L. BURRIS


                                          /s/ John L. Burris
                                          JOHN L. BURRIS
                                          BEN NISENBAUM
                                          MELISSA C. NOLD
                                          Attorneys for Plaintiffs

JS 44 (Rev. 08/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
ANNICE EVANS, individually and as Successor in Interest to Decedent ANGEL RAMOS, et al.

**DEFENDANTS**
CITY OF VALLEJO, et al.,

**(b)** County of Residence of First Listed Plaintiff    Solano
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Solano
*(IN U.S. PLAINTIFF CASES)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John L. Burris, Esq., Ben Nisenbaum, Esq., Melissa C. Nold, Esq., Law Offices of John L. Burris, 7677 Oakport Street, Suite 1120, Oakland, CA 94621 (510) 839-5200 office (510) 839-3882 fax

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☒ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*          *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C., Section 1983
Brief description of cause:
Violation of Civil Rights - Wrongful Death

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.    DEMAND $ ov $25,000    CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
08/02/2017

SIGNATURE OF ATTORNEY OF RECORD
/s/ John L. Burris

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** Plaintiffs-Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use
**(b)** County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the
**(c)** Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X"
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** Residence (citizenship) of Principal Parties. This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** Origin. Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** Related Cases. This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**EXHIBIT H**

RECEIVED

JUL 19 2018

CITY ATTORNEY'S OFFICE

1

2   JOHN L. BURRIS, ESQ., SBN 69888
    MELISSA C. NOLD ESQ., SBN 301378
3   **THE LAW OFFICES OF JOHN L. BURRIS**
4   Airport Corporate Center
    7767 Oakport St., Suite 1120
5   Oakland, CA 94621
    Telephone:    (510) 839-5200
6   Fascimile:    (510) 839-3882
7   john.burris@johnburrislaw.com
    melissa.nold@johnburrislaw.com
8
    Attorneys for Plaintiffs
9

10                  UNITED STATES DISTRICT COURT

11           FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13   ANNICE EVANS, individually and as        Case No: 2:17-cv-01619-TLN-AC
     Successor in Interest to Decedent ANGEL
14   RAMOS; DANTE RAMOS, in his individual    **PLAINTIFF'S RESPONSE TO**
     capacity; PHILLIP WILSON-VAUGHN, in his  **DEFENDANT'S SPECIAL**
15   individual capacity; LEANN SANCHEZ, in her **INTERROGATORIES, SET ONE**
     individual capacity; DARCEL LEWIS, in his
16   individual capacity; D.W., by and through his
     Guardian Ad Litem, CARITA WILSON; and
17   ALICIA SADDLER, individually and as
     Guardian Ad Litem for minor G.W.,
18
              Plaintiffs,
19
         vs.
20
     CITY OF VALLEJO; a municipal corporation;
21   ZACK JACOBSEN, Police Officer for the City
     of Vallejo; and DOES 1-50, individually and in
22   their official capacities as Police Officers for the
     City of Vallejo, inclusive,
23
              Defendants.
24

25

26

27

28

─────────────────────────────────────────

- 1 -

**REQUESTING PARTY:**   Defendant CITY OF VALLEJO

**RESPONDING PARTY:**   Plaintiff ANNICE EVANS

**SET NUMBER:**   ONE

## **Preliminary Statement**

It should be noted that the Responding Party has not concluded its investigation in this action and has therefore not completed its discovery of all relevant facts relating to the case; has not completed its discovery in this action; and has not completed its preparation for trial. All Responses herein are based only upon such information and documents that are currently available to and specifically known to this Responding party, and disclose only those contentions which currently occur to this Responding party. It is anticipated that further discovery, independent and expert investigations, legal research, and analyses will supply additional facts, add meaning to the known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to and changes to, and variations in the contentions herein set forth. The following Responses to Defendants' Request for Production of Documents are given without prejudice to this Responding Party's right to produce evidence of any subsequently discovered fact or facts which this party may later recall. Responding Party, accordingly, reserves the right to change any and all Responses herein as additional facts are ascertained, investigation and analyses are made, legal research is concluded, and contentions are made. The Responses contained herein are a made with a good faith effort to supply as many non-objectionable responsive documents as is presently in her possession, control or custody, but should in no way prejudice this Responding Party in relation to further discovery, research, and analysis.

