IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

--oOo--

ANNICE EVANS, individually and as Successor in Interest to Decedent ANGEL RAMOS; DANTE RAMOS, in his individual capacity; PHILLIP WILSON-VAUGHN, in his individual capacity; LEANN SANCHEZ, in her individual capacity; DARCEL LEWIS, in his individual capacity; D.W., by and through his Guardian Ad Litem, CARITA WILSON; and ALICIA SADDLER, individually and as Guardian Ad Litem for minor G.W.,

Plaintiffs,

vs.

CITY OF VALLEJO; a municipal corporation; ZACK JACOBSEN, Police Officer for the City of Vallejo; and DOES 1-50, individually and in their official capacities as Police Officers for the City of Vallejo, inclusive,

Defendants.

CASE NO: 2:17-cv-01619-TLN-AC

CERTIFIED COPY

DEPOSITION OF OFFICER MATTHEW SAMIDA

MONDAY, SEPTEMBER 24, 2018

REPORTED BY: ANGELICA R. GUTIERREZ, CSR NO. 13292

DEPOSITION OF MATTHEW SAMIDA

# I N D E X

| EXAMINATION BY: | PAGE |
| --- | --- |
| MS. NOLD | 6 |

--o0o--

| | |
| --- | --- |
| Appearance Page | 3 |
| Index of Exhibits | 4 |
| Location | 5 |
| Declaration of Witness | 47 |
| Reporter's Certificate | 48 |
| Witness Letter | 49 |
| Deposition Errata Sheet | 50 |
| Unsigned Transcript | 51 |
| Attorney's Notes | 52 |

--o0o--

2

Barbara J.Butler & Associates - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050 - (510) 83-BUTLER (2885) or (408) 248-BUTLER(2885)

DEPOSITION OF MATTHEW SAMIDA

APPEARANCES:

FOR THE PLAINTIFFS:

LAW OFFICES OF JOHN L. BURRIS
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
(510) 839-5200

BY: MELISSA NOLD, ATTORNEY AT LAW

FOR THE DEFENDANTS:

CITY OF VALLEJO
CITY ATTORNEY'S OFFICE
555 Santa Clara Street
Vallejo, California 94590
(707)648-4388

BY: KATELYN KNIGHT, DEPUTY CITY ATTORNEY

--o0o--

3

Barbara J.Butler & Associates - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050 - (510) 83-BUTLER (2885) or (408) 248-BUTLER(2885)

DEPOSITION OF MATTHEW SAMIDA

INDEX OF EXHIBITS

(NONE WERE MARKED)

--oOo--

4

Barbara J.Butler & Associates - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050 - (510) 83-BUTLER (2885) or (408) 248-BUTLER(2885)

Pursuant to Notice of Taking Deposition and on Monday, September 24, 2018, commencing at the hour of 10:10 a.m., thereof, at the Law Offices of John L. Burris, 7677 Oakport Street, Suite 1120, Oakland, California, before me, ANGELICA R. GUTIERREZ, CSR No. 13292, a Certified Shorthand Reporter and Deposition Officer of the State of California, there personally appeared:

OFFICER MATTHEW SAMIDA,

called as a witness by the Plaintiffs, who having been duly sworn by me, to tell the truth, the whole truth and noting but the truth, testified as hereinafter set forth:

---OOO---

A. Yes.

Q. Okay. When you say "commotion," do you mean like loud music, loud voices, screaming, what specifically was the commotion, if you can recall?

A. Loud yelling and screaming. It sounded like people pushing each other, maybe stomping of the feet because of the physical pushing sort of thing.

Q. Okay. You referred to the area as a back porch.

Was that porch area raised off the ground?

A. Yes, it was.

Q. Okay. Was it fair to say that it was essentially the second floor?

A. Yes.

Q. To the best of your ability to estimate, how far off the ground was the raised porch area?

A. About 7, 8 feet.

Q. Okay. And this was a wooden raised structure that was extending from the second floor of the home; is that correct?

A. Correct.

Q. Okay. When you got there, the porch was above you, correct?

A. Correct.

Q. Okay. Do you recall if the porch had any sort

of railing around it like to prevent people from walking off the edge and falling on the ground?

A. It did. The railing was on the side of the house and the west end, south side of the porch.

Q. Okay. Can you describe what the railing was made of?

A. It was wooden, and it had wooden slats, vertical wooden slats, along with a horizonal top rail.

Q. Okay. And the wooden slats, approximately how far apart were they?

A. Four or 5 inches maybe.

Q. Would it be accurate to describe the wooden slats as being 4 to 5 inches away from one another, or 4 to 5-inches wide themselves?

