UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNICE EVANS, individually and as Successor in Interest to Decedent ANGEL RAMOS; DANTE RAMOS, in his individual capacity; PHILLIP WILSON-VAUGHN, in his individual capacity; LEANN SANCHEZ, in her individual capacity; D.W., by and through his Guardian Ad Litem, CARITA WILSON; and ALICIA SADDLER, individually and as Guardian Ad Litem for minor G.W., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF VALLEJO; a municipal corporation; ZACK JACOBSEN, Police Officer for the City of Vallejo; and Does 1–50, individually and in their official capacities as Police Officers for the City of Vallejo, inclusive, <br><br> Defendants. | No. 2:17-cv-01619-TLN-AC <br><br> **ORDER** |

This matter is before the Court on Defendants City of Vallejo ("City") and Zack Jacobsen's ("Jacobsen") (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 38.) Plaintiff Annice Evans ("Plaintiff") opposes the motion. (ECF No. 43.) Defendants have filed a reply. (ECF No. 45.) For the reasons set forth below, Defendants' Motion for Summary Judgment (ECF No. 38) is DENIED in part and GRANTED in part.

1

### I. FACTUAL BACKGROUND[1]

This case arises from an officer-involved shooting that took place on January 23, 2017. (ECF No. 38-5 ¶ 1, Defendants' Statement of Undisputed Facts ("DUF").) The operative Complaint asserts causes of action for a violation of Angel Ramos's ("Ramos") rights under the Fourth Amendment, a violation of Plaintiff's familial rights under the Fourteenth Amendment, wrongful death under Cal. Civ. Proc. Code §§ 377.60 and 377.6, a violation of the Unruh Civil Rights Act against Jacobsen, and a *Monell* claim against the City. (*Id.* at ¶ 58.)

The parties state that at approximately 12:38 a.m., the Vallejo Police Department received multiple 911 calls reporting a group of individuals fighting and screaming at a residence. (*Id.* at ¶ 2.) Dispatch issued a priority one call and broadcasted "415 weapons; 415 fight; . . . sounds like a lot of people outside fighting, men and women, sounds like something is being hit with sticks." (*Id.* at ¶ 5.) Multiple Vallejo police officers responded to the area, including Jacobsen and Officer Samida ("Samida"). (*Id.* at ¶¶ 6–7.) As Jacobsen approached the residence, he heard yelling and screaming coming from inside. (*Id.* at ¶ 8.) Once at the residence, they saw several individuals on the second story balcony yelling and fighting. (*Id.* at ¶ 13.)

The parties dispute the interactions between the officers and the individuals before the shooting. According to Defendants, Jacobsen and Samida announced themselves as officers and gave multiple directions — including shining their flashlights at the balcony — to cease fighting. (*Id.* at ¶¶ 14–15.) Plaintiff disputes this and presents evidence that Wilson did not hear any commands or announcements by police officers prior to being tased. (ECF No. 43-1 ¶ 15, Plaintiff's Opposition to DUF.)

Defendants state that through the door from the kitchen leading to the balcony, Jacobsen saw Ramos holding a large knife at shoulder level. (DUF ¶ 17.) Plaintiff disputes this, pointing to testimony where Jacobsen described the man with the knife as a "black man wearing blue jeans." (ECF No. 43-1 ¶ 17.) Plaintiff states that Ramos was a "fair skinned Hispanic male and

---

[1] The background section provides a general overview of the action based on the evidence submitted by the parties, from which the Court largely finds there are no genuine disputed issues of material fact. The Court will note where a dispute exists.