**RESPONSES**

**SPECIAL INTERROGATORY NO. 1:**

Please itemize (name of provider, date of service) each medical expense which you or anyone acting on your behalf is claiming as damages arising out of the incident.

**RESPONSE NO. 1**

Objections: Psychotherapist privilege. Calls for speculation.

Notwithstanding the foregoing objections, plaintiff received psychotherapy services related to this incident at:

La Clinica, Georgia Street, Vallejo – Plaintiff cannot recall exact dates of treatment, but believes it occurred in early 2017.

**SPECIAL INTERROGATORY NO. 2:**

Please state the amount actually accepted as full payment by each of your medical providers for the expenses incurred by you as a result of the subject incident.

**RESPONSE NO. 2:**

Objections: Calls for speculation.

Notwithstanding the foregoing objections, plaintiff is unaware of the cost of services provided.

**SPECIAL INTERROGATORY NO. 3:**

Please identify any insurance program (i.e., Medicare, Medi-Cal), that made the payments identified in response to Special Interrogatory Nos. 1 and 2.

**RESPONSE NO. 3:**

Objections: Calls for speculation.

Notwithstanding the foregoing objections, plaintiff was receiving Medi-cal at the time of treatment and believes they made any required payments.

**SPECIAL INTERROGATORY NO. 4:**

Please state the claim number issued by any insurance program identified in Special

1  Interrogatory No. 3 for benefits you received as a result of your claimed injuries arising out of the

2  incident.

3  **RESPONSE NO. 4:**

4        Objections: Calls for speculation.

5        Notwithstanding the foregoing objections, plaintiff is not aware of any claim numbers

6  related to medical care provided.

7  **SPECIAL INTERROGATORY NO. 5:**

8        Have you placed your insurance provider(s) listed in Special Interrogatory No. 3 on notice

9  of this subject lawsuit?

10  **RESPONSE NO. 5:**

11        Objections: Vague and ambiguous regarding what would be deemed 'notice.'

12        Notwithstanding the foregoing objections, Plaintiff has made a lien inquiry with Medi-Cal,

13  to determine recoverable treatment amounts, which placed the State on notice of the subject

14  litigation.

15  **SPECIAL INTERROGATORY NO. 6:**

16        Please state the general damages, including amounts, which you claim in this matter as a

17  result of the incident.

18  **RESPONSE NO. 6:**

19        Objections: Calls for speculation-Intangible damages.

20        Pain and suffering; loss of child; emotional distress, in a combined approximate amount of

21  $25,000,000.00.

22  **SPECIAL INTERROGATORY NO. 7:**

23        Please state the special damages, including amounts, which you claim in this matter as a

24  result of the incident.

25  **RESPONSE NO. 7:**

26        Objection: Calls for speculation.

27        Notwithstanding the foregoing objections, Plaintiff took off time from work for

28  approximately two months after the incident and returned part-time thereafter, Plaintiff estimates

1  she lost $30,000 in income and is acquiring additional documentation to verify. In addition,
2  Plaintiff payed for funeral expenses in the amount of $16,000.

3  **SPECIAL INTERROGATORY NO. 8:**

4  Please state all facts regarding the alleged misconduct of defendant Zach Jacobsen on the
5  date of the subject INCIDENT (as with respect to these interrogatories, the term INCIDENT means
6  the facts and circumstances surrounding the events that took place on January 23, 2017, which
7  form the basis of your complaint for damages).

8  **RESPONSE NO. 8:**

9  Objections: Calls for speculation. Calls for expert opinion. Vague and ambiguous regarding
10  the definition of 'misconduct.'

11  Notwithstanding the foregoing objections, plaintiff alleged the following acts of
12  misconduct related to the subject incident:

13      1.  Defendant acted negligently by making the inexplicable tactical decision to shoot
14          upwards into a heavily populated 2nd floor balcony, from the ground floor, with a
15          partially obstructed view, where his inability to see the incident caused him to shoot
16          and kill an unarmed man.