A. A 4 to 5-inch gap between each slat. I don't recall exactly how thick the pieces of wood were.

Q. Okay. Would it be fair to say from your vantage point that you could partially see through the wooden railing at the places where the slats were not located?

A. Yes.

Q. It's pretty hard to describe those kind of things for the record, but that's helpful.

A. It really is.

Q. Okay. Approximately, how high up did the

railing go, like the people that were there, could you see them from the waist down, chest down, to the best of your recollection?

A. I'm sorry. Do you mean the railing, or the bottom of the patio?

Q. Meaning like the railing. If a person was standing on the porch, how much could you see completely unobstructed?

A. That's kind of a hard question to answer because obviously it changes with the angle of how close to the railing and how close to the house they were standing.

But if they were standing right next to the railing, you could probably see maybe about waist up, your belly button up. Depending on how tall they are, I would say the railing was probably about 3 feet tall.

Q. Okay. What were the lighting conditions on the porch?

A. There was a light on, on the porch.

Q. To your recollection, was this like a normal bulb, was it like a flood light? Do you know what type of light it was?

A. It was a normal lightbulb.

Q. Would it be fair to say that the porch was dimly lit?

A. It definitely wasn't lit like this room. It was still --

Q. Okay. From your own perspective, based on the lighting, were you able to see the people on the porch long enough to describe them, for example, like their race, age, gender?

A. Not with just the light on the porch. However, almost immediately after arriving on scene we used our flashlights to illuminate the porch, which allowed us to get a better view of everybody.

Q. Okay. So in addition to the porch light, everyone also had flashlights, or some officers had flashlights available to help illuminate the scene?

A. Correct.

Q. From where you were located, I mean to indicate prior to the tasing, do you recall there being a tree obstructing your view to some degree?

A. I do.

Q. Okay. At some point, did you enter the yard at 1722 Sacramento Street?

A. Yes.

Q. Okay. Was that before or after you had deployed your taser?

A. Are you referring to the front side yard?

Q. Yes.

A. I'm going to say it was almost simultaneous. It might have been either right before or right after, maybe a second or two.

Q. Okay. So within a second or two of entering into the yard, is that when the taser was deployed?

A. Yes.

Q. Okay. When you first arrived, prior to deploying your taser, do you recall observing what Officer Jacobson was doing?

A. No. I know he was in close proximity. My attention was on the patio with the subjects having some sort of altercation.

Q. Okay. When you say "close proximity," do you mean close proximity to you or to the individuals?

A. To me.

Q. When you say "close proximity," do you mean within 5 feet, 10 feet, 1 foot?

A. Within 5, 10 feet, maybe.

Q. Okay. Can you please describe to me what you observed that led you to tasing the young man on the porch?

A. Sure. So like I stated earlier, I saw four people on the porch. I saw a young male. I believe at the time he was probably about 18 years old. He was a thin build, but you could tell he had like an athletic

build as well. I don't remember if he had a shirt on or off. It was either like an undershirt/tank top or no shirt at all, because I remember seeing his build.

But he seemed extremely upset. He was yelling at somebody. It appeared he was yelling at somebody inside the house. He just seemed extremely agitated, kind of moving all around.

There was another male on the deck. I think he was a little bit more of a heavy-set male. He appeared older. I couldn't really tell what he was doing. He seemed much more calm than the other younger male.

Then there was also a female who was a heavier-set female, and she also appeared a little bit older, maybe late 20s, early 30s. She appeared to be trying to calm the younger male down, and keep him away from the house.

I remember at one point, the young male tried walking towards the door to the house and the female wrapped her arms around him and tried pulling him back more towards the stairs away from the house.

At that point, the male was able to break free and walk up to the doorway of the house. He was yelling at whoever was inside the house. I could see somebody standing there inside the doorway, and it

appeared he was trying to get that person to come out and fight him, the young male.

The young male took a @blade stance, kind of a generic fighting stance, and he had his hands balled in fists and raised them up to his chest area. It looked like he was trying to convince whoever was inside the house to come out of the house and fight.

Q. Okay. At that point, you had opted to deploy the taser; is that correct?

A. Well, before that we were attempting to get their attention. These are flashlights that not only illuminate it, but also kind of do like a sweeping motion with our lights to try and get their attention.

There was some sort of light on the background of the house. I also used my flashlight in a strobe mode, which makes it flash really fast to try and get their attention, as well as yelling at them, announcing ourselves as police officers, and telling them to stop fighting and to break it up.