2

1  was shirtless and only wearing boxer shorts." (*Id.*) Moreover, Plaintiff presents DeShon
2  Wilson's ("Wilson") testimony where Wilson stated that Dante Ramos, who is a foot shorter than
3  Ramos, was wearing blue jeans and had a knife in his hand while in the kitchen. (*Id.*)
4      Jacobsen maintains that Ramos appeared extremely angry and was being held back by
5  another individual. (*Id.* at ¶ 18.) At 12:42 a.m., Jacobsen broadcasted on the police radio that
6  there was a man armed with a knife fighting in the house. (*Id.* at ¶¶ 19–20.) Samida saw Wilson
7  instigating a fight with someone in the kitchen and raising his fists to his chest. (*Id.* at ¶ 26.)
8  Samida then fired a taser at Wilson, and Wilson fell to the ground of the balcony. (*Id.* at ¶¶ 27–
9  28.)
10      The parties dispute the series of events that occurred immediately prior to the shooting.
11 Defendants state that Ramos ran from the kitchen and placed his body on top of Wilson. (*Id.* at ¶
12 29.) Plaintiff, however, states that Ramos "came out of the house . . . [and] got over Wilson by
13 either kneeling over him . . . using his left hand to prop himself up." (ECF No. 43-1 ¶ 29.)
14 Defendants maintain that Jacobsen saw Ramos with a fist and the blade of a knife extending from
15 his pinkie while he was on top of Wilson. (DUF ¶ 31.) Plaintiff disputes this and presents
16 evidence from Samida, Officer Jeremy Callinan ("Callinan"), and Wilson's depositions that none
17 of these individuals saw a knife. (ECF No. 43-1 ¶ 31.) Jacobsen then fired four shots in quick
18 succession at Ramos, striking and killing him. (*Id.* at ¶ 32.) The first shot was fired 14.5 seconds
19 after Samida discharged his taser. (*Id.* ¶ 33.)
20      Callinan was on the scene and standing between 3 to 5 feet from Jacobsen at the time of
21 the shooting and stated that he believed Ramos to be holding a knife and stabbing Wilson. (*Id.* at
22 ¶¶ 36, 41) Callinan states he would have used his own handgun to shoot based on a perception of
23 an immediate threat to Wilson's life had Jacobsen not fired his weapon. (*Id.* at ¶¶ 37, 45, 46.)
24      Following the shooting, a large chef's knife was found in the kitchen sink and a steak
25 knife was found on the ground. (*Id.* at ¶¶ 51–52.) Ramos' DNA was found on both knives. (*Id.*
26 at ¶ 53.) Wilson later testified that Ramos was punching him and that he never saw a knife. (*Id.*
27 at ¶ 54.)
28 ///

3

On August 3, 2017, Plaintiff and seven other family members filed the present action asserting causes of action for wrongful death and survivorship. (*Id.* at ¶ 55.) The operative First Amended Complaint was filed on September 13, 2018, and Plaintiffs Wilson, Alicia Saddler, G.W., Dante Ramos, Darcel Lewis, Leann Sanchez, and Philip Wilson dismissed their claims. (*Id.* at ¶ 56.)[2] On March 2, 2019, Defendants filed the instant motion for summary judgment. (ECF No. 38.)

## II.    STANDARD OF LAW

The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* (*Matsushita*), 475 U.S. 574, 587 (1986). Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties, but not as to others." *Conte v. Jakks Pac., Inc.*, 981 F. Supp. 2d 895, 902 (E.D. Cal. 2013) (quoting *Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981)); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v. Comm'r Internal Revenue Serv.*, 878 F.2d 306, 309 (9th Cir. 1989). A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v. F.D.I.C.*, 977 F. Supp. 1051, 1055 (S.D. Cal. 1977).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett* (*Celotex*), 477 U.S. 317, 323 (1986). To carry its burden of

---

[2]    The parties further dispute the admissibility of statements by G.W. and Darcel Lewis. (ECF No. 43-1 ¶¶ 22–23.) Plaintiff argues the statements are inadmissible as hearsay. (*Id.*) The Court finds that Plaintiff has raised a dispute of material fact as to whether Ramos was holding a knife and declines to decide whether these statements are admissible.

production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.* (*Nissan Fire*), 210 F.3d 1099, 1102 (9th Cir. 2000). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102–03; *see Adickes*, 398 U.S. at 160. If, however, a moving party carries its burden of production, the burden then shifts to the nonmoving party to establish that a genuine issue as to any material fact actually does exist. *Matsushita*, 475 U.S. at 585–87.

In the endeavor to establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor but need only show the claimed factual dispute "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Anderson*, 477 U.S. at 252. Similarly, the nonmoving party may not merely rely upon the mere allegations or denials of its pleadings or "show that there is some metaphysical doubt as to the material facts," but must instead tender evidence of specific facts in the form of affidavits and/or admissible discovery material, in support of its contention that the dispute exists. *Matsushita*, 475 U.S. at 586; *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(c), (e)). Finally, the nonmoving party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence

of the nonmoving party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. Nevertheless, mere disagreement as to legal implications of the material facts does not bar summary judgment. *See Beard v. Banks*, 548 U.S. 521, 530 (2006). Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see also Celotex*, 477 U.S. at 322.