17      2.  Defendant acted negligently by using deadly force in the poor lighting conditions;

18      3.  Defendant acted with wonton and reckless disregard for the safety of plaintiffs and
19          decedent by shooting without being able to see the incident unfolding; and

20      4.  Defendant failed to warn of intent to use deadly force.

21      5.  Defendant violated Vallejo Police Department's use of force policy.

22      6.  Defendant violated P.O.S.T. standards and training for application of deadly force.

23  **SPECIAL INTERROGATORY NO. 9:**

24  Please IDENTIFY any and all witnesses that support your contention that "Angel Ramos
25  was clearly and obviously unarmed when Officer Jacobsen inexplicably opened fire" as alleged in
26  paragraph 26 of your Complaint.

27  **RESPONSE NO. 9:**

28  Objection: Calls for speculation. Calls for expert opinion.

-5-

1    Notwithstanding the foregoing objections, Plaintiff Deshon Wilson (D.W.) and Vallejo
2  Police Officer Samida saw that Angel Ramos was clearly and obviously unarmed when Officer
3  Jacobsen opened fire.

4  **SPECIAL INTERROGATORY NO. 10:**

5    Please state all facts that support your contention that "CITY'S official versions of the event
6  are belied by the inciden[sic] scene, physical evidence, placement of Decedent's injury and
7  physics" as alleged in paragraph 26 of your Complaint.

8  **RESPONSE NO. 10:**

9    Objections: Calls for speculation, Calls for expert opinion.

10    Notwithstanding the foregoing objections, the Vallejo Police Department made public
11  statements alleging that Angel Ramos was armed with a knife and attempting to stab a minor at
12  the moment Defendant opened fire.  At the time those statements were released and later restated,
13  Defendant City knew or should have known that Angel Ramos was unarmed, as confirmed by his
14  purported victim Deshon Wilson (D.W.) and Vallejo Police Department witnesses on the date of
15  the shooting. Further, the trajectory of Decedent' bullet wounds are inconsistent with the position
16  Defendant claims Decedent was in at the time of the shooting.

17  **SPECIAL INTERROGATORY NO. 11:**

18    Please IDENTIFY all witnesses with personal knowledge of the facts identified in your
19  response to Special Interrogatory No. 10.

20  **RESPONSE NO. 11:**

21    Objections: Calls for speculation. Calls for expert opinion.

22    Notwithstanding the foregoing objections, D.W., Officer Samida and yet-to-be-identified
23  Vallejo Police Department employees were aware that Angel Ramos was unarmed when they
24  public alleged that he was shot and killed while trying to stab a minor.

25  **SPECIAL INTERROGATORY NO. 12:**

26    Please state all facts that support your contention that "the family of Angel Ramos has been
27  harassed by yet-to-be-identified members of the Vallejo Police Department" as alleged in
28  paragraph 29 of your Complaint.

-6-

1  **RESPONSE NO. 12:**

2         Objections: Calls for speculation.

3         Notwithstanding the foregoing objections, on numerous occasions after the shooting death
4  of Angel Ramos, marked Vallejo Police Department patrol vehicles and unmarked police vehicles
5  have stopped in front of the Ramos home (where the shooting took place) with no legitimate police
6  business. During the unwanted police contact, officer shone their floodlights into the Ramos home,
7  thereby harassing, intimidating and disturbing the residence. The officers would subsequently
8  drive away. In additional incidents Vallejo Police in marked and unmarked cars stopped to bother
9  and harass the Ramos family and inquire about their right to access the space in front of their home.

10        In the weeks after Angel Ramos' death, officers from Vallejo Police Department walked
11 up to the memorial for Angel Ramos, located directly in front of the Ramos home. These Officers
12 harassed family members and questioned their right to be located on the public street in front of
13 their own home.

14        On May 28, 2017, a man approached Plaintiff Alicia Saddler at a nightclub is Suisun,
15 California. During this contact the man identified himself as a Vallejo Police Officer and made
16 comments which Ms. Saddler deemed threatening and inappropriate. Please see Plaintiff Alicia
17 Saddler Claim filed with the city.