Then it was at that point that I realized that nobody on that deck showed any interest in following our commands to stop fighting, and it appeared to me that the young male was going to start a violent physical altercation with somebody in the house.

Q. Okay. It's fair to say that you deployed your

house was Angel Ramos.

Once Angel Ramos came out of the house, do you recall seeing him go to the man that you had tased and punched him in the face?

A. I saw him come out of the house quickly, and he didn't dive on him, but he got over him. It looked like he was either kneeling over him or using his left hand to prop himself up over the young man. It looked like he was using his left hand to strike the young man who I had tased --

Q. Okay.

A. -- with his right hand.

Q. It's fair to say that you saw the man come out of the house and what appeared to be strike other man with his right hand in the face?

A. Yes.

Q. When you saw the young man appear to be struck in the face, did you have your taser at that point, or did you have your firearm out?

A. I had my taser out, and I was trying to switch cartridges. I was trying to reload a new cartridge into that taser while all this was occurring.

Q. Okay. At that point, do you recall if you anticipated potentially pulling your taser again?

A. Yes.

DECLARATION OF WITNESS

I do solemnly declare under penalty of perjury, under the laws of the State of California, that the foregoing is my deposition under oath; that these are the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions, or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this ____________ day of _______________, 20______.

_____________________________
MATTHEW SAMIDA

--o0o--

STATE OF CALIFORNIA )
) ss.
COUNTY OF CONTRA COSTA )

I, Angelica R. Gutierrez, a licensed Certified Shorthand Reporter, duly qualified and certified as such by the State of California;

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That the deposition was by me recorded stenographically at the time and place first herein mentioned, and the foregoing pages constitute a full, true, complete and correct record of the testimony given by the said witness;

That I am a disinterested person, not being in any way interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, or to their respective counsel, in any manner whatsoever.

DATED: September 24, 2018

__/s/Angelica R. Gutierrez____________________

ANGELICA R. GUTIERREZ, CSR No. 13292

WITNESS LETTER

TO: Officer Matthew Samida
c/o KATELYN M. KNIGHT, Deputy City Attorney
City Attorney's Office
555 Santa Clara Street30
Vallejo, CA 94590

Date: 11.28.18
Depo: 09.24.18
Ref. #18092760

RE: Annice Evans, et al. v. City of Vallejo, et al.

Dear Officer Samida:

The transcript of your Deposition reported in the above-captioned cause has been prepared and will be available at this office for your inspection and signature for a period of 30 days from the date of this letter.

Please contact our office between the hours of 9:30 a.m. and 5:00 p.m. Monday-Friday, to schedule an appointment. Or, if you prefer, contact the attorney to read, correct and sign the copy of your Deposition under penalty of perjury.

Read the transcript making any changes necessary. In making any changes, please use the following guide:

1. DO NOT WRITE on the original transcript.
2. SIGN UNDER PENALTY OF PERJURY at the end of the Deposition on the Declaration of Witness Page.
3. List each change and reason for the change on the Deposition Errata Sheet following this page. Signature is required at the bottom of the Deposition Errata Sheet.
4. Forward the signed Declaration of Witness Page and signed Deposition Errata Sheet in addition to a copy of this letter to:
   Barbara J. Butler & Associates
   Certified Court Reporters
   P.O. Box 3508
   Santa Clara, California 95055
   (510) 832-8853 or (408) 248-2885

Upon receipt of items requested in this letter, I will forward copies of same to all Counsel.

Sincerely,

/s/Barbara J. Butler
Barbara J. Butler, CSR

cc: All Counsel

DEPOSITION ERRATA SHEET

RE: Annice Evans, et al. v. City of Vallejo, et al.
Depo: 09.24.18 Ref. #18092760

Page No. _____ Line No. _____

Change: ______________________________

Reason for change: ______________________________

Page No. _____ Line No. _____

Change: ______________________________

Reason for change: ______________________________

Page No. _____ Line No. _____

Change: ______________________________

Reason for change: ______________________________

Page No. _____ Line No. _____

Change: ______________________________

Reason for change: ______________________________

Page No. _____ Line No. _____

Change: ______________________________

Reason for change: ______________________________

Page No. _____ Line No. _____

Change: ______________________________

Reason for change: ______________________________

Page No. _____ Line No. _____

Change: ______________________________

Reason for change: ______________________________

______________________________ ______________
MATTHEW SAMIDA DATE

UNSIGNED TRANSCRIPT

Upon completion of the foregoing transcript, the witness was notified it was ready for signature, but the deposition was not signed by the witness for the following reason:

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

BARBARA J. BUTLER & ASSOCIATES

--o0o--