### III.   ANALYSIS

In their motion for summary judgment, Defendants argue: (1) Plaintiff lacks standing to assert a Fourth Amendment claim based on a violation of Ramos' rights; (2) Jacobsen's use of force was objectively reasonable under the circumstances; (3) Jacobsen is entitled to qualified immunity; (4) Jacobsen did not violate clearly established law; (5) Plaintiff's Fourteenth Amendment claim should be denied because Jacobsen's act to protect Wilson was not arbitrary or conscience shocking; (6) summary judgment should be granted as to the state law claims; and (7) summary judgment should be granted as to the City. (ECF No. 38.) The Court will address each argument in turn.

#### A.   Standing under the Fourth Amendment

Defendants argue Plaintiff is barred from bringing a 42 U.S.C. § 1983 claim based on the violation of Ramos's Fourth Amendment rights because she failed to meet the statutory requirements of filing an affidavit stating she is the successor-in-interest as required by California law to establish standing. (ECF No. 38 at 13.) Plaintiff argues that she has cured any procedural deficiencies and has filed the requisite affidavit. (ECF No. 43 at 2223.) Defendants state that Plaintiff's filing does not cure the defect as Cal. Civ. Proc. Code § 377.32(a) requires the affidavit to be filed prior to the commencement of the action. (ECF No. 45 at 9.)

"Section 1983 does not address survivor claims or any appropriate remedies." *Provencio v. Vazquez,* 2008 WL 3982063, at *11 (E.D. Cal. Aug. 18, 2008). "Fourth Amendment rights are

6

personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). Thus, the general rule is that only the person whose Fourth Amendment rights were violated can sue to vindicate those rights. *Smith v. City of Fontana*, 818 F.2d 1411, 1417 (9th Cir.1987). "In § 1983 actions, however, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action." *Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 369 (9th Cir. 1998) (citing 42 U.S.C. § 1988(a); *Smith*, 818 F.2d at 1416–17). The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action, and that the plaintiff meets that state's requirements for bringing a survival action. *Id.* (citing *Byrd v. Guess*, 137 F.3d 1126, 1131 (9th Cir.1998)). California law requires any person who seeks to commence or continue an action as a successor-in-interest pursuant to § 377.30 to execute and file an affidavit setting forth that person's qualifications as a successor. Cal. Civ. Proc. Code § 377.32.

While Plaintiff filed an affidavit in compliance with the requirements of § 377.32(a) on May 15, 2019 (*see* ECF No. 41), Defendants state this is insufficient because the affidavit was filed after the statute of limitations for the claims had passed (ECF No. 45 at 9). The Court disagrees. First, "[§] 377.32 makes no reference to cutting off or extinguishing [a] claim, contains no cutoff date, no start or end date, and in fact no date of any kind . . . . Indeed, [§] 377.32 does not indicate that it is a condition precedent to filing the lawsuit, only that the affidavit must be filed at some point." *Abrego v. City of Los Angeles*, No. CV-15-00039-BRO-JEMX, 2016 WL 9450679, at *5 (C.D. Cal. Sept. 23, 2016) (quoting *Gutierrez v. City of Woodland*, No. CIV. S–10–1142 LKK, 2012 WL 1640509 at *6 (E.D. Cal. May 9, 2012).

Plaintiff is not "barred by the limitations period from filing the required [§] 377.32 documents" because "the statute of limitations is tolled when a plaintiff files the suit, even where the suit may have been defective for failing to comply with § 377.32." *Id.* Here, Plaintiff filed the underlying causes of action on August 3, 2017, within the applicable statute of limitations. Because the § 377.32 affidavit requirement is not a condition precedent to Plaintiff's action, the Court finds that the action was properly brought within the required statute of limitations.