18        On at least two occasions the Ramos family was denied police services after they called
19 the Vallejo Police Department to report criminal activity. No officers ever responded to the home
20 to obtain a police report in response to their requests for services.

21 **SPECIAL INTERROGATORY NO. 13:**

22        Please IDENTIFY all witnesses with personal knowledge of the facts identified in your
23 response to Special Interrogatory No. 12.

24 **RESPONSE NO. 13:**

25        Objections: Calls for speculation.

26        Notwithstanding the foregoing objections, the following persons have witnessed the
27 behavior described in Interrogatory 12:

28        Alicia Saddler

1   Dante Ramos

2   LeAnn Sanchez

3   Annice Evans

4   Phillip Wilson

5   **SPECIAL INTERROGATORY NO. 14:**

6   Please state all facts that support your third cause of action against the City of Vallejo.

7   **RESPONSE NO. 14:**

8   Objections: Discovery is ongoing.

9   Notwithstanding the foregoing objections, Vallejo Police Department Officers have shot
10  and killed multiple unarmed individuals in the years preceding this incident and subsequently.
11  Further, Vallejo Police Officers have falsified police reports; failed to document uses of force; and
12  have engaged in racial profiling against multiple African American and Latino citizens. None of
13  the involved officers in any of these incidents have been disciplined or terminated for their
14  unconstitutional actions, despite the City paying out millions of dollars in settlements, which
15  cannot be justified by claims of fiscal efficiency.

16  **SPECIAL INTERROGATORY NO. 15:**

17  Please state all facts that support your fourth cause of action for wrongful death.

18  **RESPONSE NO. 15:**

19  Objections: Discovery is ongoing. Plaintiff will supplement responses if and when
20  additional information becomes available.

21  Notwithstanding the foregoing objections, Defendant failed to act as a reasonable police
22  officer, thereby violating his duties under the law by engaging in the following actions:

23  1. Defendant failed to act as a reasonable police officer when he discharged his firearm into
24     a 2nd floor balcony, while located on the ground floor where he was unable to obtain a clear
25     visual of the incident, resulting in Defendant shooting an unarmed man.

26  2. Defendant failed to act as a reasonable police officer when he discharged his firearm into
27     a dimly lit balcony occupied by at least four people, resulting in Defendant shooting an
28     unarmed man.

- 8 -

**SPECIAL INTERROGATORY NO. 16:**

Please state all facts that support your fifth cause of action for Violation of California Civil Code § 52.1.

**RESPONSE NO. 16:**

Objections: Discovery is ongoing.

Notwithstanding the foregoing objections, Defendants interfered with Angel Ramos' peaceful exercise of his constitutional right to life by way of threat of violence with a firearm and bullets, which resulted in death.

**SPECIAL INTERROGATORY NO. 17:**

Please state all facts that support your sixth cause of action for battery.

**RESPONSE NO. 17:**

Objections: Discovery is ongoing, plaintiff will amend responses if and when additional information is available.

Notwithstanding the foregoing objections, Defendant made intentional, non-consensual physical contact with Decedent Angel Ramos by way of shooting multiple projectiles from the gun in his hand.

DATED: July 10, 2018

/s/Melissa C. Nold

Melissa C. Nold
Attorney for Plaintiffs

# VERIFICATION

RECEIVED
SEPTEMBER 11, 2018
CITY ATTORNEY'S OFFICE

*ANNICE EVANS, Successor-in-Interest to Decedent ANGEL RAMOS,*

*v.*

*CITY OF VALLEJO, et al.,*

*U.S. Eastern District Court
of California*

Case No.: 2:17-CV-1619

I, ANNICE EVANS, declare:

I am a plaintiff in the matter that has given a rise to this action.   I have read the following documents:

PLAINTIFF'S RESPONSES TO DEFENDANTS' SPECIAL INTERROGATORIES, SET ONE

Knowing the contents thereof, I declare under penalty of perjury under the laws of the State of California that my responses contained in the foregoing documents are true and correct.

Date:

_____
ANNICE EVANS
Plaintiff