7

Further, the fact that the affidavit was filed on May 15, 2019 (arguably after the expiration of the statute of limitations of the underlying causes of action) does not prevent the Court from accepting Plaintiff's declaration because § 377.32 does not indicate an end date by which the affidavit must be filed. And even if the filing of a § 377.32 affidavit were subject to the statute of limitations, an objection on that basis is technical, rather than substantive. *See Parsons v. Tickner*, 31 Cal. App. 4th 1513, 1524 (1995) ("failure to file the affidavit could possibly subject the action to a plea in abatement"). "Dismissal of a claim on technical, § 377.32 grounds is disfavored." *Abrego*, 2016 WL 9450679, at *5. Thus, Plaintiff's affidavit is not time-barred and will be considered valid. Accordingly, Defendants' motion for summary judgment on this basis is DENIED.

B. <u>Excessive Force Claim</u>

Defendants argue that summary judgment should be granted on Plaintiff's claim for excessive force in violation of the Fourth Amendment because Jacobsen's use of deadly force was objectively reasonable given Jacobsen's belief that Ramos posed an imminent threat to Wilson's life. (ECF No. 38 at 14–18.) In opposition, Plaintiff argues that questions of material fact exist that preclude determination of whether Ramos posed an immediate threat to the safety of the officer or others. (ECF No. 43 at 13.)

When evaluating a Fourth Amendment claim of excessive force, a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Graham v. Connor*, 490 U.S. 386, 397 (1989). "[T]here are no per se rules in the Fourth Amendment excessive force context; rather, courts must still slosh [their] way through the factbound morass of reasonableness." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (internal quotation marks omitted). This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)); *Scott v. Harris*, 550 U.S. 372, 383 (2007). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly

8

evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

The Ninth Circuit has articulated a three-step approach to the *Graham* balancing test. *See Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). First, the district court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Id.* (internal quotation marks omitted). Second, the district court must "evaluate the government's interest in the use of force." *Id.* Finally, the district court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (internal quotation marks omitted).

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc).

The Court will address each of the *Graham* factors in turn.

                *i.*     *Severity of the Intrusion*

With respect to the first step, the severity of the intrusion, there is no dispute that Jacobsen used deadly force which resulted in Ramos' death. (DUF ¶ 32.) "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. Therefore, the Court proceeds to the second step of the Ninth Circuit framework.

                *ii.*     *Government's Interest in the Use of Force*

With respect to the second step, the "strength of the government's interest in the force used is evaluated by examining three primary factors: (1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Glenn*,

1  673 F.3d at 872 (quoting *Graham*, 490 U.S. at 396).  The "'most important' [of these factors] is
2  whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Mattos*,
3  661 F.3d at 441 (quoting *Smith*, 394 F.3d at 702).  "An officer's use of deadly force is reasonable
4  only if 'the officer has probable cause to believe that the suspect poses a significant threat of
5  death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th
6  Cir. 1994) (emphasis removed) (quoting *Garner*, 471 U.S. at 3).

7      The three primary factors for evaluating the second step of the *Graham* test, however, are
8  not exclusive.  *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (describing these as
9  the "core factors").  The Ninth Circuit has made clear that the district court must "examine the
10 totality of the circumstances and consider 'whatever specific factors may be appropriate in a
11 particular case, whether or not listed in *Graham*.'"  *Glenn*, 673 F.3d at 872.  Other relevant
12 factors may include the availability of less intrusive force, whether proper warnings were given,
13 and whether it should have been apparent to the officers that the subject of the force used was
14 mentally or emotionally disturbed.  *See, e.g.*, *id.* at 872; *Bryan*, 630 F.3d at 831; *Deorle v.*
15 *Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001).  With respect to the possibility of less
16 intrusive force, officers need not employ the least intrusive means available so long as they act
17 within a range of reasonable conduct.  *Scott*, 39 F.3d at 915.

18         a.   <u>Immediate Threat to the Safety of Officers or Others</u>

19     Defendants argue that Jacobsen believed there was an immediate threat to the safety of
20 Wilson's life.  (ECF No. 38 at 15.)  To support this belief, Defendants state that Jacobsen saw
21 Ramos with a knife in his hand and 10 to 12 seconds later, Jacobsen saw Ramos get on top of
22 Wilson with a knife in his hand and rapidly stab downward.  (*Id.*)  Plaintiff maintains that
23 disputes of material fact preclude the determination of whether Ramos posed an immediate threat
24 to the safety of the officers or others.  (ECF No. 43 at 13.)

25     The parties first dispute whether Jacobsen actually saw Ramos with a knife.  Defendants
26 state that "Jacobsen saw [] Ramos' hand clenched in a hammerfist with the blade of a knife
27 extending from his pinkie as Ramos quickly stabbed downward at [Wilson]."  (DUF ¶ 31.)
28 Plaintiff presents both Samida and Callinan's testimony stating they did not see anything in

1   Ramos' hand.  (ECF No. 43-1 ¶¶ 31–32.)  Further, Samida described Ramos' striking motion not
2   as "stabbing," but as "punching strikes with the knuckles."  (*Id.* at ¶ 32.)  Wilson himself testified
3   that "it was a fight between me and [Ramos]," and Ramos' own autopsy revealed a hand injury
4   consistent with knuckle punching.  (*Id.*)  Moreover, weapons were not observed at the scene
5   while emergency responders were providing medical care.  (*Id.*)

6   Plaintiff further points to Jacobsen's testimony that he "saw [] Ramos in the kitchen
7   holding a large knife at shoulder level."  (DUF ¶ 17.)  However, Jacobsen described the man with
8   the knife as a black man wearing blue jeans and wielding a knife in the kitchen.  (ECF No. 43-1 ¶
9   17.)  Ramos, however, is a fair-skinned Hispanic male and was wearing only boxing shorts.  (*Id.*)
10  Defendants, in their reply, admit that Jacobsen misidentified Ramos's race stating that Jacobsen
11  "did initially describe [] Ramos as a shirtless black man, rather than a shirtless Hispanic man."
12  (ECF No. 45 at 7.)  Defendants state that this misidentification is "insufficient to support an
13  inference that [] Jacobsen did not reasonably believe the individual in the kitchen with the knife
14  to be [] Ramos."  (*Id.*)

15  Defendants contend that Jacobsen's actions, including mistaking Ramos' race, were
16  reasonable and that "[i]t has been recognized that it is reasonable for an officer to move quickly
17  where delay would endanger lives, even where that results in mistakes being made."  (ECF No.
18  38 at 17 (quoting *City & Cnty. of S. F. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015).)  However,
19  "[w]here an officer's particular use of force is based on a mistake of fact, we ask whether a
20  reasonable officer would have or should have accurately perceived that fact."  *Torres v. City of*
21  *Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).  That is because "not all errors in perception . . .
22  are reasonable."  *Id.*  By his own testimony, Jacobsen first saw a black man in jeans with a knife,
23  and this was a predicate for fatally shooting a Hispanic man in boxers.  Whether this "mistake"
24  was reasonable is a question that must be resolved by a jury and cannot be disposed of on
25  summary judgment.

26  The undisputed facts are that Ramos and Wilson were engaged in an altercation where
27  Ramos was on top of Wilson.  Plaintiff has raised a genuine dispute as to whether it was
28  reasonable for Jacobsen to believe Ramos had a knife and was stabbing Wilson, and therefore,

whether it was reasonable for Jacobsen to believe that Ramos posed an immediate threat to officers or others. This question must be resolved by a jury.

As to the third *Graham* factor, in balancing the "unmatched" intrusion on Ramos against the government's need for that intrusion — and that the Court cannot find as a matter of law that Jacobsen's actions were reasonable under the circumstances — the Court finds this factor weighs against granting summary judgment.

Accordingly, the Court finds summary judgment on this claim must be DENIED.

### C. Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mueller v. Auker*, 700 F.3d 1180, 1185 (9th Cir. 2012) (*quoting Messerschmidt v. Millender*, 565 U.S. 535 (2012)) (internal quotation marks omitted); *see also Behrens v. Pelletier*, 516 U.S. 299, 311–12 (1996) (qualified immunity may provide immunity from certain claims and not reach all claims). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Qualified immunity is an affirmative defense; the burden of pleading it rests with the defendant. *Crawford-El v. Britton*, 523 U.S. 574, 586–87 (1998).

A qualified immunity analysis requires determining: (1) whether facts alleged, taken in the light most favorable to the injured party, show the defendants' conduct violated a constitutional right; and (2) whether the right was clearly established. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012) (*en banc*) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Defendants argue even if Jacobsen's conduct violated Ramos's Fourth Amendment rights, qualified immunity protects him from liability. (ECF No. 38 at 18–19.) The Court has

determined the record contains sufficient evidence to raise a triable issue as to whether Jacobsen's conduct constituted excessive force in violation of the Fourth Amendment. As such, "[s]ummary judgment in favor of the Defendants is improper because where there are factual disputes as to the parties' conduct or motives, qualified immunity cannot be resolved at summary judgment and the case must proceed to trial." *Beaver v. City of Fed. Way*, No. CV05-1938MJP, 2006 WL 3203729, at *3 (W.D. Wash. Nov. 3, 2006); *Liston v. Cnty. of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997) (finding summary judgment for defendants improper where a genuine issue of material fact prevents a determination of qualified immunity). Accordingly, summary judgment on the basis of qualified immunity is not appropriate, and Defendants' motion on this basis is DENIED.

### D. Fourteenth Amendment Claim

Defendants argue that summary judgment with respect to Plaintiff's Fourteenth Amendment claim should be granted because Jacobsen's actions were not "arbitrary" or "conscience shocking." (ECF No. 38 at 21.) Plaintiff states that Jacobsen's conduct shocks the conscience in violation of the Fourteenth Amendment. (ECF No. 43 at 17.)

"The [Ninth C]ircuit has recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Under the Fourteenth Amendment, "only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (citing *City of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998)). In assessing whether an officer's conduct shocks the conscience, the Court may consider whether the officer exhibited "deliberate indifference" or, when the situation is one that requires a snap judgment, whether the officer acted with a "purpose to harm" the decedent. *Rose v. Cnty. of Sacramento*, 163 F. Supp. 3d 787, 792 (E.D. Cal. 2016) (citing *Porter*, 546 F.3d at 1137–38). "[C]onduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *City of Sacramento*, 523 U.S. at 849.

Defendants argue the Court should apply the purpose to harm standard stating that Jacobsen was responding to an "immediate threat" to Wilson and fired his gun to protect him, and therefore, had no purpose to harm. (ECF No. 38 at 21–22.) Defendants contend that because

13

nothing in the record suggests Jacobsen fired his gun for any other reason, summary judgment on this claim is proper. (*Id.*)  Plaintiff states that "[o]ther police observed Ramos's conduct and stood near to Jacobsen and took action to use intermediate force. [] Jacobsen had the same opportunity to deliberate and determine that deadly force was not warranted" and "this conduct evinces a purpose to harm." (ECF No. 43 at 18.)

In assessing Plaintiff's claim, the Court must consider the totality of the facts in order to determine whether a Fourteenth Amendment violation has occurred. *Rose*, 163 F. Supp. 3d at 792 (citing *Isayeva v. Cnty. of Sacramento*, No. 2:13–CV–02015–KJM, 2015 WL 5544505, at *11 (E.D. Cal. Sept. 18, 2015)). Here, the Court finds a dispute of material fact as to whether Jacobsen had sufficient time to deliberate his actions with respect to Ramos.   The Court also finds a dispute of material fact as to whether Jacobsen's use of lethal force instead of intermediate force shocks the conscience. Defendants claim Jacobsen perceived an immediate threat (ECF No. 38 at 22), but Plaintiff points out that Samida was loading his Taser cartridge at the time Jacobsen fired his shot evidencing other officers' ability to deliberate and determine deadly force was unwarranted (ECF No. 43 at 18; ECF No. 43-1 ¶ 49).

The Court finds that the submitted evidence creates a genuine dispute about which standard of culpability should apply in this case. "By its nature, the determination of which situation [a defendant] actually found himself in is a question of fact for the jury, so long as there is sufficient evidence to support both standards." *Duenez v. City of Manteca*, No. CIV. S–11–1820 LKK, 2013 WL 6816375, at *14 (E.D. Cal. Dec. 23, 2013).  Moreover, because the parties differ so vastly in their recounting of the facts, the Court finds that there is a genuine dispute as to whether Jacobsen acted with either deliberate indifference or a purpose to harm.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's Fourteenth Amendment claim is DENIED.

    E. <u>State Law Claims</u>

Plaintiff asserts causes of action for wrongful death under Cal. Civ. Proc. Code §§ 377.60 and 377.61, and a violation of the Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1 ("Bane Act"). (DUF ¶ 58.) Defendants argue that claims of excessive force are analyzed under the

14

objective reasonable standard used in evaluating Fourth Amendment claims, and to the extent the Court finds Jacobsen's use of force reasonable, the Court must dismiss the state law claims. (ECF No. 38 at 22.) Because the Court finds the question of whether Jacobsen's actions were reasonable requires resolution by a jury, the Court finds Defendants' argument unpersuasive and denies summary judgment on this basis.

Defendants ask that if the Court denies summary judgment, to find partial summary judgment with respect to the Bane Act claim as Plaintiff has failed to demonstrate a specific intent to violate Ramos's rights. (ECF No. 38 at 22.) Plaintiff argues that the specific intent standard to an excessive force claim is whether there was just a "mere intention to use force that the jury finds unreasonable . . . ." (ECF No. 43 at 22 (citing *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018)).)

The Bane Act provides a private cause of action against anyone who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution or laws of the United States, or laws and rights secured by the Constitution or laws of California." Cal. Civ. Code § 52.1(a). However, "[e]vidence simply showing that an officer's conduct amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement under the Bane Act." *Losee v. City of Chico*, 738 F. App'x 398, 401 (9th Cir. 2018) (citing *Reese*, 888 F.3d at 1045). "Rather, [the plaintiff] must show that [the officer] 'intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances.'" *Id.* (quoting *Reese*, 888 F.3d at 1045).

The specific intent inquiry for a Bane Act claim is focused on two questions: first, "'[i]s the right at issue clearly delineated and plainly applicable under the circumstances of the case,' and second, '[d]id the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right?' So long as those two requirements are met, specific intent can be shown 'even if the defendant did not in fact recognize the unlawfulness of his act' but instead acted in 'reckless disregard' of the constitutional right." *Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018) (internal

citations omitted) (quoting *Cornell v. City & Cnty. of S. F.*, 17 Cal. App. 5th 766, 801–02 (2017)).

Plaintiff argues that "Jacobsen shot [] Ramos who was unarmed and engaged in a mutual fist fight with [] Wilson — someone whom the [officers] observed and determined to be the aggressor. [Jacobson] shot up into a crowded dimly lit balcony backed by an even more crowded house, where his view was obstructed by wooden slats and possibly a tree and fencing. Under these circumstances, a jury can easily determine that [Jacobson] acted with the specific intent to violate decedent's constitutional rights." (ECF No. 43 at 22.)

The Court agrees. A jury could reasonably find that Jacobsen acted in "reckless disregard" when he shot into the dimly lit balcony. Accordingly, summary judgment as to Plaintiff's state law claims is DENIED.

F. Section 1983 *Monell* Liability

Plaintiff seeks to impose liability on the City under 42 U.S.C. § 1983. Local governments are "persons" subject to liability under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A local government, however, cannot be held liable solely because it employs a tortfeasor on a theory of respondeat superior. *Id.* at 691. Rather, the local government "itself must cause the constitutional deprivation." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). Thus, to prevail on a § 1983 claim against a local government, a plaintiff must generally show that: (1) there was a violation of the plaintiff's constitutional rights; (2) the local government had a policy, procedure, or custom; (3) the policy, procedure, or custom amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) the policy, procedure, or custom was the moving force behind the constitutional violation. *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).

In moving for summary judgment, the City argues: (1) Plaintiff did not provide evidence that the City failed to train its employees; and (2) Plaintiff did not provide evidence that the City ratified Jacobsen's conduct as its own when it failed to discipline him. (ECF No. 38 at 24–25.)

*i. Failure to Train*

In *City of Canton v. Harris*, 489 U.S. 378, 379–80, 388 (1989), the Supreme Court held

16

1    that deliberately indifferent training may give rise to § 1983 municipal liability.  However, it
2    limited liability to instances "only where the failure to train amounts to deliberate indifference to
3    the rights of persons with whom the police come in contact," and that deliberate indifference was
4    the moving force of the violation of the plaintiff's federally protected right.  *Id.* at 388.
5    Therefore, "only where a municipality's failure to train its employees in a relevant respect
6    evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be
7    properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389.  To
8    succeed, the plaintiff must demonstrate specific training deficiencies and either: (1) a pattern of
9    constitutional violations of which policy-making officials can be charged with knowledge; or (2)
10   that training is obviously necessary to avoid constitutional violations, e.g., training on the
11   constitutional limits on a police officer's use of deadly force.  *Id.* at 390–91.

12            Plaintiff asserts that a jury could find that multiple prior instances of shooting non-
13   threatening suspects is evidence of the City's failure to train, though Plaintiff does not cite to any
14   specific instances.  (ECF No. 43 at 18.)  Defendants argue that Plaintiff has not "produced any
15   evidence whatsoever as to the training provided by Vallejo Police Department."  (ECF No. 45 at
16   8.)  Plaintiff does cite to its proffered expert report by Roger Clark from Police Procedures
17   Consultant, Inc. ("Clark"), stating that the Vallejo Police Department "through its chain of
18   command, appears to have endorsed [] dangerous and out-of-policy tactics that are connected to
19   this incident."  (ECF No. 43-9 at 10.)  Moreover, the report generally discusses the training of all
20   California officers, including the Vallejo Police Department.  (*Id.* at 9.)  Defendants fail to object
21   to this evidence or to respond in any capacity.  (*See* ECF No. 45.)

22            Whether a local government entity has displayed a policy of deliberate indifference is
23   generally a question of fact for the jury.  *Oviatt v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992);
24   *Wood v. Ostrander*, 879 F.2d 583, 588 n.4 (9th Cir. 1989), *cert. denied*, 498 U.S. 938 (1990).
25   However, if a plaintiff fails to introduce evidence from which a jury could infer deliberate
26   indifference, the case may be resolved summarily.  *See, e.g.*, *Mateyko v. Felix*, 924 F.2d 824, 826
27   (9th Cir. 1990), *cert. denied*, 502 U.S. 814 (1991) (testimony that officers received only three to
28   four hours of Taser gun training and lacked information as to the Taser's precise effect would at

best support a finding of mere negligence); *Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 771, 771 n.10 (9th Cir. 1989) (no evidence presented that county was aware of need to train officers regarding import of conflicting VIN numbers). In comparison, cases that have survived defense motions for summary disposition have involved training programs that were far below national standards, *Reed v. Hoy*, 909 F.2d 324, 331 (9th Cir. 1989), *cert. denied*, 501 U.S. 1250 (1991), or virtually nonexistent, *Davis v. Mason Cnty.*, 927 F.2d 1473, 1482–83 (9th Cir. 1991), *cert. denied*, 502 U.S. 899 (1991) (finding judgment for plaintiff as a matter of law).

Plaintiff has not provided any evidence other than Clark's singular broad statement ("appears to have") that the City failed to train its employees. Accordingly, Plaintiff has not provided any evidence that could cause a jury to infer deliberate indifference.

*ii. Ratification*

Plaintiff argues that the City has ratified Jacobsen's conduct by failing to discipline or terminate him, and further argues that Defendants have failed to provide any evidence otherwise. (ECF No. 43 at 19.) Defendants, in reply, argue that Plaintiff was required "to produce evidence from which a fact finder might conclude that authorized policymakers approved a subordinate's decision and the basis for it." (ECF No. 45 at 8 (citing *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).) Plaintiff presents testimony by Clark, who states that there is "no evidence that [] Jacobsen was either disciplined or at a minimum retrained in proper arrest methods, tactical deployments or use of force." (ECF No. 43-9 at 11.)

First, a single failure to discipline a subordinate is generally insufficient to demonstrate ratification. *See Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003) (citing *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989)) ("As we have indicated before, we cannot hold that the failure of a police department to discipline a specific instance is an adequate basis for municipal liability under *Monell*."). Second, there is no evidence that an authorized policymaker had knowledge of Jacobsen's conduct yet failed to discipline him. It is the policymaker's authority to make final decisions on behalf of a local government that makes his actions capable of imposing liability on it. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). The City is entitled to summary judgment on this matter.

Accordingly, Defendants' motion for summary judgment as to the *Monell* claim is GRANTED, and the City is dismissed from this action.

### IV.   CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Defendants' Motion for Summary Judgment (ECF No. 38) is GRANTED as to Plaintiff's *Monell* claim and the City is DISMISSED from this action;

2. Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's remaining claims; and

3. The parties are hereby ordered to file a Joint Status Report within thirty (30) days of the electronic filing date of this Order indicating their readiness to proceed to trial and proposing trial dates.

IT IS SO ORDERED.

**DATE:  December 8, 2021**

_____
Troy L. Nunley
United States District Judge